**MUSICK, PEELER & GARRETT LLP**
ATTORNEYS AT LAW
ONE WILSHIRE BOULEVARD, SUITE 2000
LOS ANGELES, CALIFORNIA 90017-3383
TELEPHONE: 213-629-7823
FACSIMILE 213-624-1376

Marc R. Greenberg (State Bar No. 123115)
m.greenberg@mpglaw.com

Attorneys for Plaintiff YIGUANG CHEN

FILED
CLERK, U.S. DISTRICT COURT

NOV 1 2 2014

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

CV14-08764 MWF(AGR)

YIGUANG CHEN, an individual,

        Plaintiff,

    vs.

USA GLOBAL DEVELOPMENT
COMPANY; AMERICAN LIFE, INC.;
THOMAS G. WILKINSON, in his
capacity as President of USA GLOBAL
DEVELOPMENT COMPANY;
JAMES STOUT, in his capacity as
Chairman and CEO of USA GLOBAL
DEVELOPMENT COMPANY; and
GRACE LIN, in her capacity as
Director of USA GLOBAL
DEVELOPMENT COMPANY,

        Defendants.

CASE No.

**COMPLAINT FOR FRAUD, NEGLIGENT MISREPRESENTATION, CONSTRUCTIVE FRAUD, CONVERSION OF MONEY, UNJUST ENRICHMENT, VIOLATION OF PENAL CODE § 496, BREACH OF CONTRACT, NEGLIGENCE, AND VIOLATION OF SECTION 10(b) OF THE SECURITIES AND EXCHANGE ACT RULE 10b-5**

**DEMAND FOR JURY TRIAL**

COMES NOW Plaintiff YIGUANG CHEN (hereinafter "Plaintiff") for his Complaint against Defendants, and each of them, states and alleges as follows:

## THE PARTIES

1.     Plaintiff is a citizen of China domiciled abroad.

2.     Defendant USA GLOBAL DEVELOPMENT COMPANY (hereinafter "USA GLOBAL") is a corporation incorporated under the laws of the State of

1    California, with its principal place of business in the State of California.

2         3.      Defendant AMERICAN LIFE, INC. (hereinafter "ALI") is a

3    corporation incorporated under the laws of the State of Washington, with its

4    principal place of business in the State of Washington.

5         4.      Defendant THOMAS G. WILKINSON (hereinafter "WILKINSON") is

6    a citizen of the State of California.  At all relevant times herein, WILKINSON is the

7    President of USA GLOBAL.

8         5.      JAMES STOUT (hereinafter "STOUT") is a citizen of the State of

9    California.  At all relevant times herein, STOUT is the Chairman and CEO of USA

10    GLOBAL.

11         6.      GRACE LIN (hereinafter "LIN") is a citizen of the State of California.

12    At all relevant times herein, LIN is the Director of USA GLOBAL.

13

14                         **ADDITIONAL PARTICIPANTS**

15         7.      AMERICAN LIFE DEVELOPMENT COMPANY, LLC (hereinafter

16    "ALDC") is a corporation incorporated under the laws of the State of Washington,

17    with its principal place of business in the State of Washington, of which USA

18    GLOBAL DEVELOPMENT COMPANY, AMERICAN LIFE, INC. and THOMAS

19    G. WILKINSON are the sole members.

20         8.      REMAR INVESTMENTS, LP is a limited partnership registered in the

21    State of Nevada, of which REMAR HOLDINGS, LLC is the general partner.

22    Daniel J Miller is listed as the manager for REMAR HOLDINGS, LLC.

23

24                         **JURISDICTION AND VENUE**

25         9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C.

26    § 1332(a)(1), in that the matter in controversy exceeds the sum of $75,000 exclusive

27    of interest and costs as between citizens of different states.

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW    920113.1

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated in this District.

## THE EB-5 EMPLOYMENT CREATION IMMIGRANT INVESTOR VISA

11.     Pursuant to § 203(b)(5) of the Immigration and Nationality Act (INA) (8 U.S.C. § 1153(b)(5)) ("hereinafter "EB-5 VISA"), the United States annually allocates 10,000 immigrant visas to qualified immigrants seeking to enter the United States for the purpose of engaging in a new commercial enterprise which will benefit the United States economy and create full-time employment for not fewer than 10 United States citizens or aliens lawfully admitted for permanent residence or other immigrants lawfully authorized to be employed in the United States. Ordinarily, the minimum amount of capital required for the investment is $1,000,000.   However, where qualified immigrants invest in a new commercial enterprise which will create employment in a "targeted employment area", the minimum capital contribution is reduced to not less than $500,000.

12.     8 U.S.C. § 1153(d) provides that a spouse or child under 21 years of age, if not otherwise entitled to an immigrant status and the immediate issuance of a visa, be entitled to the same status, and the same order of consideration, if accompanying or following to join the spouse or parent.

13.     Pursuant to the EB-5 VISA program, there are two ways to qualify for an EB-5 VISA: (1) The Standalone EB-5 Visa program, which requires the creation of 10 jobs **directly** in the commercial enterprise, and a $1 million investment (reduced to $500,000 if the project is located in a "targeted employment area"), or (2) The EB-5 Regional Center Pilot Program, which requires the creation of 10 jobs **directly** or **indirectly**, and a $1 million investment (reduced to $500,000 if the

1  project is located in a "targeted employment area") within a Designated Regional
2  Center.

3      14.    EB-5 Regional Center Pilot Program ("Pilot Program"), the second
4  program to qualify for an EB-5 VISA, was implemented on October 6, 1992. The
5  Pilot Program was not created to run indefinitely and had an expiration date ("sunset
6  date") upon which the program would conclude. The Pilot Program was briefly
7  suspended between 1998 and 2003 to correct flaws in the program. However, on
8  September 30, 2003, the Pilot Program was extended for another 5 years until the
9  "sunset" date of September 30, 2008. Thereafter, the Pilot Program was extended
10 for additional 6 month periods until March 6, 2009, then until September 30, 2009.
11 It was not until October 1, 2009, the day after the September 30, 2009 sunset date,
12 that the Pilot Program was extended for an additional 30 days until October 31,
13 2009. The Pilot Program has subsequently been extended.

14     15.    The majority of EB-5 VISAs are administered through EB-5 regional
15 centers, which are entities that pool investments and are authorized to develop
16 projects across a large swath of the United States' metropolitan regions and rural
17 areas. The U.S. Citizenship and Immigration Services (USCIS) must approve the
18 designation of Regional Center for it to qualify under the Pilot Program.

19     16.    While Immigrants seeking to obtain EB-5 VISAs bear the burden of
20 compliance with program requirements, they themselves have little control over the
21 investment process.

22
23                         **THE INVESTMENT SCHEME**
24     17.    ALDC, ALI, USA GLOBAL, WILKINSON, STOUT and LIN
25 (collectively "GROUP") perpetuated an investment scheme to exploit a federal visa
26 program as a means to defraud investors seeking a legal path to U.S. Residency and
27 strong investment returns.

28

18.     Using the lure of gaining a pathway to U.S. Citizenship through the EB-5 VISA Program, the GROUP targeted Plaintiff in a scheme to sell securities interest in a Limited Partnership (the Hacienda de Caballo, LP described below) in order to finance and build a horse training and boarding facility, residential lots, and a resort spa and corporate retreat.

19.     The GROUP used false and misleading information to solicit Plaintiff in the purported project to pay a $500,000 investment and $25,000 "administrative fee" in order to defraud him and misappropriate his investment funds.

## PLAINTIFF'S EFFORTS TO PROCURE AN EB-5 VISA BY INVESTING IN THE HACIENDA DE CABALLO PROJECT

20.     In 2009, Plaintiff sought to obtain United States immigration visas for himself, his wife and his daughter through the EB-5 VISA program.

21.     ALDC, ALI, and USA GLOBAL manage real estate investments for federally approved EB-5 VISA regional centers.

22.     On behalf of the GROUP, WILKINSON and LIN presented to Plaintiff via U.S. Mail and electronic mail five to six prospectuses for Plaintiff to invest in to qualify for the EB-5 VISA.

23.     As set forth in greater detail below, the prospectus on a project for a property called Hacienda de Caballo was selected for Plaintiff to invest in, as it was the only prospectus that would create "direct" jobs. The other prospectuses created only "indirect" jobs for Regional Centers. However, the Pilot Program sunset date was September 30, 2009 and there were no assurances that it would be extended again to ensure continuation of the program. In addition, since Plaintiff's daughter's twenty-first birthday was at the end of September 2009, it was essential that Plaintiff invest in a program prior to her birthday that would ensure his daughter would qualify for the EB-5 VISA with Plaintiff's single investment of $500,000. Otherwise, an investment after September 2009 would not have qualified Plaintiff's

1    daughter for the EB-5 VISA under Plaintiff's single investment of $500,000.

2        24.    On or about March 2009, on behalf of the GROUP, WILKINSON and

3    LIN presented a "Business Plan" called "Hacienda de Caballo" to Plaintiff via U.S.

4    Mail and electronic mail to be an investor for an EB-5 VISA in conjunction with the

5    development of 274 acres of raw land near the Cleveland National Forest into a five-

6    star, one thousand stall horse training and boarding facility and the improvement

7    and sale of 30 high end residential lots ranging in size from 2 to 10 acres.  The plan

8    included the intent to sell a portion of the acquired property designated as the resort

9    spa and corporate retreat site to an operator for construction and operation, while

10   allowing the investor partners to maintain credits for job creation as part of the

11   requirement for the EB-5 VISA program.    (Hereinafter "Hacienda de Caballo

12   Project").  Certain documents also refer to Hacienda de Caballo as the "PUMA Area

13   Regional Center".  A true and correct copy of the Business Plan is attached hereto as

14   Exhibit "A".

15       25.    Set forth below are photos from the Business Plan representing how the

16   facility was represented to Plaintiff to look.





26.   Below is one of the brochures used by the GROUP to pitch investors including Plaintiff, seeking to obtain U.S. Citizenship through the EB-5 VISA Program.



27.   The GROUP's presentation to Plaintiff of the "Business Plan" also included marketing materials with brochures, presentations, reports, maps, Pro Forma of the anticipated revenues, expenses, costs, capital, distributions, etc. and other supporting documentation to pitch Plaintiff to invest in the Hacienda de Caballo Project.

28.   The Limited Partnership acquiring the property for development described in paragraph 14 is "Hacienda de Caballo, LP", a Delaware Limited

1  Partnership formed on February 21, 2008.

2      29.    The Business Plan was directed specifically to take advantage of
3  "Foreign Investors who wish to become U.S. Permanent Residents ('Green Card')
4  holders [who] are required to file an application with U.S. Citizenship and
5  Immigration Services (USCIS) in which it must be shown that each investment of
6  $500,000 will create 10 new jobs." (Exhibit "A", page 7).

7      30.    The Business Plan proposed to "board a sufficient number of horses to
8  create 10 new jobs for each investment of $500,000 within the time period to
9  comply with USCIS regulations.   Investors are required to submit their I-829
10 applications between 21-24 months from the date their temporary Green Card has
11 been issued." (Exhibit "A", page 8).

12     31.    The Business Plan further stated that the Initial Offering of "[u]p to
13 Three and One-Half Million Dollars ($3,500,000) will be raised through a
14 Regulation D Exempt Private Offering … targeting accredited investors seeking to
15 obtain Green Cards pursuant to the United States Citizenship Immigration Services'
16 ('USCIS') Direct Employment EB-5 Program …" (Exhibit "A", page 8).

17     32.    The Business Plan provided that "Investors in the Initial Offering will
18 receive 100% ownership in the Partnership (as Limited Partners) and a 35% Profit
19 Interest, or 5% per $500,000 investment, with a commitment from the General
20 Partners that they will subordinate their Profit Interests until each Investor receives a
21 5% annualized return on his or her investment. (Exhibit "A", page 9).

22     33.    The Pro Forma presented by the GROUP to Plaintiff in conjunction
23 with the Business Plan reflected expected investments of $3,500,000 with expected
24 land costs of $3,000,000. The Pro Forma anticipated returns to the Limited Partners
25 of 1.8% in 2009, 6.0% in 2010, 14.9% in 2011, and 8.4% from 2012-2014.

26     34.    The Business Plan further stated that a Secondary Offering of Forty
27 Million Dollars "will be raised through a Regulation D Exempt Private Offering,
28 targeting accredited investors seeking Green Cards pursuant to the USCIS Regional

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1                                        8

1 Center Program or from private USA Investors ... or through bank loans."
2 (Exhibit "A", page 9).

3        35.    The Secondary Offering was to be undertaken by ALDC whose
4 members consist of USA GLOBAL and ALI, "the most prominent EB-5 Developers
5 in America." (Exhibit "A", page 9).

6        36.    The Business Plan also stated that "Each Investor is required to retain
7 his or her own independent counsel.  The global immigration law firm of Fragomen,
8 Del Rey, Bernsen & Loewy LLP ('Fragomen') will be filing the immigration cases
9 on behalf of the Investors to ensure consistency and compliance with the law.
10 Fragomen will work in cooperation with [each Investor's] legal counsel." (Exhibit
11 "A", page 7).

12        37.    The Business Plan provided that, while there are no assurances that
13 Investors will be successful in obtaining Green Cards, "if an Investor is denied a
14 Green Card due to our failure to prepare and submit proper documentation to
15 USCIS, the Partnership has agreed to refund the Investor's $500,000 Investment."
16 (Exhibit "A", page 7).

17        38.    The Business Plan included letters from California Governor
18 Schwarzenegger and the State of California Business, Transportation and Housing
19 Agency which designated the Hacienda de Caballo Project as a "targeted
20 employment area" as defined under section 203(b)(5) of the Immigration and
21 Nationality Act.

22        39.    Since the Hacienda de Caballo Project was designated within a
23 "targeted employment area", the minimum capital investment required for qualified
24 immigrant investors for an EB-5 VISA is reduced to $500,000.

25        40.    The GROUP also presented Plaintiff with a copy of The Revised and
26 Restated Limited Partnership Agreement for Hacienda de Caballo, LP which was
27 executed on March 1, 2009 and named USA GLOBAL as the General Partner
28 (hereinafter "Agreement").  A true and correct copy of the Agreement is attached

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1

1   hereto as Exhibit "B".

2        41.   The Agreement provided for the prospective Limited Partners, such as

3   Plaintiff, to invest $550,000.00 in the Partnership, consisting of a capital

4   contribution of $500,000, an administrative fee of $25,000, and a brokerage fee of

5   $25,000. (Exhibit "B", page 6).

6        42.   The Agreement stated that the "Partnership is formed for the object and

7   purpose of acquiring the commercial and residential real property commonly known

8   as Hacienda de Caballo, and owning, developing, operating, improving, financing,

9   refinancing, managing and disposing of Partnership real or personal property,

10   sharing the profits and losses there from and engaging in such activities necessary,

11   incidental or ancillary thereto and to engage in any other lawful act or activity for

12   which limited partnerships may be formed under the Act in furtherance of the

13   foregoing." (Exhibit "B", ¶ 2.5).

14        43.   The terms of the Agreement provided that the Partnership may execute,

15   deliver and perform "Subscription Agreements" with any Limited Partner or

16   prospective Limited Partner. (Exhibit "B", ¶ 3.1(a)).

17        44.   Based upon the Business Plan, supporting documents, negotiations and

18   representations by the GROUP, Plaintiff entered into a Subscription Agreement with

19   Hacienda de Caballo LP to become an Investor in the Hacienda de Caballo Project

20   in order to secure an EB-5 VISA for himself, his wife and daughter.  Plaintiff

21   traveled from China to the United States in order to execute the Subscription

22   Agreement.

23        45.   Accordingly, a Subscription Agreement was concurrently entered into

24   between Plaintiff, USA GLOBAL and WILKINSON at the time the parties entered

25   into the Agreement. ("Subscription Agreement").  A true and correct copy of the

26   Subscription Agreement is attached hereto as Exhibit "C".

27        46.   The Subscription Agreement requires Plaintiff to "(i) pay to the

28   Partnership the Purchase Price [$525,000] and (ii) execute and deliver to the

1  Partnership the Joinder to the Limited Partnership Agreement." (Exhibit "C", ¶ 2).

2       47.    The Subscription Agreement provided that "[T]he investment in the
3  Partnership by Subscriber is not dependent or conditioned upon success by any
4  subscriber in achieving lawful conditional or unconditional permanent residency in
5  the United States; **provided, however that the Partnership covenants and agrees**
6  **to provide at least ten (10) full time jobs at its facilities on the Property at the**
7  **time necessary for Subscriber's timely application for removal of conditional**
8  **residence status, for support of Subscriber's I-526 or I-829 petition**." (Exhibit
9  "C", ¶ 9(g), emphasis added).

10      48.    The Subscription Agreement further provided that "If the Partnership
11  does not fulfill its contractual duty regarding provision of jobs on or before the time
12  necessary for Subscriber's timely application for removal of conditional residence
13  status, or if Subscriber's I-526 or I-829 petition is denied solely by reason of failure
14  of the Partnership to supply reasonable documentation and information to
15  Subscriber or Subscriber's legal counsel for Subscriber's I-526 or I-829 petition,
16  then the parties agree that Subscriber will suffer damages in an amount that cannot
17  be readily ascertained.  Subscriber and the Partnership agree that if the Partnership
18  (1) breaches either of (i) its covenant and agreement to provide jobs on or before the
19  time necessary for Subscriber's timely application for removal of conditional
20  residence status or (ii) its covenant and agreement to supply reasonable
21  documentation and information to Subscriber or Subscriber's independent counsel
22  for Subscriber's I-526 or I-829 petition or (2) breaches both of such covenants, then
23  the Partnership shall pay to Subscriber liquidated damages equal to and limited to
24  US$500,000.00." (Exhibit "C", ¶ 9(g)).

25      49.    In accordance with the requirements of the Agreement, Subscription
26  Agreement, and the representations made by the GROUP, Plaintiff invested
27  $525,000.00 ("Plaintiff's Investment").   Pursuant to instructions made by the
28  GROUP, Plaintiff wired Plaintiff's Investment to Hacienda de Caballo.

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

50.     As a result of Plaintiff's Investment, Plaintiff and his family received a conditional residency in the United States.  In order to remove the condition for their residency, 10 direct jobs must be directly created as a result of Plaintiff's Investment in the commercial enterprise.

51.     The Hacienda de Caballo Project was designated as a "regional center" for purposes of the EB-5 VISA program at the time of Plaintiff's Investment. However, Plaintiff's Investment was for **direct** job creation and not **indirect** job creation because the Pilot Program's sunset date was on September 30, 2009 and it was unknown if the Pilot Program would be extended again so that an investment by Plaintiff would qualify him and his family for the EB-5 VISA.

52.     On January 27, 2010, Hacienda de Caballo, LP closed escrow on a parcel of property in Riverside County, Assessor's Parcel Number ("APN") 385-260-009-5 ("Hacienda Property").  The Hacienda Property contained 107.06 acres of land.  The purchase price of the Hacienda Property totaled $1,027,776.00.

## THE HACIENDA DE CABALLO PROJECT WAS NEVER EXECUTED

53.     Following Plaintiff's Investment, the GROUP failed to execute the Business Plan.

54.     The Hacienda Property remains barren undeveloped land to this day.

55.     On April 15, 2014, Plaintiff requested a progress report concerning the Hacienda de Caballo Project.

56.     On April 29, 2014, Plaintiff received correspondence from WILKINSON on behalf of Hacienda de Caballo, LP stating that **"as a result of generating substantial and continued losses in the operation of Hacienda de Caballo we have been forced to discontinue all horse boarding activities.  We will therefore be unable to prove-up any direct jobs for [Plaintiff's] I-829 Filing. [¶]  We fully understand the hardship this places on [Plaintiff] and are doing everything in our power to dispose of Hacienda at a price which will**

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

allow [Plaintiff] to recover his investment and thereby allow him to invest in another EB5 Program."

57.     Plaintiff is unaware of any foreign investor of the Hacienda de Caballo Project other than himself, and is unaware of any other foreign investors that became a limited partner of the Hacienda de Caballo, LP.

58.     On information and belief, the GROUP never acted in good faith to secure any other foreign investors to reach the $3,500,000 for the Initial Offering.

59.     The 2012 Partnership Income tax return for Hacienda de Caballo, LP lists USA GLOBAL, WILKINSON and Plaintiff as the only partners.  USA GLOBAL is listed as having a 92.857 share, WILKINSON with a 0.000 share, and Plaintiff with a 7.143 share.

60.     The 2013 Schedule K-1 Partner's Share of Income, Deductions, Credits, etc. reflects that Plaintiff's share of the Hacienda de Caballo, LP remained at 7.143.

61.     The April 29, 2014 Trial Balance for Hacienda de Caballo, LP shows that other than contributions from USA GLOBAL and Remar Investments, LP (a mortgage lender), Plaintiff is the only individual and only foreign investor who made a capital contribution to the Hacienda de Caballo Project.

## THE GROUP NEVER INTENDED TO EXECUTE
## THE HACIENDA DE CABALLO PROJECT

62.     On information and belief, the GROUP presented the Business Plan to Plaintiff in order to unlawfully and improperly take Plaintiff's Investment for their benefit.

63.     On information and belief, the GROUP never had the intention or ability to execute the Business Plan.

64.     On information and belief, the GROUP accepted Plaintiff's Investment knowing they were not going to execute the Business Plan.

65.   On information and belief, the GROUP unlawfully cashed and retained Plaintiff's Investment without making any effort to create the 10 jobs necessary to remove the condition on Plaintiff and his family's residency in satisfaction of the EB-5 VISA requirements.

66.   Based on the GROUP's failure to execute the Business Plan and create the 10 jobs, Plaintiff was unable to obtain an EB-5 VISA.

67.   At the time Plaintiff sought conditional residency under his application for an EB-5 VISA through investment in the Hacienda de Caballo Project, his daughter was under the age of 21.

68.   The GROUP was aware that Plaintiff's daughter was nearing the age of 21 at the time Plaintiff was investing in the Hacienda de Caballo Project.  In fact, the reason the Hacienda de Caballo Project was selected for Plaintiff's Investment was to ensure Plaintiff's daughter would timely qualify for the EB-5 VISA under Plaintiff's Investment.  Among the projects offered to Plaintiff for his investment, the Hacienda de Caballo Project was presented as the only project that would create **direct** jobs in order to secure an EB-5 VISA for Plaintiff, his wife and daughter.

69.   Had 10 jobs been directly created as a result of Plaintiff's Investment, the condition of Plaintiff and his family's residency would have been lifted and Plaintiff's daughter would have been entitled to the same immigrant status and immediate issuance of a visa pursuant to 8 U.S.C. § 1153(d).

70.   At present, Plaintiff's daughter is over the age of 21.   Accordingly, Plaintiff's daughter is no longer entitled to the same immigrant status and immediate issuance of a visa pursuant to 8 U.S.C. § 1153(d).

71.   As a result of the GROUP's failure to execute the Business Plan, the condition on Plaintiff and his family's residency will not be lifted.  Furthermore, Plaintiff's daughter will lose the opportunity to obtain another conditional residency with her father assuming he re-applies for a new conditional residency.

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1

14

72.   Now, if Plaintiff attempts to secure an EB-5 VISA through an investment with a new program or company, Plaintiff will have to invest $1,000,000 instead of $500,000 in order to entitle him, his wife and daughter to a new conditional residency.

73.   As a result of the GROUP's failure to execute the Business Plan, Plaintiff not only lost his investment of $525,000 but also lost future profits and earnings he expected to gain from the Hacienda de Caballo Project.

## STATUS OF THE HACIENDA PROPERTY

74.   On February 15, 2012, Hacienda de Caballo, LP took a $300,000 Mortgage against the Hacienda Property from Remar Investments, LP.

75.   On information and belief, Hacienda de Caballo is attempting to sell the Hacienda Property.

## FIRST CAUSE OF ACTION
### (FRAUD – All Defendants)

76.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 75 above.

77.   On information and belief, Plaintiff alleges that the GROUP provided Plaintiff with the Business Plan to induce Plaintiff to invest $525,000 to qualify for an EB-5 VISA for himself, his wife and daughter, when the GROUP did not intend to execute the Business Plan and intended to unlawfully and improperly take Plaintiff's Investment for their benefit.

78.   On information and belief, Plaintiff alleges that the GROUP never intended to attempt to secure any other Immigrant Investor seeking an EB-5 VISA for investment in the Hacienda de Caballo Project.

79.   On information and belief, Plaintiff alleges that the GROUP continued to misrepresent and fail to disclose to Plaintiff that they did not intend to execute the

1  Business Plan and intended to unlawfully and improperly take Plaintiff's Investment
2  for their benefit and have Plaintiff sign the Subscription Agreement.

3      80.    On information and belief, Plaintiff alleges that the GROUP made the
4  foregoing misrepresentations and concealments knowing them to be false.  The
5  GROUP knew that they were never going to execute the Business Plan, knew that
6  Plaintiff was investing in the Hacienda de Caballo Project with the intention of
7  qualifying for an EB-5 VISA, knew that they were never going to create 10 jobs in
8  order for Plaintiff to qualify for the EB-5 VISA, accepted Plaintiff's Investment
9  knowing they were not going to execute the Business Plan, knew they kept
10  Plaintiff's Investment for their benefit, and knew that Plaintiff's Investment should
11  be returned to Plaintiff.

12      81.    On information and belief, Plaintiff alleges that the GROUP intended
13  that Plaintiff rely on the foregoing misrepresentations and concealments so that
14  Plaintiff would sign the Subscription Agreement and pay the GROUP his
15  investment of $525,000.

16      82.    On information and belief, Plaintiff alleges that he actually and
17  justifiably relied on the GROUP's misrepresentations and concealments because
18  Plaintiff signed the Subscription Agreement and paid $525,000 to the GROUP with
19  the belief that his investment would result in 10 jobs from the Hacienda de Caballo
20  Project which would qualify him, his wife and his daughter for an EB-5 VISA.

21      83.    On information and belief, Plaintiff alleges that, as a proximate result
22  of the GROUP's misrepresentations and concealments, Plaintiff suffered damages in
23  the amount of approximately $525,000 for Plaintiff's Investment, another $525,000
24  for the additional investment that Plaintiff must now make to qualify his daughter
25  for an EB-5 VISA now that she is over the age of 21 years, lost profits and earnings
26  from the Hacienda de Caballo Project that Plaintiff would have earned had the
27  Business Plan been executed, plus prejudgment interest at the annual legal rate of
28  10% until paid in full, cost of suit and attorneys fees.

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

84.     On information and belief, Plaintiff alleges that the GROUP's actions were undertaken with the intent to defraud, which thereby justifies an award for punitive damages in an amount according to proof at trial.

## SECOND CAUSE OF ACTION

### (NEGLIGENT MISREPRESENTATION – All Defendants)

85.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 84 above.

86.     On information and belief, Plaintiff alleges that the GROUP made the foregoing misrepresentations and concealments without having a reasonable ground for believing them to be true.  The GROUP did not have reasonable grounds to present Plaintiff with the Business Plan that was not likely to be executed, did not have reasonable grounds to believe that 10 jobs would be created by the Hacienda de Caballo Project in order to qualify Plaintiff for permanent residency, did not have reasonable grounds to believe that Plaintiff, his wife and daughter would qualify for an EB-5 VISA, did not have reasonable grounds to believe they would secure additional immigrant investors seeking to qualify for an EB-5 VISA, did not have reasonable grounds to cash or retain Plaintiff's Investment, did not have reasonable grounds to represent expected profits and earnings from the Hacienda de Caballo Project, did not have reasonable grounds to believe that they should retain Plaintiff's Investment, did not have reasonable grounds to believe that Plaintiff's investment should not be returned to Plaintiff.

87.     On information and belief, Plaintiff alleges that the GROUP intended that Plaintiff rely on the foregoing misrepresentations and/or concealments concerning the Business Plan for the Hacienda de Caballo Project in order for Plaintiff to sign the Subscription Agreement and pay the GROUP his investment of $525,000 so that the GROUP could unlawfully and improperly cash and retain Plaintiff's Investment for their benefit.

88.     On information and belief, Plaintiff alleges that he actually and justifiably relied on the GROUP's misrepresentations and concealments because Plaintiff signed the Subscription Agreement and paid $525,000 to the GROUP with the belief that his investment would result in 10 jobs from the Hacienda de Caballo Project which would qualify him, his wife and his daughter for an EB-5 VISA.

89.     On information and belief, Plaintiff alleges that as a proximate result of the GROUP's misrepresentations and concealments, Plaintiff suffered damages in the amount of approximately $525,000 for Plaintiff's Investment, another $525,000 for the additional investment that Plaintiff must now make to qualify his daughter for an EB-5 VISA now that she is over the age of 21 years, lost profits and earnings from the Hacienda de Caballo Project that Plaintiff would have earned had the Business Plan been executed, plus prejudgment interest at the annual legal rate of 10% until paid in full, cost of suit and attorneys fees.

90.     On information and belief, Plaintiff alleges that the GROUP's actions were undertaken with the intent to defraud, which thereby justifies an award for punitive damages in an amount according to proof at trial.

## THIRD CAUSE OF ACTION

### (CONSTRUCTIVE FRAUD – All Defendants)

91.     Plaintiff realleges and incorporates by reference Paragraphs 1 through 90 above.

92.     At all relevant times, there existed between Plaintiff and the GROUP, and each of them, a fiduciary and/or confidential relationship upon which Plaintiff relied to his detriment.

93.     A fiduciary and/or confidential relationship between Plaintiff and the GROUP formed when the GROUP presented Plaintiff with the Business Plan, supporting documents, negotiations and representations concerning the Hacienda de Caballo Project.

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1

18

94.    A fiduciary and/or confidential relationship between Plaintiff and the GROUP formed when Plaintiff entered into a Subscription Agreement with Hacienda de Caballo LP to become an Investor in the Hacienda de Caballo Project.

95.    By virtue of the relationship between Plaintiff and the GROUP, and each of them, a fiduciary duty and expectation of trust and confidence existed that the GROUP would execute the Business Plan as presented and create the 10 jobs necessary to qualify Plaintiff, his wife and his daughter for permanent residency.

96.    By virtue of the relationship between Plaintiff and the GROUP, and each of them, a fiduciary duty and expectation of trust and confidence existed that the GROUP would utilize Plaintiff's Investment of $525,000 to execute the Business Plan.

97.    Plaintiff had trust and confidence in the GROUP, and believed in and relied on their honesty, fairness good faith and superior knowledge, believed their representations to be true, relied on them to utilize Plaintiff's Investment of $525,000 to execute the Business Plan to create the 10 jobs necessary to qualify Plaintiff, his wife and his daughter for an EB-5 VISA.

98.    Pursuant to the duties owed by the GROUP, the GROUP owed the utmost good faith and fairness to Plaintiff in all matters pertaining to the GROUP's conduct with respect to Plaintiff's Investment of $525,000 to execute the Business Plan.

99.    The GROUP accepted the reliance of Plaintiff on the fiduciary relationship and accepted Plaintiff's expectation of trust and confidence in the GROUP.

100.    The GROUP breached the aforesaid duties as alleged herein and, in doing so, gained advantage over Plaintiff in matters relating to the execution of the Business Plan and use of Plaintiff's Investment of $525,000.

101.    In breaching the aforesaid duties as alleged herein, the GROUP is required to return Plaintiff's Investment of $525,000, Plaintiff is entitled to an

1  additional $525,000 he must now invest in another EB-5 Regional Center Program

2  for his daughter, now that she is over the age of 21, and Plaintiff is entitled to

3  interest on such amounts.

4        102.   In breaching the aforesaid duties as alleged herein, the GROUP is

5  guilty of fraud, malice and oppression, and acted in conscious disregard of

6  Plaintiff's rights, entitling Plaintiff to recovery of exemplary and punitive damages

7  according to proof at time of trial.

8                      **FOURTH CAUSE OF ACTION**

9                **(CONVERSION OF MONEY – All Defendants)**

10       103.   Plaintiff realleges and incorporates by reference Paragraphs 1 through

11  102 above.

12       104.   Plaintiff is the rightful owner of Plaintiff's Investment of $525,000

13  unlawfully cashed and retained by the GROUP.

14       105.   On information and belief, Plaintiff alleges that the GROUP

15  participated in a fraudulent scheme with each other to divert approximately

16  $525,000 from Plaintiff to themselves.

17       106.   On information and belief, Plaintiff alleges that the GROUP knew that

18  the $525,000 they diverted to themselves from Plaintiff did not belong to them and

19  was not earned by them.

20       107.   On information and belief, Plaintiff alleges that despite the foregoing,

21  the GROUP cashed and retained Plaintiff's Investment of $525,000, which they

22  fraudulently induced Plaintiff to pay by presenting the Business Plan to Plaintiff

23  knowing they were never going to execute it, knowing that Plaintiff was investing in

24  the Hacienda de Caballo Project with the intention of qualifying for an EB-5 VISA,

25  knowing that they were never going to create 10 jobs in order for Plaintiff to qualify

26  for the EB-5 VISA, knowing they were keeping Plaintiff's Investment for their

27  benefit, and knowing that Plaintiff's Investment should be returned to Plaintiff.

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1

108.   On information and belief, Plaintiff alleges that as a proximate result of the GROUP's conversion of Plaintiff's Investment of $525,000, Plaintiff suffered damages in the amount of $525,000 plus prejudgment interest at the annual legal rate of 10% until paid in full, cost of suit and attorney's fees.

109.   On information and belief, Plaintiff alleges that the GROUP's actions were undertaken with the intent to defraud, which thereby justifies an award for punitive damages in an amount according to proof at trial.

## FIFTH CAUSE OF ACTION

### (UNJUST ENRICHMENT – All Defendants)

110.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 109 above.

111.   On information and belief, Plaintiff alleges that the GROUP provided Plaintiff with the Business Plan to induce Plaintiff to invest $525,000 to qualify for an EB-5 VISA for himself, his wife and daughter, when the GROUP did not intend to execute the Business Plan and intended to unlawfully and improperly take Plaintiff's Investment for their benefit.

112.   On information and belief, the GROUP unlawfully cashed and retained Plaintiff's Investment which did not belong to them and were not earned by them.

113.   On information and belief, the GROUP unjustly cashed and retained Plaintiff's Investment since Plaintiff made such Investment based upon the Business Plan the GROUP presented to Plaintiff which they knew they were never going to execute, knew they kept Plaintiff's Investment for their benefit, and knew that Plaintiff's Investment should be returned to Plaintiff.

114.   On information and belief, the GROUP unjustly retained Plaintiff's $525,000.

115.   On information and belief, Plaintiff alleges the GROUP's actions were undertaken with the intent to induce and defraud, which thereby justifies an award for punitive damages in an amount according to proof at trial.

1
2
3

## SIXTH CAUSE OF ACTION

### (VIOLATION OF CALIFORNIA PENAL CODE § 496 – RECEIVING STOLEN PROPERTY – All Defendants)

4   116.   Plaintiff realleges and incorporates by reference Paragraphs 1 through
5   115 above.

6   117.   Plaintiff is the rightful owner of the $525,000 unlawfully diverted by
7   the GROUP based on the Business Plan they presented to Plaintiff in order to induce
8   Plaintiff to invest $525,000 to qualify for an EB-5 VISA for himself, his wife and
9   daughter, when the GROUP did not intend to execute the Business Plan and
10  intended to unlawfully and improperly take Plaintiff's Investment for their benefit.

11  118.   On information and belief, Plaintiff alleges that the GROUP unlawfully
12  received, cashed and retained Plaintiff's Investment of $525,000.

13  119.   On information and belief, Plaintiff alleges that the GROUP knew that
14  Plaintiff's Investment of $525,000 unlawfully retained by them did not belong to
15  them because they fraudulently induced Plaintiff to invest $525,000 by presenting
16  the Business Plan to Plaintiff knowing they were never going to execute it, knowing
17  that Plaintiff was investing in the Hacienda de Caballo Project with the intention of
18  qualifying for an EB-5 VISA, knowing that they were never going to create 10 jobs
19  in order for Plaintiff to qualify for the EB-5 VISA, knowing they were keeping
20  Plaintiff's Investment for their benefit, and knowing that Plaintiff's Investment
21  should be returned to Plaintiff

22  120.   On information and belief, Plaintiff's Investment of $525,000 that the
23  GROUP unlawfully cashed and retained did not belong to them and were not earned
24  by them.

25  121.   On information and belief, Plaintiff alleges that the GROUP aided each
26  other in concealing or withholding Plaintiff's Investment of $525,000 when they
27  continued to perpetuate the fraud by providing and continuing to provide Plaintiff
28  with the foregoing misrepresentations and concealments, and by continuing to

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

1   unlawfully keep Plaintiff's Investment of $525,000.

2      122.   On information and belief, Plaintiff alleges that as a proximate result of
3   the GROUP's receipt of stolen property (Plaintiff's Investment of $525,000),
4   Plaintiff suffered damages in the amount of $525,000 plus prejudgment interest at
5   the annual legal rate of 10% until paid in full, cost of suit, treble damages and
6   attorney's fees.

7      123.   On information and belief, Plaintiff alleges that the GROUP's actions
8   were undertaken with the intent to defraud, which thereby justifies an award for
9   punitive damages in an amount according to proof at trial.

10                    **SEVENTH CAUSE OF ACTION**

11        **(BREACH OF CONTRACT – USA GLOBAL, WILKINSON only)**

12      124.   Plaintiff realleges and incorporates by reference Paragraphs 1 through
13   123 above.

14      125.   The Subscription Agreement requires Plaintiff to "(i) pay to the
15   Partnership the Purchase Price [$525,000] and (ii) execute and deliver to the
16   Partnership the Joinder to the Limited Partnership Agreement." (Exhibit "C", ¶ 2).

17      126.   The Subscription Agreement provides that "the investment in the
18   Partnership by Subscriber is not dependent or conditioned upon success by any
19   subscriber in achieving lawful conditional or unconditional permanent residency in
20   the United States; **provided, however that the Partnership covenants and agrees**
21   **to provide at least ten (10) full time jobs at its facilities on the Property at the**
22   **time necessary for Subscriber's timely application for removal of conditional**
23   **residence status, for support of Subscriber's I-526 or I-829 petition**." (Exhibit
24   "C", ¶ 9(g), emphasis added)

25      127.   The Subscription Agreement further provided that "If the Partnership
26   does not fulfill its contractual duty regarding provision of jobs on or before the time
27   necessary for Subscriber's timely application for removal of conditional residence
28   status, or if Subscriber's I-526 or I-829 petition is denied solely by reason of failure

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW   920113.1                           23

1  of the Partnership to supply reasonable documentation and information to

2  Subscriber or Subscriber's legal counsel for Subscriber's I-526 or I-829 petition,

3  then the parties agree that Subscriber will suffer damages in an amount that cannot

4  be readily ascertained.  Subscriber and the Partnership agree that if the Partnership

5  (1) breaches either of (i) its covenant and agreement to provide jobs on or before the

6  time necessary for Subscriber's timely application for removal of conditional

7  residence status or (ii) its covenant and agreement to supply reasonable

8  documentation and information to Subscriber or Subscriber's independent counsel

9  for Subscriber's I-526 or I-829 petition or (2) breaches both of such covenants, then

10  the Partnership shall pay to Subscriber liquidated damages equal to and limited to

11  US$500,000.00." (Exhibit "C", ¶ 9(g)).

12       128.   Pursuant to the terms of Subscription Agreement, Plaintiff paid the

13  $525,000 Purchase Price and executed and delivered the Joinder to the Limited

14  Partnership Agreement.

15       129.   Plaintiff has complied with all applicable terms and conditions

16  precedent contained in the Subscription Agreement, to the extent not waived or

17  otherwise excused.

18       130.   USA GLOBAL and WILKINSON are not excused from the obligations

19  they assumed under the terms of the Subscription Agreement.

20       131.   USA GLOBAL and WILKINSON breached the Subscription

21  Agreement by failing and refusing to return Plaintiff's Investment of $525,000 when

22  they breached their covenant and agreement to provide jobs on or before the time

23  necessary for Plaintiff's timely application for removal of conditional residence

24  status.

25       132.   USA GLOBAL and WILKINSON admitted their breach in the

26  April 29, 2014, letter to Plaintiff from WILKINSON on behalf of Hacienda de

27  Caballo, LP stating that "as a result of generating substantial and continued losses in

28  the operation of Hacienda de Caballo we have been forced to discontinue all horse

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1                                    24

1  boarding activities.  We will therefore be unable to prove-up any direct jobs for
2  [Plaintiff's] I-829 Filing. [¶]  We fully understand the hardship this places on
3  [Plaintiff] and are doing everything in our power to dispose of Hacienda at a price
4  which will allow [Plaintiff] to recover his investment and thereby allow him to
5  invest in another EB5 Program."

6       133.  In August 2014, Plaintiff has made a written demand upon
7  WILKINSON's attorney for the immediate return of Plaintiff's $525,000, but
8  neither WILKINSON nor his attorney responded to the demand.

9       134.  As a direct and proximate result of USA GLOBAL and WILKINSON's
10 breaches, the condition on Plaintiff, his wife and his daughter's residency could not
11 be removed, Plaintiff lost his $525,000 Investment, Plaintiff lost future profits and
12 earnings he expected to gain from the Hacienda de Caballo Project, Plaintiff now
13 has to invest an additional $500,000 (and possibly another $25,000 in administrative
14 fees) that he would not otherwise have had to because Plaintiff's daughter, now over
15 the age of 21, is no longer entitled to the same immigrant status and immediate
16 issuance of a visa pursuant to 8 U.S.C. § 1153(d), which she would have qualified
17 for had USA GLOBAL and WILKINSON fulfilled their covenants and agreements
18 in the Subscription Agreement.  In addition, Plaintiff has also been forced to
19 incur the cost of counsel to bring the instant action to enforce USA GLOBAL
20 and WILKINSON's obligations assumed under the terms of the Subscription
21 Agreement.

22              **EIGHTH CAUSE OF ACTION**
23              **(NEGLIGENCE – All Defendants)**

24      135.  Plaintiff realleges and incorporates by reference Paragraphs 1 through
25 134 above.

26      136.  Plaintiff alleges that the GROUP owed a duty to act in good faith to
27 execute the Business Plan with Plaintiff's Investment.

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

137.   Plaintiff alleges that the GROUP breached their duty by failing to secure other foreign or local investors to reach the $3,500,000 for the Initial Offering, accepting and retaining Plaintiff's Investment without executing the Business Plan, and failing to return Plaintiff's Investment when the GROUP failed to create the 10 full time jobs necessary for the condition on Plaintiff and his family's residency to be removed.

138.   Plaintiff alleges that as a proximate result of the GROUP's breaches, Plaintiff suffered damages in the amount of $1,050,000 (for Plaintiff's Investment and the additional investment and administrative fees Plaintiff will have to pay for his daughter to secure an EB-5 VISA now that she is over the age of twenty-one), plus lost future profits and earnings Plaintiff expected to gain from the Hacienda de Caballo Project, prejudgment interest at the annual legal rate of 10% until paid in full, cost of suit and attorneys fees.

139.   Plaintiff alleges that the GROUP's actions were undertaken with the intent to defraud, which thereby justifies an award for punitive damages in an amount according to proof at trial.

## NINTH CAUSE OF ACTION

### (VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND EXCHANGE ACT RULE 10b-5 – All Defendants)

140.   Plaintiff realleges and incorporates by reference Paragraphs 1 through 139 above.

141.   By engaging in the conduct described above, the GROUP, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce or by use of the mails, directly and indirectly; used and employed devices, schemes and artifices to defraud; and engaged in acts, practices and courses of business which operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities. Further, the GROUP made untrue statements of material fact and omitted

1  to state material facts necessary in order to make the statements, in light of the
2  circumstances under which they were made, not misleading.

3      142.  On or about March 2009, WILKINSON, on behalf of the GROUP,
4  orally presented to Plaintiff the Business Plan in conjunction with providing copies
5  of all written documents in support of the Business Plan including the marketing
6  materials, brochures, presentations, reports, maps, Pro Forma of the anticipated
7  revenues, expenses, costs, capital, distributions, etc., Subscription Agreement and
8  The Revised and Restated Limited Partnership Agreement for Hacienda de Caballo,
9  LP, as described in detail above.

10      143.  The GROUP used instrumentalities of interstate commerce, including
11  U.S. Mail and electronic mail in connection with the sale of the securities for
12  Plaintiff's Investment in the Hacienda de Caballo Project.

13      144.  On behalf of the GROUP, WILKINSON and LIN communicated with
14  Plaintiff directly by U.S. Mail and electronic mail when they presented the Business
15  Plan and supporting documentation, the Pro Forma, the Agreement, and the
16  Subscription Agreement.

17      145.  Based upon the Business Plan, supporting documents, negotiations and
18  representations by the GROUP, the GROUP sold and Plaintiff purchased a limited
19  partnership share of Hacienda de Caballo, LP upon execution of a Subscription
20  Agreement without any good faith intention of executing the Business Plan and for
21  the purpose of retaining Plaintiff's Investment for the GROUP's own financial gain.

22      146.  On information and belief, Plaintiff alleges that the GROUP
23  misrepresented and failed to disclose to Plaintiff that they did not intend to execute
24  the Business Plan and intended to unlawfully and improperly take Plaintiff's
25  Investment for their benefit and have Plaintiff purchase a share of the limited
26  partnership of Hacienda de Caballo, LP.

27      147.  On information and belief, Plaintiff alleges that the GROUP made the
28  foregoing misrepresentations and concealments knowing them to be false.  The

GROUP knew that they were never going to execute the Business Plan, knew that Plaintiff was investing in the Hacienda de Caballo Project with the intention of qualifying for an EB-5 VISA, knew that they were never going to create 10 jobs in order for Plaintiff to qualify for the EB-5 VISA, accepted Plaintiff's purchase of a share of the Limited Partnership of Hacienda de Caballo, LP through paying an Investment and signing the Subscription Agreement knowing they were not going to execute the Business Plan, knew they kept Plaintiff's Investment for their benefit, and knew that Plaintiff's Investment should be returned to Plaintiff.

148. On information and belief, Plaintiff alleges that the GROUP intended that Plaintiff rely on the foregoing misrepresentations and concealments so that Plaintiff would purchase a share of the limited partnership of Hacienda de Caballo, LP by investing $525,000 and signing the Subscription Agreement.

149. On information and belief, Plaintiff alleges that he actually and justifiably relied on the GROUP's misrepresentations and concealments in selling a share of the limited partnership of Hacienda de Caballo, LP, because Plaintiff signed the Subscription Agreement and paid $525,000 to the GROUP with the belief that his investment would result in 10 jobs from the Hacienda de Caballo Project which would enable him, his wife and his daughter to remove the condition on their residency.

150. On information and belief, Plaintiff alleges that as a proximate result of the GROUP's misrepresentations and concealments, Plaintiff suffered damages in the amount of approximately $525,000 for Plaintiff's Investment, another $525,000 for the additional investment that Plaintiff must now make to qualify his daughter for an EB-5 VISA now that she is over the age of 21 years, lost profits and earnings from the Hacienda de Caballo Project that Plaintiff would have earned had the Business Plan been executed, plus prejudgment interest at the annual legal rate of 10% until paid in full, cost of suit and attorneys fees.

1    151.   By reason of the foregoing, the GROUP violated Section 10(b) of

2    the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R.

3    240.10b-5].

4

5                        **DEMAND FOR JURY TRIAL**

6    152.   Plaintiff hereby demands a jury trial.

7

8                        **DEMAND FOR RELIEF**

9    Wherefore, Plaintiff prays for judgment as follows:

10   **On the First Cause of Action:**

11   1.     For general and compensatory damages in the amount of $1,050,000;

12   2.     For lost profits and earnings from the Hacienda de Caballo Project that

13   Plaintiff would have earned had the Business Plan been executed, to be proved at

14   trial;

15   3.     For prejudgment interest at the annual legal rate of 10%;

16   4.     For reasonable attorneys' fees and costs incurred in bringing the instant

17   action;

18   5.     For punitive damages in an amount according to proof.

19   **On the Second Cause of Action:**

20   6.     For general and compensatory damages in the amount of $1,050,000;

21   7.     For lost profits and earnings from the Hacienda de Caballo Project that

22   Plaintiff would have earned had the Business Plan been executed, to be proved at

23   trial;

24   8.     For prejudgment interest at the annual legal rate of 10%;

25   9.     For reasonable attorneys' fees and costs incurred in bringing the instant

26   action;

27   10.    For punitive damages in an amount according to proof.

28

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1

**On the Third Cause of Action:**

11.   For general and compensatory damages in the amount of $1,050,000;

12.   For lost profits and earnings from the Hacienda de Caballo Project that Plaintiff would have earned had the Business Plan been executed, to be proved at trial;

13.   For prejudgment interest at the annual legal rate of 10%;

14.   For reasonable attorneys' fees and costs incurred in bringing the instant action;

15.   For punitive damages in an amount according to proof.

**On the Fourth Cause of Action:**

16.   For general and compensatory damages in the amount of $525,000;

17.   For prejudgment interest at the annual legal rate of 10%;

18.   For reasonable attorneys' fees and costs incurred in bringing the instant action;

19.   For punitive damages in an amount according to proof.

**On the Fifth Cause of Action:**

20.   For general and compensatory damages in the amount of $525,000;

21.   For prejudgment interest at the annual legal rate of 10%;

22.   For reasonable attorneys' fees and costs incurred in bringing the instant action;

23.   For punitive damages in an amount according to proof.

**On the Sixth Cause of Action:**

24.   For general and compensatory damages in the amount of $525,000;

25.   For prejudgment interest at the annual legal rate of 10%;

26.   For treble damages;

27.   For reasonable attorneys' fees and costs incurred in bringing the instant action;

28.   For punitive damages in an amount according to proof.

**On the Seventh Cause of Action:**

29.     For general and compensatory damages in the amount of $1,050,000;

30.     For lost profits and earnings from the Hacienda de Caballo Project that Plaintiff would have earned had the Business Plan been executed, to be proved at trial;

31.     For prejudgment interest at the annual legal rate of 10%;

32.     For reasonable attorneys' fees and costs incurred in bringing the instant action;

33.     For punitive damages in an amount according to proof.

**On the Eighth Cause of Action:**

34.     For general and compensatory damages in the amount of $1,050,000;

35.     For lost profits and earnings from the Hacienda de Caballo Project that Plaintiff would have earned had the Business Plan been executed, to be proved at trial;

36.     For prejudgment interest at the annual legal rate of 10%;

37.     For punitive damages in an amount according to proof.

**On the Ninth Cause of Action:**

38.     Enter an order freezing the assets of the GROUP.

39.     Enter an order requiring the GROUP to prepare a sworn accounting of all the money they have obtained from investors in the Hacienda de Caballo Project, including (1) a report on the disposition and current location of the money, and (2) a disclosure of all bank and brokerage account numbers where they deposited the money.

40.     Enter an order prohibiting the movement, alteration, and destruction of books and records to protect the books and records showing the location of assets and the disposition of their clients' money and to protect all remaining documents necessary for full discovery in this matter.

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

41.   Enter an order requiring the GROUP to disgorge the ill-gotten gains received as a result of the violations alleged herein, including prejudgment interest.

42.   Issue an Order imposing upon the GROUP appropriate civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

43.   Temporarily restrain and enjoin the GROUP, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with the GROUP from, directly or indirectly marketing or offering for sale to investors Limited Partnership interests in Hacienda de Caballo, LP.

44.   Enter an Order of Permanent Injunction restraining and enjoining the GROUP from, directly or indirectly, participating in, or facilitating, the solicitation of any investment in any security or in the offering of any security.

**On All Causes of Action:**

45.   For costs of suit incurred herein; and,

46.   For such other, further or different relief as the Court deems just and proper, including injunctive relief against further violations of U.S. Securities Laws.

DATED:  November 12, 2014       MUSICK, PEELER & GARRETT LLP


                                By: _____
                                Marc R. Greenberg
                                Attorneys for Plaintiff
                                YIGUANG CHEN

MUSICK, PEELER
& GARRETT LLP

ATTORNEYS AT LAW

920113.1

32

# EXHIBIT "A"

**March 2009**

For The Information Of
The Addressee Only



# Hacienda de Caballo

### Near San Juan Capistrano California, USA

## Business Plan

## Development Team

**USA Global Development Company**

March 2009 [HACIENDA DE CABALLO]

# Objectives

  

Recognizing the present state of the U.S. economy and the instability of its capital markets, Hacienda de Caballo (a California Limited Partnership and herein referred to as the "Partnership") has decided to postpone its previously announced Master Planned Development for five (5) years in order to provide its Immigrant Investors with an interim project that a.) will be immune to our current recession, b.) minimize investor risk to his investment, c.) create jobs , and d.) generate an attractive return for each investor.

To accomplish these objectives, the Partnership proposes to acquire up to 274 acres which will be utilized exclusively to board older horses on the property. Other than land costs, the Partnership believes that this interim use ("Phase I") will require nominal up- front expenditures, and will create sufficient jobs to satisfy USCIS requirements, and generate a positive cash flow to the Partnership. (See Budget and Financial Projections Attached)  The Partnership will commit that no full-time employee will be terminated until each Immigrant investor has received his or her Green Card. (See Partnership Agreement Attached)

# Master Planned Development

Once the U.S. economy and its capital markets have recovered and all entitlements have been secured the Partnership intends to construct and operate a five-star, one thousand stall horse training and boarding facility and improve and sell 30 high end residential lots ranging in size from 2 to 10 acres. The Partnership also intends to sell the resort spa site to a proven operator who will construct and operate said facility while allowing the Partnership to maintain credits for job creation. Our Project will be enhanced by the planting of vineyards on approximately 33 acres of the property. As explained under Exit Strategy, every investor will be given the option of wither liquidating their investment or participating in our Master Planned Development.

  



March 2009   [HACIENDA DE CABALLO]

# Location

The Property is located on Ortega Highway on the boundary of Orange County and Riverside County. The jurisdiction for entitlements will be the responsibility of Riverside County. The Project is approximately 20 minutes from Interstate 5 to the West and 15 minutes to Interstate 15 to the East. Proposed Toll Road 241 extension entrance would be approximately 15 minutes from the Project entry gate. The Project is surrounded by the Cleveland National Forest in a serene rural setting with magnificent oak trees and large landscape boulders. The national forest provides thousands of acres of riding and hiking trails which are expected to enhance the value of the entire Project.

The Project, even though located in a rural setting, is surrounded by almost twenty million people within a three hour circle of the Property. The very exclusive City of Newport Beach and Newport Coast, along with the John Wayne Airport is a mere 35 minutes away. In addition, Ontario International Airport, Los Angeles International Airport, and Long Beach Airport are all within an hour's drive of the Project.



# Purchase Terms

The Partnership has options to acquire up to two hundred and seventy four acres of fee title land. In addition, another thirty eight acres can be leased on a long term basis of ninety nine years. There are two separate acquisitions on the two hundred and seventy four acre purchase. Approximately one hundred and seventy two acres (consisting of five (5) legal parcels) can be purchased from the Robert Sanchez Family for Four Million Five Hundred Nineteen Thousand Four Hundred and Seventy Three Dollars. The balance of the Property, one hundred and two acres is being purchased from the Robert Trette Estate. The purchase price for this Parcel is One Million Dollars, reduced by $500,000 from original purchase price. Closing costs and acquisition expense will be in addition to the purchase price. An additional 18 acres is under consideration currently and is being evaluated for its benefit to the Project.



**March 2009**   [HACIENDA DE CABALLO]

If acquired the price will be approximately Nine Hundred and Fifty Thousand dollars, subject to final negotiation.

Under Phase I, the Partnership intends to only close on the Trette parcel and one or two of the Sanchez's parcels. The balance of the Sanchez parcels will be acquired at a later date to Implement the Partnerships Master Planned Development.

# Equestrian Site Plan



March 2009   [HACIENDA DE CABALLO]

# Resort Spa & Corporate Retreat



March 2009   [HACIENDA DE CABALLO]

# Residential Site Plan



Current Zoning Allows For Up To 30 Residential Estate Lots, Equestrian Training Facility, & Hotel/Spa Corporate Retreat

# Market Analysis – Phase I

The Partnership believes there is a huge demand to pasture privately owned retired horses whether they are older jumper horses no longer able to compete or thoroughbred horses unable to race. Why? With respect to jumper horses, existing owners do not want to put horses that can no longer compete to "sleep", but would prefer to reduce their monthly boarding fees from $650/ month to $400 to $450/ month. These owners are also faced with the dilemma that available stable space is shrinking (as a result of closures) and operators of existing facilities want space for horses they can continue to train for $1,000/ month. With respect to

USA Global Development 

thoroughbreds, horses that cannot continue to race still have value as breeders or jumpers. Their owners need space to board, rehab and train these horses. This type of facility does not exist in Southern California. As you can verify in our analysis regarding lack of available space for competitive horses, the Partnership believes our Phase I facility will create a monopoly in our area.

# Market Analysis – Master Planned Development

Extensive internal and external market research and analysis has been completed on all components of the project. The Concord Group, a well established and highly reputable market research and appraisal firm was contracted to give independent and arms length opinions as to the value and feasibility of the hotel/spa and the residential lots. Feasibility for the equestrian facility was determined by The John Berney Company. In addition, several months of internal research was completed as to the feasibility and demand levels for the equestrian facility. The purchase price for the land is approximately thirty percent of the value indicated in the professional market appraisal done by the Concord Group. All outside reports have indicated a strong demand for the Projects components with lot values appraised in excess of one million five hundred thousand dollars. The pent-up demand for the equestrian training and boarding facility indicates six to eighteen months waiting time for the availability to board additional horses in the area. Please see John Berney letter, attachment 1in the Appendix.

Investors may also check out estate size homes in the San Juan Capistrano area for comparison. The website below is a group of listings in the Hunt Club on Ortega Hwy which is a land development deal that Jim Stout, (Chairman and CEO of USA Global Development) developed in the late 70's and early 80's. The houses listed (February 2009) are about $2.5 million to $7.7 million on large lots (average 1+ acre, up to 5 acre lot.)

http://mls.ocexclusives.com/703796w/1852-Real-Estate-in-Hunt-Club-in-Ortega

http://www.homes.com/Real_Estate/CA/City/SAN%20JUAN%20CAPISTRANO

# Employment Impacts – Phase I

The Partnership will consist of Immigrant Investors. Foreign Investors who wish to become U.S. Permanent Residents ("Green Card") holders are required to file an application with U.S. Citizenship and Immigration Services (USCIS) in which it must be shown that each investment of $500,000 will create 10 new jobs. Our Master Planned Development Project and Phase I project have been designed to create sufficient new jobs for each Immigrant Investor. It is the responsibility of the Investor to apply for their Green Card. Each Investor is required to retain his or her own independent legal counsel. The global immigration law firm of Fragomen, Del Rey, Bernsen & Loewy LLP ("Fragomen") will be filing the immigration cases on behalf of the Investors to ensure consistency and compliance with the law. Fragomen will work in cooperation with your selected legal counsel. Neither the Partnership nor its General Partners can provide any assurances that Investors will be successful in obtaining Green Cards. However, if an Investor is denied a Green Card due to our failure to prepare and submit proper documentation to USCIS, the Partnership has agreed to refund the Investor's $500,000 investment. The Partnership will provide information and documents to Fragomen to support the immigration applications at no cost to the Investor. Please see Subscription Agreement for the

USA Global Development  7

**March 2009** [HACIENDA DE CABALLO]

duties of the Partnership. You may log also on to www.fragomen.com/professional/partner for the biography of attorney David Hirson. David has successfully processed the first EB-5 in the U.S. since the law became effective in 1990.

# Job Creation – Phase I

The Partnership anticipates to receive all Phase I entitlements and permits within six (6) months. The Property's existing zoning allows five (5) horses per acre (i.e. a total of 1,370 horses), and therefore the only legal requirements are a conditional use permit and business license.

The Partnership proposes to board a sufficient number of horses to create 10 new jobs for each investment of $500,000 within the time period required to comply with USCIS regulations. Investors are required to submit their I-829 applications between 21- 24 months from the date their temporary Green Card has been issued. Requisite employment has to be in place before this application is submitted to USCIS. The Partnership has decided to grow its business over a three (3) year timeframe to comply with these timelines. All requisite jobs will continue until each Investor has received his or her Green Card.

The income created to board abandoned and retired horses will not only create jobs, it will generate a positive cash flow and will only require nominal up-front expenditures to provide water, fencing, and shelter.

# Security of Investment

The Investors initial security for his or her investment will be the Property itself, which is being acquired for approximately 50% of prerecession prices and is being acquired for cash. Although title will be held in the name of the Partnership, the Limited Partners (Investors) are entitled to their money back plus a 5% return thereon before any profits are distributed to the General Partner. Therefore the Investors, in effect, own the Land until they recover their investment and a 5% return. Once the U.S. economy has recovered, the value of the Partnership Property is anticipated to double in value (i.e. return to 2007 values). Once the Project is completed, the Limited Partners security will not only be the value of the Land and Improvements, but the capitalized value of its income stream.

# Project Funding – Phase I

Up to Three and One-Half Million Dollars ($3,500,000) will be raised through a Regulation D Exempt Private Offering (Please refer to our Confidential Investment Memorandum) targeting accredited Investors seeking to obtain Green Cards pursuant to the United States Citizen Immigration Services' ("USCIS") Direct Employment EB-5 Program ("Initial Offering"). Letters supporting our Direct Employment EB-5 Program from California Governor Schwarzenegger and the State of California Business, Transportation and Housing Agency are attached.

**USA Global Development**  8

**March 2009**   [HACIENDA DE CABALLO]

Investors in the Initial Offering will receive 100% ownership in the Partnership (as Limited Partners) and a 35% Profit Interest, or 5% per $500,000 investment, with a commitment from the General Partners that they will subordinate their Profit Interests until each Investor receives a 5% annualized return on his or her investment.

# Project Funding – Master Planned Development

It is anticipated that Forty Million Dollars will be required to acquire, entitle and construct the Master Planned Development. These Funds will be raised through a Regulation D Exempt Private Offering, targeting accredited Investors seeking Green Cards pursuant to the USCIS Regional Center Program or from private USA investors ("Secondary Offering"), or through bank loans

Our Secondary Offering will be undertaken by American Life Development Company, LLC ("ALDC") whose members consist of USA Global Development Company (USA) and American Life, Inc. ("ALI"), the most prominent EB- 5 Developers in America (see www.AmericanLifeInc.com) ALI will be responsible for raising funds through their worldwide network of Brokers, and USA will be responsible for development and construction. The first project targeted for development by ALD is Hacienda De Caballo. Money raising will commence as soon as the USCIS has approved our new Regional Center Application which is expected to occur by November 30, 2009 (see attached letter from David Hirson at Fragomen, summary of "Regional Center" report) Funds raised will be used to gain entitlements. Construction will not commence for five (5) years.

## Exit Strategy

The primary exit strategy for Investors will be to sell the Property to American Life Development Company LLC ("ALDC") in five (5) years for $3,500,000 cash, plus any unpaid portion of Investors promised preference to five percent (5%) per annum. As an alternative, each Investor has the option to participate in the Master Planned Development.

If, for whatever reason, ALDC is unable to acquire the Property at that time, the Partnership will sell the Property in whole or by individual parcels. Proceeds would be distributed first to Investors until they recovered their principle back, then based on their profit interest but not less that 5% annual preference.

# Appendix

1. Jim Stouts Resume
2. Letters from Governor Arnold Schwarzenegger and Business, Transportation and Housing Agency



**March 2009** [HACIENDA DE CABALLO]

3. Letters and Resume from John Berney at ESI
4. Letter from David Hirson at Fragomen Attorneys at Law and the Riverside Regional Center report

## Hacienda de Caballo
## Pro Forma for July 1, 2009 - December 31, 2014

| | 2009* | 2010 | 2011 | 2012 | 2013 | 2014 | Totals |
|---|---|---|---|---|---|---|---|
| **Boarded Horses** | 150 | 500 | 800 | 800 | 800 | 800 | |
| **Gross Revenues** | | | | | | | |
| In Pasture | $ 288,000 | $ 1,920,000 | $ 3,072,000 | $ 3,072,000 | $ 3,072,000 | $ 3,072,000 | $ 14,496,000 |
| In Rail Stall | $ 81,000 | $ 540,000 | $ 864,000 | $ 864,000 | $ 864,000 | $ 864,000 | $ 4,077,000 |
| Total Gross Revenue | $ 369,000 | $ 2,460,000 | $ 3,936,000 | $ 3,936,000 | $ 3,936,000 | $ 3,936,000 | $ 18,573,000 |
| **Direct Expenses** | | | | | | | |
| Ground Supervisor | $ 22,770 | $ 34,155 | $ 45,540 | $ 45,540 | $ 45,540 | $ 45,540 | $ 239,085 |
| Labor | $ 16,577 | $ 198,919 | $ 346,108 | $ 1,110,630 | $ 1,110,630 | $ 1,110,630 | $ 3,895,492 |
| Feed | $ 112,500 | $ 750,000 | $ 1,200,000 | $ 1,200,000 | $ 1,200,000 | $ 1,200,000 | $ 5,662,500 |
| Waste Management | $ 13,500 | $ 90,000 | $ 144,000 | $ 144,000 | $ 144,000 | $ 144,000 | $ 679,500 |
| Porta Potty | $ 900 | $ 2,160 | $ 3,780 | $ 12,060 | $ 12,060 | $ 12,060 | $ 43,020 |
| Water | $ 4,500 | $ 30,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ 48,000 | $ 226,500 |
| Utilities | $ 12,000 | $ 15,000 | $ 18,000 | $ 18,000 | $ 18,000 | $ 18,000 | $ 99,000 |
| Total Direct Expense | $ 182,747 | $ 1,120,234 | $ 1,807,428 | $ 2,578,230 | $ 2,578,230 | $ 2,578,230 | $ 10,845,097 |
| **Indirect Expenses** | | | | | | | |
| Supervisor | $ 34,155 | $ 95,634 | $ 122,958 | $ 122,958 | $ 122,958 | $ 122,958 | $ 621,621 |
| Bookkeeper | $ 13,662 | $ 40,986 | $ 54,648 | $ 54,648 | $ 54,648 | $ 54,648 | $ 273,240 |
| Liability Insurance | $ 25,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 275,000 |
| Workers Comp | $ 3,487 | $ 14,788 | $ 22,850 | $ 53,351 | $ 53,351 | $ 53,351 | $ 201,178 |
| Phone | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 300 | $ 1,800 |
| Property Tax | $ 18,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 36,000 | $ 198,000 |
| Management Fee | $ 18,450 | $ 123,000 | $ 196,800 | $ 196,800 | $ 196,800 | $ 196,800 | $ 928,650 |
| Total Indirect Expense | $ 113,054 | $ 360,708 | $ 483,556 | $ 514,057 | $ 514,057 | $ 514,057 | $ 2,499,489 |
| NET INCOME | $ 73,200 | $ 979,059 | $ 1,645,016 | $ 843,713 | $ 843,713 | $ 843,713 | $ 5,228,415 |

* Year commences July 1, 2009 and ends on December 31, 2009

43

## Start Up Costs

| Boarded Horses | 2009 * | 2010 | 2011 | 2012 | 2013 | 2014 | Totals |
|---|---|---|---|---|---|---|---|
| | 150 | 500 | 800 | 800 | 800 | 800 | |
| Conditional Use Permit | $ 150,000 | $ 150,000 | $ - | $ - | $ - | $ - | $ 300,000 |
| Paddocks | $ 18,000 | $ 42,000 | $ 36,000 | $ - | $ - | $ - | $ 96,000 |
| Shelter | $ 1,650 | $ 3,850 | $ 3,300 | $ - | $ - | $ - | $ 8,800 |
| Water Containers | $ 390 | $ 910 | $ 780 | $ - | $ - | $ - | $ 2,080 |
| Installation | $ 10,000 | $ 15,000 | $ 10,000 | $ - | $ - | $ - | $ 35,000 |
| Scraping Land | $ 10,000 | $ 10,000 | $ 10,000 | $ - | $ - | $ - | $ 30,000 |
| Water Wells | $ 50,000 | $ - | $ 50,000 | $ - | $ - | $ - | $ 100,000 |
| Housing | $ 20,000 | $ 20,000 | $ 20,000 | $ - | $ - | $ - | $ 60,000 |
| Feed Sheds | $ 10,000 | $ 10,000 | $ 10,000 | $ - | $ - | $ - | $ 30,000 |
| Phone | $ 1,000 | $ - | $ - | $ - | $ - | $ - | $ 1,000 |
| Contingencies | $ 27,104 | $ 25,176 | $ 14,008 | $ - | $ - | $ - | $ 66,288 |
| Total Start Up Cost | $ 298,144 | $ 276,936 | $ 154,088 | $ - | $ - | $ - | $ 729,168 |

## Capital

| | 2009 * | 2010 | 2011 | 2012 | 2013 | 2014 | Totals |
|---|---|---|---|---|---|---|---|
| Investments | $ 3,500,000 | | | | | | $ 3,500,000 |
| Less: | | | | | | | |
| Land Costs | $ 3,000,000 | | | | | | $ 3,000,000 |
| Start Up Costs | $ 298,144 | $ 276,936 | $ 154,088 | $ - | $ - | $ - | $ 729,168 |
| Repay Advances | $ 100,000 | $ 100,000 | | | | | $ 200,000 |
| Net Cash | $ 101,856 | $ (376,936) | $ (154,088) | $ - | $ - | $ - | $ (429,168) |
| Net Income (Loss) | $ 73,200 | $ 979,059 | $ 1,645,016 | $ 843,713 | $ 843,713 | $ 843,713 | $ 5,228,415 |
| Cash Balances | $ 175,056 | $ 602,123 | $ 1,490,928 | $ 843,713 | $ 843,713 | $ 843,713 | $ 4,799,247 |

## Distributions (1)

| | 2009 * | 2010 | 2011 | 2012 | 2013 | 2014 | Totals |
|---|---|---|---|---|---|---|---|
| General Partners | $ 113,786 | $ 391,380 | $ 969,103 | $ 548,414 | $ 548,414 | $ 548,414 | $ 3,119,510 |
| Limited Partners | $ 61,270 | $ 210,743 | $ 521,825 | $ 295,300 | $ 295,300 | $ 295,300 | $ 1,679,736 |
| Return to Limited Partners (1) | 1.8% | 6.0% | 14.9% | 8.4% | 8.4% | 8.4% | 48.0% |

Average Rate of Return to Limited Partners   8.73%

Footnotes:

(1) The General Partners agree to suspend and accrue their right to distribution of operating cash flow until distributions have been made to the Limited Partners aggregating and annualized, non compounded return of five percent on the adjusted capital contributions of the Limited Partners.

# Hacienda de Caballo
## Pro Forma Assumptions

| | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Boarded Horses | 150 | 500 | 800 | 800 | 800 | 800 |

**Gross Revenues**

| | |
|---|---|
| In Pasture | $400/ month – 80% of Boarded Horses |
| In Rail Stall | $450/ month – 20% of Boarded Horses |

**Direct Expenses**

| | |
|---|---|
| Ground Supervisor | Year 1= $20,000; Year 2= $30,000; Year 3-6= $40,000 plus 13.85% Payroll Tax |
| Labor | $8.00/ hour, 35/ hours plus 13.85% Payroll Tax Year 1= 2 employ; Year 2= 12 employ; Year 3= 21 employ, Year 4-6= 67 employ |
| Feed | $125/ horse/ month |
| Porta Potty | $150/month per stall. Max 10 people per stall |
| Water | $5.00 horse/ month |
| Utilities | Year 1= $12,000; Year 2= $15,000; Year 3-6= $18,000 |

**Indirect Expenses**

| | |
|---|---|
| Supervisor | Year 1= $5,000/ month; Year 2= $7,000/ month; Year 3-6= $9,000 plus 13.85% Payroll Tax |
| Bookkeeper | Year 1= $2,000/month; Year 2= $3,000/month; Year 3-6= $4,000 plus 13.85% Payroll Tax |
| Liability Insurance | Year 1= $25,000; Year 2= $50,000; Year 3-6= $50,000 |
| Workers Comp | 4% of gross payroll |
| Phone | Set up fee $1,000 flat plus $300/month |
| Property Tax | 1.2% land cost |
| Management Fee | 5% Gross Revenue |

**Start Up Costs**

# Hacienda de Caballo
## Pro Forma Assumptions

|  | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 |
|---|---|---|---|---|---|---|
| Boarded Horses | 150 | 500 | 800 | 800 | 800 | 800 |

| | |
|---|---|
| Conditional Use Permit | $300,000 split over 2 years |
| Paddocks | $12,000/ 100/ horse – onetime fee; |
| Shelter | $1,100/ 100/ horse – onetime fee |
| Water Containers | $260/ 100 horses – onetime fee |
| Installation | Year 1= $10,000; Year 2= $15,000 Year 3= $10,000 |
| Scraping Land | $10,000/ years (Years 1-3 only) |
| Water Wells | $50,000 / year (Years 1 & 3 only) |
| Housing | Year 1= $20,000; Year 2= $20,000; Year 3= $20,000 |
| Feed Sheds | $10,000/Year (Years 1-3 only) |
| Contingencies | 10% of total Start Up costs |

## Distributions

| | |
|---|---|
| General Partners | General Partners – 65% |
| Limited Partners | Limited Partners – 35% |

46



GOVERNOR ARNOLD SCHWARZENEGGER

April 21, 2008

Ms. Barbara Q. Velarde
Chief
Office of Service Center Operations
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue NW
Room 2123
Washington, DC 20529

RE:    State Designation of Agency

Dear Ms. Velarde,

Under section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), 10,000 immigrant visas per year are available to qualified individuals seeking permanent resident status on the basis of their engagement in a new commercial enterprise. I am writing to update your records as to the authorized California Agency to designate geographic areas as a high unemployment area ("targeted employment area") to comply with the components of the Immigration Investor Program.

As Governor of the State of California, I select the Secretary of Business, Transportation and Housing (BTH), or his or her designee, to be the authorized entity empowered to certify identified targeted employment area that meet the qualifications to be designated for the Immigration Investor Program. The Secretary of BTH will, upon request, certify by letter to the U.S. Citizenship and Immigration Services that the areas where the investments are being directed meets the definition of "high unemployment," that the data reflects the unemployment rate for the area to be in excess of 150 percent of the national average and the "targeted employment area" designation will remain in effect for the foreseeable future.

Sincerely,

Arnold Schwarzenegger

/la

STATE CAPITOL • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

47

STATE OF CALIFORNIA

ARNOLD SCHWARZENEGGER
Governor

Department of Alcoholic Beverage Control
Department of Corporations
Department of Financial Institutions
California Highway Patrol
California Housing Finance Agency
Department of Housing & Community Development
Department of Managed Health Care



DALE E. BONNER
Secretary

Department of Motor Vehicles
Office of the Patient Advocate
Department of Real Estate
Office of Military & Aerospace Support
Office of Real Estate Appraisers
Office of Traffic Safety
Department of Transportation

## BUSINESS, TRANSPORTATION AND HOUSING AGENCY

May 28, 2008

Mr. Geoff Hirson
USA Global Development Company
7 Upper Newport Place
Newport Beach, CA 92660

RE:   EB-5 Employment Creation Investor Visas - Immigration and Nationality Act.
      Section 203(b)(5) – Geographic Area: Puma (Public Use Micro Data Area)
      08001 including Census Tract 430.1 (Riverside, California)

Dear Mr. Hirson:

The Business, Transportation and Housing (BTH) Agency has been duly delegated the authority and
responsibility for declaring high unemployment and rural areas in California as Targeted Employment
Areas (TEAs) for EB-5 Employment Creation Immigration cases.

We have reviewed the geographic area provided by the Hacienda de Caballo developers referenced
above, and according to the most current U.S. Census Bureau data (PUMA) for the District, the area is a
"High Unemployment Area" as defined under section 203(b)(5) of the Immigration and Nationality Act
(INA).  The latest U.S. Census Bureau statistics for Census Tract 430.1, included in PUMA 08001
indicate an unemployment rate of 8.9%, which is more than the requisite of 150% (approximately 170%)
of the national average unemployment rate of 5.1% (March 2008).

Relying upon current PUMA U.S. Census Bureau data for 08001-1, the State of California shall designate
the area as an area of high unemployment, and considers it a "Targeted Employment Area" as defined
under section 203(b)(5) of the Immigration and Nationality Act (INA).

Sincerely,

DALE E. BONNER
Secretary

Attachment

980 9th Street, Suite 2450  •  Sacramento, CA  95814-2719  •  (916) 323-5400  •  1 (800) 924-2842  •  Fax: (916) 323-5440
FLEX YOUR POWER!   •   BE ENERGY EFFICIENT!



**ESI**

**EQUINE SERVICES, INC.**

26282 Oso Road

San Juan Capistrano, California 92675

949 246-3986

Mr. James D. Stout                                    August 4, 2008

Executive Vice President

Phillips Development Company

7 Upper Newport Plaza

Newport Beach, California  92660

Reference:  Hacienda de Caballo – Letter of Intent

Dear Mr. Stout:

Over the past twenty five years, my wife, Katie Berney, and I have worked as a professional team specializing in training and management in the equestrian industry and currently own and operate ESI, Equine Services, Inc.  Success in this industry has several judges including  competitive achievements in the various classes of the "Show Jumping World".  We have competed successfully in local, national and international show competitions and have coached riders from all over the United States and Canada as well as Paraguay and New Zealand.

We have won numerous awards during our career and last weekend, Katie took fifth place in the Grand Prix Show Jumping event at the Pebble Beach Equestrian Center and is now on her way to compete in the Twin Oaks Horse Show in Vancouver, Canada; she has in years past placed first in this same event. The importance of this is to demonstrate to you the competition element of this sport often reaches beyond the U. S. borders since it is one of the oldest competitive sports on record.  The most recent example of a "state of the art" destination the Jockey Club Sha-Tin Race Course in Hong Kong, receiving a $150,000,000 refurbishing, preparing to welcome the Show Jumping and Dressage Competitors  for the Olympics.   To accommodate this level of competition takes training facilities of equal quality which appears to be just what you have designed at your Hacienda de Caballo.

We currently manage and train over one hundred horses in the San Juan Capistrano, South Orange County area of Southern California.  The waiting list for boarding and training is currently in excess of one year for availability.  This demand holds true throughout our Southern California area with little exception.  I estimate there is currently a demand in San Juan alone for an additional 600-800 horses to be boarded and trained.  Today, the industry within the U. S. is growing at about ten percent a year.

Page 2

We have studied your plan for the development of Hacienda de Caballo and find it to be far superior in design than any other facility in the area.  We also have heard for many years that the location's specific altitude provides an opportunity  to build the lung capacity for increased endurance strengthening of the horse, and therefore, feel  it will not prove itself to  be anything but a destination success.

In addition, Equine Services, Inc. through management, training and competition has developed relationships with all other major training companies in the general area as well as developed and maintained relationships throughout the world.  Partly because we have travelled  the U. S. and abroad to purchase horses, most recently,  Ireland.

For these reasons, Equine Services, Inc. would like to express its strong desire to be part of this exciting new development.  Our interests would lie in the long term management of the facility, along with the ability to bring at a minimum over 100 horses  on opening day.  We also believe through our many long term contacts in the industry that we will be able to attract other trainers who control 20-100 horses to the facility.  One business area not so obvious but in great demand is layup facilities for these equestrian athletes.  Recovering horses, today, are shipped from San Diego as well as Washington State to Carmel Valley, California to recover from illness, injury or surgery and we are constantly asked about and handle some layups out of necessity.   We have contacts in this area to discuss this aspect with Equine Veterinarians, surgeons and owners of such facilities, looking for a "better" spot.

In addition, a fact which very few realize is that LAX is the only airport on the West Coast which allows the receipt of an equine shipment because they have a quarantine layup facility for the horse.  Stallions have to be transported to U. S. Davis from LAX prior to release.  Your location on the Ortega is a center point of the crossroads between all major Southern California destinations.  The layup race horse must journey to Tennessee to obtain the appropriate care in a first class facility such as you propose to build here.   Basically, you already have the best weather, so if you build this facility designed to "attract the best" trainers, veterinarians, and groomers and managed well, everyone  else will follow.

We look forward to discussing this project with you further in the immediate future!

Sincerely,

John Berney
President

50



February 11, 2009

Dear Tom:

I feel that the demand for a high quality multi discipline equestrian facility in this area is such that we could fill a 1,000 horse project upon completion.

An equestrian center of this size would have the capacity to employ well over 100 people. For 1,000 horses you will need a barn manager, assistant barn manager and receptionist to take care of administrative and financial details. For training of the horses and people it will be about 10 to 15 trainers, 20 to 30 assistant trainers and professional riders as well as 66 professional grooms. For the grounds a crew of 10 to 13 landscapers and maintenance workers would be necessary. Outside sources of employment would come from vets, farriers, horse transporters, feed suppliers and tack and equipment suppliers just to name a few.

There is a definite demand for stabling in southern California. I feel that until the equestrian center can be developed you can meet that need. Your land has the legal right to board over 1300 horses, Boarding as opposed to providing a high end training and rehab facility would obviously a) reduce your cash flow, and b) require expenditures for minor grading, fencing and portable stalls, but, in my opinion the demand is there today.
The development and ongoing care and maintenance of such an interim facility, as well as the care of the horses would require a staff of at least 100 people (as riders, hand walkers, grooms, stall cleaners, maintenance workers, grounds keepers, etc).
The costs would be nominal, and you would be able to generate a positive cash flow even assuming you reduced your projected income from boarding by 50%.
All I need to know is how many employees you will need and by when. I will bring in the horses.

As you know I have been in the business for 25 years and am the CEO of Equine Services Inc, My resume is attached.

Sincerely,

John Berney
Equine Services, Inc.

Equine Services, Inc., 26282 Oso Road, San Juan Capistrano, CA 92675  Tel: (949) 246-3986

## John Berney Bio

I have lived in the San Juan Capistrano area my whole life. My relationship with horses started at the Smith Stables in Capistrano Beach. As a young boy it was Western and bareback riding. I started riding English at Coto de Caza in the early 70's as well as continuing to ride in San Juan Capistrano where my sister ran a stable. I helped her run her training business until I left for college in 1980.

I earned a degree in Agricultural Management from New Mexico State University. While attending school I earned top honors in the Leadership in Agricultural Occupations program. During my time at college I missed horses so much I started attending rodeos, fairs, and ranches just to have contact with horses.

In 1984 I returned to San Juan Capistrano to work with a landscape company. In my spare time I would visit Jimmy Kohn's barn and help out any way I could. That is where I met my future wife Katie and we started our own training business at the Capistrano Saddle Club (now the Oaks). In 1985 we moved our business to Sycamore Trails Stables where we are still training today. In 1999 we changed the name of our business from KKB Training Stables to Equine Services Inc. We consistently have an average of 90 horses in training. We break, train, and show hunters and jumpers as well as coach riders in local, national, and international events.

I am proud that San Juan Capistrano is host to the West Coast Olympic Trials and several international horse shows for hunter/jumpers and dressage, not to mention the worlds richest two day rodeo.

My interest in serving on the SJCEC is not just because I am passionate about horses but because I want to see our town preserve the equestrian lifestyle that is so unique. In addition I am a long time equestrian business owner who does not want to live, work, ride, or play anywhere else.

**John & Katie Berney - Trainers**

In 1984 John & Katie started an equestrian training program in San Juan Capistrano with 18 horses and 30 students. Incorporated in 1999 their business now consists of an average of 100 horses and students.
Their responsibilities consist of managing the horse and riders health, training and competition schedule at the local, national and international levels.
They also travel within the U.S.A. and Europe to buy and sell horses for their clients as well as for investment possibilities.
Arranging and managing clinics with Olympic riders, coaches and judges is another part of their business as well as consulting on equestrian projects such as the Tajon ranch equestrian center and riding school and other such equestrian related businesses.

Some of their many accomplishments include.
- John attended New Mexico State University and earned a degree in Agricultural management.
- Managing Larkspur Acres a lay-up and retirement facility for horses.
- Assisting O.C. Animal control officers with on-site training in horsemanship.
- Coaching children at the 2004 F.E.I. International Jumper Finals from Paraguay, New Zealand & the United States.
- Trainers of the Children's jumper horse and rider champion for the United States for 2007.
- Trainers of two Zone 10 jumper champions.
- Founding members of the San Juan Equestrian Coalition.

They actively and successfully compete and train year round and continue to be positive ambassadors for the equestrian community.

Fragomen, Del Rey, Bernsen & Loewy LLP
18401 Von Karman Avenue, 2nd Floor,
Irvine, CA 92612
Telephone: +1 949 261 0209
Facsimile: +1 949 261 7821
www.fragomen.com

David Hirson | Partner | +1 949 660-3504 | dhirson@fragomen.com

**FRAGOMEN**
ATTORNEYS AT LAW

February 12, 2009

Tom Wilkinson, President
USA Global Development Company, LLC
3080 Bristol Street, Suite 630
Costa Mesa, CA 92626

RE:      Regional Center Application: American Life Realty LLC
         Hacienda de Caballo, LP.

Dear Tom

As we previously advised you, we filed the application for registration of the American Life Realty, LLC Regional Center. The application was delivered to the US Citizenship and Immigration Service ("USCIS") on December 17, 2008. We expect to receive Regional Center designation around September, 2009.

Any investors who subscribe to be a Limited Partner and invest the $500,000 before the Regional Center application is approved will have to utilize the direct employees to be hired by Hacienda de Caballo, LP. I understand that the present business plan projects 300 direct employees which equates to 30 investors.

However, only 10 employees are required for each investor as he/she invests in Hacienda de Caballo LP. Once the Regional Center is approved by the USCIS, the indirect employment provisions will apply to the future investors. These investors can utilize the unused direct hires where less than 30 Limited Partners have invested in Hacienda de Caballo, LP as well as indirect employment to be created by the Limited Partnership.

I am available to assist with any additional questions that you may have.

Sincerely,

David Hirson, Partner
Fragomen, Del Rey, Bernsen & Loewy, LLP

Boston, MA • Brisbane, Australia • Brussels, Belgium • Canberra, Australia • Chicago, IL • Coral Gables, FL • Dallas, TX • Frankfurt, Germany • Hong Kong • Irvine, CA
Berlin, NJ • London, United Kingdom • Los Angeles, CA • Melbourne, Australia • New York, NY • Palo Alto, CA • Perth, Australia • San Diego, CA
San Francisco, CA • Santa Clara, CA • Shanghai, China • Singapore • Stamford, CT • Sydney, Australia • Toronto • Washington, DC • Wollongong, New Zealand

STATE OF CALIFORNIA



ARNOLD SCHWARZENEGGER
Governor

Department of Alcoholic Beverage Control
Department of Corporations
Department of Financial Institutions
California Highway Patrol
California Housing Finance Agency
Department of Housing & Community Development
Department of Managed Health Care

DALE E. BONNER
Secretary

Department of Motor Vehicles
Office of the Patient Advocate
Department of Real Estate
Office of Military & Aerospace Support
Office of Real Estate Appraisers
Office of Traffic Safety
Department of Transportation

## BUSINESS, TRANSPORTATION AND HOUSING AGENCY

May 28, 2008

Mr. Geoff Hirson
USA Global Development Company
7 Upper Newport Place
Newport Beach, CA  92660

RE:    EB-5 Employment Creation Investor Visas - Immigration and Nationality Act.
       Section 203(b)(5) – Geographic Area: Puma (Public Use Micro Data Area)
       08001 including Census Tract 430.1 (Riverside, California)

Dear Mr. Hirson:

The Business, Transportation and Housing (BTH) Agency has been duly delegated the authority and
responsibility for declaring high unemployment and rural areas in California as Targeted Employment
Areas (TEAs) for EB-5 Employment Creation Immigration cases.

We have reviewed the geographic area provided by the Hacienda de Caballo developers referenced
above, and according to the most current U.S. Census Bureau data (PUMA) for the District, the area is a
"High Unemployment Area" as defined under section 203(b)(5) of the Immigration and Nationality Act
(INA).  The latest U.S. Census Bureau statistics for Census Tract 430.1, included in PUMA 08001
indicate an unemployment rate of 8.9%, which is more than the requisite of 150% (approximately 170%)
of the national average unemployment rate of 5.1% (March 2008).

Relying upon current PUMA U.S. Census Bureau data for 08001-1, the State of California shall designate
the area as an area of high unemployment, and considers it a "Targeted Employment Area" as defined
under section 203(b)(5) of the Immigration and Nationality Act (INA).

Sincerely,

DALE E. BONNER
Secretary

Attachment

980 9th Street, Suite 2450  •  Sacramento, CA  95814-2719  •  (916) 323-5400  •  1 (800) 924-2842  •  Fax: (916) 323-5440
FLEX YOUR POWER!  •  BE ENERGY EFFICIENT!



## GOVERNOR ARNOLD SCHWARZENEGGER

April 21, 2008

Ms. Barbara Q. Velarde
Chief
Office of Service Center Operations
U.S. Citizenship and Immigration Services
20 Massachusetts Avenue NW
Room 2123
Washington, DC 20529

RE:   State Designation of Agency

Dear Ms. Velarde,

Under section 203(b)(5) of the Immigration and Nationality Act, 8 U.S.C. § 1153(b)(5), 10,000 immigrant visas per year are available to qualified individuals seeking permanent resident status on the basis of their engagement in a new commercial enterprise. I am writing to update your records as to the authorized California Agency to designate geographic areas as a high unemployment area ("targeted employment area") to comply with the components of the Immigration Investor Program.

As Governor of the State of California, I select the Secretary of Business, Transportation and Housing (BTH), or his or her designee, to be the authorized entity empowered to certify identified targeted employment area that meet the qualifications to be designated for the Immigration Investor Program. The Secretary of BTH will, upon request, certify by letter to the U.S. Citizenship and Immigration Services that the areas where the investments are being directed meets the definition of "high unemployment," that the data reflects the unemployment rate for the area to be in excess of 150 percent of the national average and the "targeted employment area" designation will remain in effect for the foreseeable future.

Sincerely,

Arnold Schwarzenegger

/la

# EXHIBIT "B"

)08252000007

# Delaware

PAGE 1

*The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "HACIENDA DE CABALLO, LP" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE FIFTH DAY OF SEPTEMBER, A.D. 2008.

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "HACIENDA DE CABALLO, LP" WAS FORMED ON THE TWENTY-FIRST DAY OF FEBRUARY, A.D. 2008.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL TAXES HAVE NOT BEEN ASSESSED TO DATE.



4508232   8300

080930064

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 6833739

DATE: 09-05-08

57



# State of California

## SECRETARY OF STATE

I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That, Debra Bowen whose name appears on the annexed certificate, was on February 05, 2009, the duly qualified and acting Secretary of State of the State of California.

That the seal affixed thereto is the seal of said State; that the signature thereon appears to be the signature of Debra Bowen and that the annexed certificate is in due form and by proper officer.

In Witness Whereof, I execute this certificate and affix the Great Seal of the State of California this 9th day of February 2009.



_Debra Bowen_
Secretary of State

NP-24 A [REV. 1-07]

BY

OSP 08 96002

58

# State of California
## Secretary of State



I, DEBRA BOWEN, Secretary of State of the State of California, hereby certify:

That the attached transcript of ___2___ page(s) was prepared by and in this office from the record on file, of which it purports to be a copy, and that it is full, true and correct.



IN WITNESS WHEREOF, I execute this certificate and affix the Great Seal of the State of California this day of

FEB − 5 2009

_Debra Bowen_

**DEBRA BOWEN**
Secretary of State

Sec/State Form CE 108 (REV 1/2007)

OSP 06 89723

HACIENDA DE CABALLO, LP

A DELAWARE LIMITED PARTNERSHIP

REVISED AND RESTATED

AGREEMENT

OF

LIMITED PARTNERSHIP

Dated as of March 1, 2009

THIS SECURITY HAS NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933 (ACT) OR THE SECURITIES OR BLUE SKY LAWS OF ANY STATE AND MAY NOT BE OFFERED AND SOLD UNLESS REGISTERED AND/OR UNTIL QUALIFIED PURSUANT TO THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES OR BLUE SKY LAWS OR AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IS APPLICABLE. THEREFORE, NO SALE OR TRANSFER OF THIS SECURITY SHALL BE MADE, NO ATTEMPTED SALE OR TRANSFER SHALL BE VALID, AND THE ISSUER SHALL NOT BE REQUIRED TO GIVE ANY EFFECT TO ANY SUCH TRANSACTION UNLESS (A) SUCH TRANSACTION SHALL HAVE BEEN DULY REGISTERED UNDER THE ACT AND QUALIFIED OR APPROVED UNDER APPROPRIATE STATE OR BLUE SKY LAWS, OR (B) THE ISSUER SHALL HAVE FIRST RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO ISSUER THAT SUCH REGISTRATION, QUALIFICATION OR APPROVAL IS NOT REQUIRED AND THAT SUCH TRANSACTION OTHERWISE COMPILES WITH ALL APPLICABLE LAW. PURCHASERS OF SUCH SECURITIES WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

772957.3

# TABLE OF CONTENTS

Page

ARTICLE I       DEFINITIONS.................................................................................. 1
ARTICLE II      GENERAL PROVISIONS ................................................................. 6

2.1      Formation................................................................................................. 6
2.2      Certificate................................................................................................ 6
2.3      Operational Certificates and Other Filings ............................................ 7
2.4      Name of the Partnership ......................................................................... 7
2.5      Purpose.................................................................................................... 7
2.6      Powers ..................................................................................................... 7
2.7      Principal Place of Business..................................................................... 8
2.8      Registered Office and Registered Agent................................................. 8
2.9      Term ........................................................................................................ 8
2.10     Fiscal Year............................................................................................... 8

ARTICLE III     CAPITAL CONTRIBUTIONS, LOANS, CAPITAL ACCOUNTS
                AND ALLOCATIONS....................................................................... 8

3.1      Capital Contributions.............................................................................. 8
3.2      Loans to Partnership ............................................................................... 9
3.3      Capital Accounts ..................................................................................... 9
3.4      Allocations to the Partners .................................................................... 10
3.5      Special Allocations ............................................................................... 11
3.6      Certain Additional Allocations .............................................................. 12
3.7      Compliance with Law and Regulations ................................................. 12
3.8      Tax Elections and Determinations By Tax Matters Partner................... 13
3.9      Authority of Tax Matters Partner .......................................................... 13
3.10     Allocations upon Transfers of Partnership Interests ............................. 14

ARTICLE IV      DISTRIBUTIONS........................................................................... 14

4.1      Withdrawal of Capital............................................................................ 14
4.2      Return of Limited Partners .................................................................... 14
4.3      Operating Cash Flow ............................................................................. 14
4.4      Proceeds of a Capital Transaction ........................................................ 14
4.5      Dissolution and Liquidation .................................................................. 14
4.6      Withholding Taxes ................................................................................. 14
4.7      No Distributions in Kind........................................................................ 14
4.8      Discretion to Distribute Refinancing Proceeds...................................... 15
4.9      Distribution of Start Up Capital Contributions...................................... 15
4.10     Restricted Distributions ......................................................................... 15

ARTICLE V      LIMITED PARTNERS..................................................................... 15

5.1      Identification of Limited Partners........................................................... 15
5.2      Personal Nature of Limited Partnership Interests .................................. 15

-i-

772957.3

TABLE OF CONTENTS
(continued)

Page

5.3    Liability Limitation ............................................................................ 15
5.4    Resignation or Withdrawal ............................................................. 15
5.5    Management Rights of Limited Partners ........................................ 15
5.6    Right of Limited Partners to Remove General Partner .................. 16
5.7    Death or Legal Incapacity of Limited Partner ............................... 16
5.8    Meetings of Limited Partners ........................................................ 16

ARTICLE VI      MANAGEMENT OF THE PARTNERSHIP .................................. 18

6.1    Exclusive Management by the General Partners ............................ 18
6.2    Development General Partner ....................................................... 18
6.3    Powers of Development General Partner ....................................... 18
6.4    Operational General Partner ......................................................... 19
6.5    Powers of Operational General Partner ........................................ 19
6.6    Transactions between the Partnership and a General Partner ...... 20
6.7    Expenses ...................................................................................... 20
6.8    Time and Effort ............................................................................. 20
6.9    Dissolution, Disability or Bankruptcy of a General Partner ........... 21
6.10   Compensation General Partners .................................................. 21
6.11   Major Decisions ............................................................................ 21
6.12   Executive Committee .................................................................... 22
6.13   Regular and Special Meetings ...................................................... 22
6.14   Voting and Consents ..................................................................... 22
6.15   Place of Meetings ......................................................................... 22
6.16   Limited Liability ............................................................................. 23
6.17   General Standards of Conduct ..................................................... 23
6.18   Independent Activities .................................................................. 23
6.19   Conflicts of Interest ...................................................................... 24
6.20   Actions Requiring Approval of the Partners .................................. 24
6.21   Indemnification of Agents ............................................................. 24
6.22   Insurance ...................................................................................... 25
6.23   General Partner as Limited Partner .............................................. 25
6.24   Foreign Ownership ........................................................................ 25

ARTICLE VII     PARTNERSHIP ACCOUNTING ................................................. 25

7.1    Partnership Tax Treatment ............................................................ 25
7.2    Method of Accounting ................................................................... 25
7.3    Fiscal Year .................................................................................... 25
7.4    Financial and Business Records ................................................... 25

ARTICLE VIII    TRANSFER OF PARTNERSHIP INTERESTS ............................ 26

8.1    Transfer By Limited Partners ........................................................ 26

-ii-

772957.3

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|

8.2 Transfer Void ............................................................. 27
8.3 Transfer By General Partner ...................................... 27

ARTICLE IX  TERM AND DISSOLUTION OF THE PARTNERSHIP .................. 27

9.1 Events Causing Dissolution ...................................... 27
9.2 No Other Dissolution ................................................ 27
9.3 Responsibility for Winding Up ................................. 27
9.4 Liquidation and Distribution ..................................... 27
9.5 Deficit Capital Accounts ........................................... 28

ARTICLE X  MISCELLANEOUS .............................................. 28

10.1 Notices .................................................................... 28
10.2 Amendment ............................................................. 29
10.3 Construction of Agreement ...................................... 30
10.4 Integration ............................................................... 30
10.5 Time ........................................................................ 30
10.6 Counterparts and Execution ..................................... 30
10.7 Governing Law ......................................................... 30
10.8 Further Assurances .................................................. 30
10.9 Waiver ..................................................................... 30
10.10 Severability .............................................................. 30
10.11 Equitable Remedies ................................................. 30
10.12 Remedies Cumulative .............................................. 31
10.13 Benefits, Obligations and Survival of Representations and
        Warranties ............................................................... 31
10.14 No Third-Party Beneficiary ....................................... 31
10.15 Waiver of Partition ................................................... 31
10.16 Power of Attorney .................................................... 31
10.17 Scope of Representation .......................................... 31

-iii-

772957.3

REVISED & RESTATED
AGREEMENT
OF LIMITED PARTNERSHIP

OF

HACIENDA DE CABALLO, LP

A Delaware Limited Partnership

This revised and restated AGREEMENT OF LIMITED PARTNERSHIP (this "Agreement") of HACIENDA DE CABALLO, LP, a Delaware Limited Partnership (the "Partnership"), is made as of March 1, 2009, by and among USA GLOBAL DEVELOPMENT COMPANY, a California corporation, as a general partner ("Development General Partner" and "Operational General Partner" referred to as the "General Partners"), and the parties whose names and addresses are listed from time to time as Limited Partners on Exhibit A hereto, as limited partners (the "Limited Partners").

## ARTICLE I

### Definitions

As used herein, the following terms shall have the following meanings:

Act: The Delaware Revised Uniform Limited Partnership Act, as the same may be amended from time to time.

Adjusted Capital Account Deficit: "Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to this Agreement or is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(C) after taking into account any changes during such year in Partnership minimum gain and in minimum gain attributable to any Partnership nonrecourse debt under Regulations Section 1.704-2(d)(2) and (3); and

(ii)    Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.7041(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

1

772957.1

<u>Adjusted Capital Contribution</u>:   A Partner's Capital Contribution, adjusted as follows:

(a)    Increased by the amount of any cash Capital Contribution to the Partnership or the fair market value of Capital Contributions made in kind net of any liabilities assumed by the Partnership or are secured by any property contributed to the Partnership by such Partner; and

(b)    Reduced (but not below zero) by the amount of distributions made pursuant to <u>Section 4.3(a)</u>, and/or the fair market value of any Partnership property distributed to such Partner net of any liabilities assumed by a Partner or are secured by any distributed property in connection with any in kind Distribution made pursuant to <u>Section 4.3(a)</u>.  If any Partner transfers all or any portion of his Partnership Interest in accordance with the terms of this Agreement, his transferee shall succeed to the Adjusted Capital Contribution of the transferor to the extent it relates to the transferred Partnership Interest.

<u>Affiliate</u>:  Any Person, directly or indirectly, through one or more intermediaries, which controls or is controlled by or is under common control with another Person or any spouse or ancestor, lineal descendants, or relatives of the first degree (or their spouses).  A Person shall be treated as controlling, controlled by or under common control with any Person with which the spouse or the ancestors, lineal descendants or relatives of the first degree (or their spouses) of such Person or such Person's spouse controls or is controlled by or is under control.  The term "control" as used herein (including the terms "controlling", "controlled by" and "under common control with") means any officer, director, general partner, managing partner or manager of any Person or the possession, direct or indirect, of the power to (a) vote twenty-five percent (25%) or more of the outstanding voting interests of such Person, or (b) otherwise direct management policies of such person or entity, by contract or otherwise.

<u>Agreement</u>:   This Agreement of Limited Partnership, including any Exhibits hereto, as the same may be amended or restated from time to time.

<u>Annual Budget</u>: As defined in <u>Section 6.5(g)</u>.

<u>Bankruptcy</u>:   If a Person makes an assignment for the benefit of creditors or applies for the appointment of a trustee, liquidator, receiver or custodian of substantially all of its assets or commences any proceeding relating to itself under any bankruptcy, reorganization, arrangement or similar law, or if such application is filed or any proceeding is commenced against such Person and such Person indicates its consent thereto, or an order or decree is entered appointing any such trustee, liquidator, receiver or custodian or approving a petition in any such proceeding and such order or decree shall have continued undischarged and unstayed for a period of 30 days, if a Person admits in writing that it is unable to pay its debts as they come due or if a Person takes any corporate action in furtherance of any such application or proceeding or if a Person

2

772957.3

becomes insolvent or is unable to pay its obligations and debts when they become due. The term "Bankruptcy" as defined in this Agreement and as used herein is intended to and shall be deemed to supersede and replace the events of withdrawal described in Sections 17-402(a)(4) and (5) of the Act.

Book Basis:  Means with respect to any asset, the asset's adjusted basis for federal income tax purposes; provided, however, (a) if property is contributed to the Partnership, the initial Book Basis of such property shall equal its fair market value on the date of contribution; and (b) if the Capital Accounts of the Partners are adjusted pursuant to Treasury Regulation Section 1.704-1(b) to reflect the fair market value of any Partnership asset, the Book Basis of such asset shall be adjusted to equal its respective fair market value as of the time of such adjustment in accordance with such Treasury Regulation.  The Book Basis of all assets shall be adjusted thereafter by depreciation as provided in Treasury Regulation Section 1.704-1(b)(2)(iv)(g) and any other adjustment to the basis of assets other than depreciation or amortization.

Business Day:  Any day on which commercial banking institutions in the City of Los Angeles are not authorized or required to close.

Capital Account:  As defined in Section 3.3

Capital Contribution:   As to any Limited Partner, the portion of the Unit purchased by a Limited Partner consisting of five hundred thousand United States Dollars (US$500,000.00).   As to any General Partner, the sum of any amount contributed by such General Partner to the Partnership and designated as a Capital Contribution.

Capital Transaction:  A sale, exchange, financing, refinancing, condemnation, destruction or other disposition of all or any substantial portion of the Company property

Cash Flow:  The amount by which the total cash received by the Partnership from all sources, exceeds operating expenses, current debt service and the reasonable working capital requirements of the Partnership.   The reasonable working capital requirements of the Partnership shall include the requirements of the Partnership to service its debt in the future, and other current obligations and to provide other reasonable Partnership reserves under the circumstances, as reasonably determined by the Operational General Partner including repair, maintenance and replacement reserves and any reserves required by any lender.

Cause:  Shall mean gross negligence, willful misconduct, fraud, or breach of this Agreement; provided, that if Cause is alleged to be a breach of this Agreement by any General Partner, then notice shall be provided to such General Partner and such General Partner shall have thirty (30) days to commence to cure such breach and Cause shall not exist as long as such General Partner commences to cure such breach

3

772957.3

within such thirty (30) day period and thereafter diligently prosecutes such cure to completion.

Certificate:  The Original Certificate of Limited Partnership of the Partnership, which was executed by the General Partner and filed in the office of the Secretary of State of the State of Delaware on February 22, 2008, and all subsequent amendments thereto and restatements thereof.

Code:  The Internal Revenue Code of 1986, as the same may be amended from time to time.

Economic Risk of Loss:  Has the meaning in Section 1.752-2 of the Regulations.

Event of Dissolution:  As defined in Section 9.1.

Executive Committee:  As defined in Section 6.12.

General Partners:  Defined in the introductory paragraph.

Indemnified Parties:  As defined in Section 6.2.1.

Initial Closing:  The initial closing of the purchase and sale of at least Two  (2 ) Units in the Partnership by Limited Partners.

Limited Partner:  The parties listed as Limited Partners on Exhibit A hereto, as amended from time to time, in their capacities as Limited Partners of the Partnership, and, for purposes of the allocation and distribution provisions contained in Articles III, IV and IX, an Assignee.  For purposes of the Act, all Limited Partners shall be considered a single class or group.

Major Contract:  As defined in Section 6.3(b).

Major Decisions:  As defined in Section 6.11.

Nonrecourse Deductions:  Shall have the meaning given to such term in Regulations Section 1.704-2(b)(1).   The amount of Nonrecourse Deductions for a Partnership fiscal year equals the excess, if any, of the net increase, if any, in the amount of Partnership Minimum Gain during that fiscal year, over the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Liability that are allocable to an increase in Partnership Minimum Gain, determined according to the provisions of Regulation section 1.704-2(c).

Nonrecourse Liability:  Defined in Regulation section 1.704-2(b)(3).

Operating Cash Flow:  All Cash Flow of the Partnership, except Cash Flow from a Capital Transaction.

Partners:  The General Partners and the Limited Partners.

4

772957.3

<u>Partner Nonrecourse Debt</u>: As defined in Regulation section 1.704-2(b)(4).

<u>Partner Nonrecourse Minimum Gain</u>:   Defined in Regulation section 1.704-2(I)(2).

<u>Partner Nonrecourse Deductions</u>:  Defined in Regulation section 1.704-2(I)(2). The amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for a fiscal year equals the excess, if any, of the net increase, if any, in the amount of Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt during that fiscal year, over the aggregate amount of any distributions during such year to the Partner that bears the Economic Risk of Loss for such Partner Nonrecourse Debt to the extent such distributions are from the proceeds of such Partner Nonrecourse Debt and are allocable to an increase in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined according to the provisions of Regulation section 1.704-2(I)(2).

<u>Partnership</u>:  Hacienda de Caballo, LP, a Delaware limited partnership.

<u>Partnership Interest</u>:   The entire interest of a Partner in the Partnership representing such Partner's rights, powers and privileges as specified in this Agreement.   The term Partnership Interest includes the Partner's rights to vote on or approve any matter as provided in this Agreement, such Partner's Capital Account, Adjusted Capital Contributions and Percentage Interest.

<u>Partnership Minimum Gain</u>:  Shall have the meaning given to such term in Regulations Section 1.704-2(b)(2).

<u>Percentage Interest</u>:  The Percentage Interest in the Partnership for each Limited Partner shall consist of thirty five percent (35%) times a fraction where the numerator is the number of Units in the Partnership issued and outstanding to such Limited Partner and the denominator is the maximum number of Units authorized to be sold to the Limited Partners consisting of up to seven (7) Units. The balance Percentage Interest in the Partnership shall be shared equally between the Operational and Development General Partners.

<u>Permitted Transfer</u>:  A Transfer or a Partnership Interest be a Limited Partner in full compliance with the conditions precedent in <u>Section 8.1</u> or any Transfer of Partnership Interest by a General Partner pursuant to <u>Section 8.3</u>.

<u>Person</u>:  Any individual, partnership, corporation, limited liability company, joint venture, joint-stock company, unincorporated organization or association, trust (including the trustees thereof, in their capacity as such), government, governmental agency, political subdivision of any government or other entity.

<u>Profit and Loss</u>:  Mean for each taxable year or other period, an amount equal to the Partnership's taxable income or loss for the year or other period, determined in accordance with Section 703(a) of the Code (including all items of income, gain, loss or

5

7729373

deduction required to be stated separately under Section 703(a)(1) of the Code), with the following adjustments:

(a) any income of the Partnership that is exempt from federal income tax and not otherwise taken into account in computing Profit or Loss shall be added to taxable income or loss;

(b) any expenditures of the Partnership described in Section 705(a)(2)(B) of the Code or treated as Section 705(a)(2)(B) expenditures under Treasury Regulation Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

(c) gain or loss resulting from any disposition of Partnership property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Book Basis of the property, notwithstanding that the adjusted tax basis of the property differs from its Book Basis;

(d) in lieu of depreciation, amortization and other cost recovery deductions taken into account in computing taxable income or loss, there shall be taken into account depreciation for the taxable year or other period as determined in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(g); and

(e) any increase or decrease to Capital Accounts as a result of any adjustment to the book value of Partnership assets pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(g) shall constitute an item of Profit or Loss as appropriate.

<u>Regulations</u>:  The Treasury Regulations promulgated by the Internal Revenue Service pursuant to the Code.

<u>Subscription Agreements</u>:  Each of the several Subscription Agreements between the Partnership and the Limited Partners.

<u>Total Percentage Interests of the General Partners</u>:  Shall be one hundred percent (100%) minus the total Percentage Interests of the all of Limited Partners holding currently issued and outstanding Units.

<u>Transfer</u>:  Any sale, conveyance, assignment, disposition or hypothecation of a Partnership Interest.

<u>Unit</u>:  An investment of five hundred fifty thousand United States Dollars (US$550,000.00) in the Partnership by a Limited Partner consisting of a Capital Contribution of five hundred thousand United States Dollars (US$500,000.00) together with an administrative fee per Unit of twenty five thousand United States Dollars (US$25,000.00) and a brokerage fee of twenty five thousand United States Dollars (US$25,000.00).

7729573

## ARTICLE II

### General Provisions

2.1    Formation.  The General Partners and the Limited Partners hereby form the Partnership pursuant to the Act and this Agreement.

2.2    Certificate.  The General Partners have caused the Certificate to be filed as required by the Act.  The Certificate shall contain any additional information that the General Partner shall determine to include.  The Partners will immediately execute all certificates and other documents and do all filing, recording, publishing and other acts necessary to comply with all requirements for the formation and operation of the Partnership.  The General Partner may record the Certificate in the office of the County Recorder in any county in which the Partnership owns real property or anywhere else that the General Partner determines.

2.3    Operational Certificates and Other Filings.  If requested by the Operational General Partner, the Development General Partner and the Limited Partners shall immediately execute all certificates and other documents, and any amendments or renewals of such certificates and other documents as thereafter required, consistent with the terms of this Agreement necessary for the Operational General Partner to accomplish all filing, recording, publishing and other acts as may be appropriate to comply with all requirements for (a) the formation, continuation and operation of the Partnership as a limited partnership under the laws of the State of Delaware, (b) if the Operational General Partner deems it advisable, the operation of the Partnership as a limited partnership, or partnership in which the Limited Partners have limited liability, in all jurisdictions where the Partnership proposes to operate and (c) all other filings required to be made by the Partnership.

2.4    Name of the Partnership.  The name of the Partnership is Hacienda de Caballo, LP, a Delaware limited partnership.  The Operational General Partner may, in its discretion, from time to time, change the name of the Partnership and, in such event, shall notify the Limited Partners within 30 days after such name change.  The Operational General Partner, in its discretion, from time to time, may adopt such trade or fictitious names as it deems appropriate for the conduct of the Partnership's business.  The Operational General Partner shall file and publish any Fictitious Business Name Statements as are required by applicable laws.

2.5    Purpose.  The Partnership is formed for the object and purpose of acquiring the commercial and residential real property commonly known as Hacienda de Caballo, and owning, developing, operating, improving, financing, refinancing, managing and disposing of Partnership real or personal property, sharing the profits and losses there from and engaging in such activities necessary, incidental or ancillary thereto and to engage in any other lawful act or

7

772957.3

70

activity for which limited partnerships may be formed under the Act in furtherance of the foregoing.

2.6     Powers.   In furtherance of the purposes of the Partnership, the Partnership shall have all powers necessary, suitable or convenient for the accomplishment of the aforesaid purposes, subject to the limitations and restrictions set forth herein, including, without limitation, the following:

(a)     The entering into, performing and carrying out of contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Partnership; including, expressly, any contract or contracts with appropriate governmental agencies which may be desirable or necessary to comply with the requirements of applicable governmental statutes and rules affecting the Partnership property.

(b)     Borrowing money and issuing evidences of indebtedness, and securing the same with Partnership property by mortgage, deed of trust, pledge or other lien, in furtherance of any or all of the objects of the Partnership.

(c)     The doing of any and all acts and things necessary, appropriate, proper, advisable, incidental to or convenient for the furtherance and accomplishment of the business, objectives, and purposes herein set forth.

2.7     Principal Place of Business.  The Partnership shall maintain its office and principal place of business at, and its business shall be conducted from, 3080 Bristol Street, Suite 630, Costa Mesa, CA 92626 or such place or places inside the United States as the Operational General Partner may decide.

2.8     Registered Office and Registered Agent.   The address of the Partnership's registered office in the State of Delaware is 40 E. Division Street, Suite A, Dover, Delaware 19901.  The name of the Partnership's registered agent for service of process in the State of Delaware is Paracorp Incorporated.

2.9     Term.  The term of the Partnership commenced upon the filing of the Certificate in the office of the Secretary of State of the State of Delaware and shall continue until the Partnership is earlier dissolved, wound up and liquidated pursuant to Section 9.1.

2.10    Fiscal Year.  The fiscal year of the Partnership shall be the calendar year.  The Partnership shall have the same fiscal year for United States federal and state income tax purposes and for financial and partnership accounting purposes.

8

772957.3

ARTICLE III

Capital Contributions, Loans, Capital Accounts and Allocations

3.1     Capital Contributions.

(a)     Notwithstanding any other provision of this Agreement, the Partnership, and the Operational General Partner on behalf of the Partnership, may execute, deliver and perform the Subscription Agreements for a maximum of Seven (7) Units, and any other agreement with any Limited Partner or prospective Limited Partner without any further act, vote or approval of any Partner.

(b)     At the time of the Initial Closing, the amounts paid by the Limited Partners pursuant to the Subscription Agreements shall be paid to the Partnership and the Operational General Partner is authorized and directed to list the name, address, Capital Contribution, administrative fee and brokerage fee paid by such Limited Partners in the Exhibit A to be attached by the Operational Limited Partner at such Initial Closing.   The Operational Limited Partner is further authorized and directed to refund to the Limited Partners the sums paid for each Unit if the Initial Closing does not occur.

(c)     The Operational General Partner is authorized and directed to amend and replace the Exhibit A to add the name, address, Capital Contribution, administrative fee and brokerage fee paid by each Limited Partner at times subsequent to the Initial Closing until the maximum number of Units have been sold by the Partnership.  If the Partnership purchases any Unit, then (i) the Operational General Partner is authorized and directed to amend and replace the Exhibit A to delete the Limited Partner from whom such Unit is purchased, and (ii) such Unit may be resold to another Limited Partner and Operational General Partner is authorized and directed to amend and replace the Exhibit A to add the name, address, Capital Contribution, administrative fee and brokerage fee paid by such Limited Partner.

(d)     The Limited Partners shall have no obligation to make any additional Capital Contribution.  The General Partners shall have no obligation to make any initial or additional Capital Contribution to the Partnership; provided however the General Partners shall be permitted to make Capital Contributions to the Partnership with the approval of the Operational Limited Partner to the extent designated as such.

(e)     The portion of the Unit paid to the Partnership as an administrative fee and as a brokerage fee shall be nonrefundable to the Limited Partners after the Initial Closing and shall not be added to the Capital Accounts of the Limited Partners.

3.2     Loans to Partnership.   The Operational General Partner is authorized to obtain loans from one or more Partners that are willing to extend

9

772957.3

credit to the Partnership for the capital needs of the Partnership. No Partner shall be entitled to make any loan to the Partnership. The Operational Partner shall not be obligated to notify any Partner of any opportunity to make a loan to the Partnership. The Operational General Partner is authorized to obtain any loan from any Partner related to the Operational General Partner on terms and conditions that the Operational General Partner in its sole discretion deems are fair and reasonable to the Partnership. If the Operational General Partner arranges for any Partner to make any loan or loans to the Partnership, the amount of any such loan shall not constitute an increase in the Capital Account of the lending Partner or entitle such lending Partner to any increase in such Partner's share of the distributions and profits of the Partnership, or subject the lending Partner to any greater proportion of the losses which the Partnership may sustain. The amount of any such loan or advance shall be a recourse debt due from the Partnership to such lending Partner, repayable upon the terms and conditions as shall be mutually agreed upon by the lending Partner and the Operational General Partner. Unless otherwise agreed between the lending Partner and the Operational General Partner, any such loan shall bear interest at the prime rate of interest from time to time published by the Wall Street Journal.

3.3   Capital Accounts. The Partnership shall maintain a separate capital account (a "Capital Account") for each Partner.

(a)   Each Partner's Capital Account shall be increased by: (a) such Partner's Capital Contributions; (b) such Partner's distributive share of Profit; (c) any items in the nature of income or gains that are specially allocated; and (d) the amount of any Partnership liabilities assumed by such Partner or secured by any Partnership property distributed to such Partner.

(b)   Each Partner's Capital Account shall be decreased by: (a) the amount of cash and the Gross Asset Value of any Partnership property distributed to such Partner pursuant to any provision of this Agreement (net of liabilities encumbering such distributed property that the recipient Partner is considered to assume pursuant to Code Section 752); (b) such Partner's distributive share of Loss; (c) any items in the nature of expenses or losses which are specially allocated pursuant to the terms hereof; and (d) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

(c)   The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. In the event the Operational General Partner shall reasonably determine that it is prudent to modify the manner in which the Capital Accounts, or any debits or credits thereto, are computed in order to comply with such Treasury Regulations, the Operational General Partner may make such modification.

10

7729573

(d)     If the Gross Asset Values of Partnership assets are adjusted as described in the definition of Gross Asset Value, the Capital Accounts of all Partners shall be adjusted simultaneously to reflect the aggregate net adjustment as if the Partnership recognized gain or loss equal to the amount of such net adjustment.

(e)     In the event any interest in the Partnership is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent such Capital Account relates to the transferred interest.

3.4     <u>Allocations to the Partners</u>.

(a)     Profits from operations other than a Capital Transaction shall be allocated to the Partners in accordance with their Percentage Interests.

(b)     Losses from operations other than a Capital Transaction shall be allocated to the Partners in accordance with their Percentage Interests.

(c)     Profits from any Capital Transaction shall be allocated to the Partners as follows:

(i)     First, to the Partners to the extent that cumulative Losses previously allocated to the Partners during the term of the Partnership exceed cumulative Profits allocated to the Partners during the term of the Partnership, Profits shall be allocated to the Partners in such manner as to offset such cumulative Losses in the order of priority which is the inverse of the order of priority in which such cumulative Losses were allocated to the Partners pursuant to <u>Section 3.4(b)</u>, <u>Section 3.4(d)(ii)</u> and <u>Section 3.4(d)(iii)</u> hereof (i.e., the last dollar of Losses allocated shall be offset by the next dollar of Profits allocated), until such cumulative Losses have been offset entirely by Profits;

(ii)     Thereafter, to the Partners in proportion to their Percentage Interests.

(d)     Losses from any Capital Transaction shall be allocated to the Partners as follows:

(i)     First, to the extent that cumulative Profits previously allocated to the Partners during the term of the Partnership exceed cumulative Losses allocated to the Partners during the term of the Partnership, Losses shall be allocated to the Partners in such a manner as to offset such cumulative Profits in an order of priority which is the inverse of the order of priority in which such cumulative Profits were allocated to the Partners pursuant to <u>Section 3.4(a)</u> and <u>Section 3.4(c)(ii)</u> hereof (i.e., the last dollar of Profits allocated shall be offset by the next dollar of Losses allocated), until such cumulative excess Profits have been offset entirely by Losses;

11

772957.3

74

(ii)   Next, to the Partners with positive Capital Account balances in proportion to the positive balances in their Capital Accounts until the Capital Account of such Partners are reduced to zero;

(iii)   Thereafter to the Partners in proportion to their Percentage Interests.

3.5   Special Allocations.   Notwithstanding anything to the contrary in Section 3.5:

(a)   The following special allocations shall be made in the following order:

(i)   Minimum Gain Chargeback.   If there is a net decrease in Company Minimum Gain during a fiscal year, each Member shall be specially allocated, before any other allocation under this Section 3.5, items of Company income and gain for such fiscal year (and, if necessary, subsequent years) in proportion to and to the extent of an amount equal to such Member's share of the net decrease in Company Minimum Gain determined in accordance with Regulation section 1.704-2(g)(2).   This Section 3.5(a)(i) is intended to comply with, and shall be interpreted consistently with, the "minimum gain chargeback" provisions of Regulation section 1.704-2(f).

(ii)   Company Nonrecourse Debt Minimum Gain Chargeback.   Notwithstanding any other provision of Section 3.5 hereof, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any fiscal year of the Company, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulation section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulation section 1.704-2(i)(4).   Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.   The items to be so allocated shall be determined in accordance with Regulation section 1.704-2(i)(4).   This Section 3.5(a)(ii) is intended to comply with the minimum gain chargeback requirement of that section of the Regulations and shall be interpreted consistently therewith.

(iii)   Qualified Income Offset.   Notwithstanding any other provision of Section 3.4 hereof, if either Member unexpectedly receives any adjustment, allocation or distribution described in clauses (4), (5) or (6) of Regulation section 1.704-1(b)(2)(ii)(d), items of Company income and gain shall be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit, if any, created by such

12

7729957.3

adjustment, allocation or distribution as quickly as possible. This Section 3.5(a)(iii) is intended to constitute a "qualified income offset" within the meaning of Regulation section 1.704-1(b)(2)(ii)(d)(3) and shall be interpreted consistently therewith.

(b)    Nonrecourse Deductions.    Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Partners in proportion to the Partner's respective Percentage Interest.

(c)    Partner Nonrecourse Deductions.    Any Partner Nonrecourse Deductions for any fiscal year or other period shall be allocated to the Partner who bears (or is deemed to bear) the Economic Risk of Loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Regulation section 1.704-2(i)(2).

3.6    Certain Additional Allocations.

(a)    With respect to assets distributed in kind to the Partners, (a) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be Profit or Loss realized by the Partnership immediately prior to the distribution; and (b) such Profit or Loss shall be allocated to the Capital Accounts pursuant to Section 3.4(c) or 3.4(d) hereof. Any Property so distributed shall be treated as a distribution to the Partners to the extent of the value as determined by the Operational General Partners less the amount of any liability related thereto that is assumed by the Partner receiving such distribution or is secured by the Property distributed. Nothing contained in this Section 3.6 or elsewhere in this Agreement is intended to treat or cause such distributions to be treated as sales for value. For the purposes of this Section 3.6, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the value of such assets as determined by the Operational General Partners and the Partnership's basis for such assets.

(b)    IRC Section 704(c) Allocation.    Any item of income, gain, loss and deduction with respect to any Property (other than cash) that has been contributed by a Partner to the capital of the Partnership or which has been revalued pursuant to clause (d) of the definition of "Capital Account" and which is required or permitted to be allocated to such Partner for income tax purposes under section 704(c) of the Code so as to take into account the variation between the tax basis of such Property and its fair market value at the time of its contribution shall be allocated solely for income tax purposes in the manner so required or permitted under Code section 704(c) using the "traditional method" described in Regulation section 1.704-3(b), except that any other method allowable under applicable Regulations may be used for any contribution of Property as to which there is agreement among the contributing Partners.

3.7    Compliance with Law and Regulations.    It is the intent of the Partners that each Partner's distributive share of Partnership tax items be

13

772957.3

determined in accordance with Article III to the fullest extent permitted by sections 704(b) and 704(c) of the Code. Therefore, notwithstanding anything to the contrary contained herein, if the Partnership is advised that, as a result of the adoption of new or amended regulations pursuant to Code sections 704(b) and 704(c), or the issuance of authorized interpretations, the allocations provided in this Article III are unlikely to be respected for federal income tax purposes, the Partners and the Operational General Partners shall amend the allocation provisions of this Agreement, on advice of accountants and legal counsel, to the minimum extent necessary to cause such allocation provisions to be respected for federal income tax purposes.

     3.8   <u>Tax Elections and Determinations By Tax Matters Partner</u>. The Operational General Partner shall be the Tax Matters Partner. The Operational General Partner shall from time to time cause the Partnership to make all tax elections as they deem to be in the best interests of the Partnership and the Partners. The Tax Matters Partner shall be the "tax matters partner" within the meaning of Section 6231 of the Code and shall represent the Partnership (at the Partnership's expense) in connection with all examinations of the Partnership's affairs by tax authorities, including judicial and administrative proceedings, and shall expend Partnership funds for professional services and costs associated therewith. If for any reason the Tax Matters Partner can no longer serve in that capacity or ceases to be a Partner or a Operational General Partner, as the case may be, the Operational General Partner may designate another Tax Matters Partner who shall be, to the extent possible, a Partner.

     3.9   <u>Authority of Tax Matters Partner</u>. The Tax Matters Partner is hereby authorized, but not required to undertake the following:

        (a)   To enter into any settlement with the Internal Revenue Service or the Secretary of the Treasury with respect to any tax audit or judicial review, in which agreement the Tax Matters Partner may expressly state that such agreement shall bind the other Partners, except that such settlement agreement shall not bind any Partner who (within the time prescribed pursuant to the Code and regulations thereunder) files a statement with the Secretary providing that the Tax Matters Partner shall not have the authority to enter into a settlement agreement on the behalf of such Partner.

        (b)   In the event that a notice of a final administrative adjustment at the Partnership level of any item required to be taken into account by a Partner for tax purposes (a "final adjustment") is mailed to the Tax Matters Partner, to seek judicial review of such final adjustment, including the filing of a petition for readjustment with the Tax Court, the District Court of the United States for the district in which the Partnership's principal place of business is located, or the United States Court of Claims, and to prosecute an appeal from a judgment of any court.

7729573

(c)   To intervene in any action brought by the other Partners for judicial review of a final adjustment.

(d)   To file a request for an administrative adjustment with the Secretary at any time and, if any part of such request is not allowed by the Secretary, to file a petition for judicial review with respect to such request.

(e)   To enter into an agreement with the Internal Revenue Service to extend the period for assessing any tax which is attributable to any item required to be taken into account by a Partner for tax purposes, or an item affected by such item.

(f)   To take any other action on behalf of the Partners or the Partnership in connection with any administrative or judicial tax proceeding to the extent permitted by applicable law or regulations, including retaining tax advisors to whom the Tax Matters Partner may delegate such of its rights and duties as the Tax Matters Partner may consider necessary and appropriate.

3.10   <u>Allocations upon Transfers of Partnership Interests</u>.   Profit and Loss, together with corresponding tax items, shall be allocated between the transferring Partner and the Substitute Partner using any method selected by the Operational General Partner which is permitted by Section 706 of the Code.

ARTICLE IV

Distributions

4.1   <u>Withdrawal of Capital</u>.   Except as otherwise expressly provided herein, no Partner shall have the right to withdraw capital from the Partnership or to receive any distribution or return of its Capital Contribution. Distribution of Partnership assets that are provided for in this Agreement shall be made only to Persons who, according to the books and records of the Partnership, are the holders of record of Interests in the Partnership on the date determined by the Operational General Partner as of which the Partners are entitled to any such distributions.

4.2   .Return to Limited Partners. The General Partners agree to suspend and accrue their rights to distribution of Operating Cash Flow and proceeds from Capital Transaction under Sections 4.3 and 4.4, below, until distributions have been made to Limited Partners aggregating and annualized, non-compounded return of five percent (5%) on the Adjusted Capital Contributions of the Limited Partners. After the Limited Partners have received distributions of the aggregate annualized, non-compounded return of Five percent (5%), the General Partners receive all distributions until their suspended and accrued distributions have been paid out.

15

772957.3

**4.3   Operating Cash Flow.**  Operating Cash Flow shall be distributed to each of the Partners proportionately in accordance with their Percentage Interests

**4.4   Proceeds of a Capital Transaction.**  In any year in which the Partnership is not dissolved, proceeds from a Capital transaction shall be distributed to the Partners as follows:

(a)   First, proportionately in accordance with their Adjusted Capital Contributions until reduced to zero; and

(b)   Thereafter, the remaining proceeds from a Capital Transaction shall be distributed to all of the Partners proportionately in accordance with their Percentage Interests.

**4.5   Dissolution and Liquidation.**  In any year in which the Partnership is dissolved, liquidating distributions shall be subject to Section 9.4.

**4.6   Withholding Taxes.**  If the Partnership is obligated to withhold and pay any taxes concerning any Partner, any tax required to be withheld may be withheld from any distribution otherwise payable to that Partner, and may be paid to the appropriate tax authority.  Any amount withheld and paid to the tax authority with respect to a Partner shall be charged to that Partner's Capital Account as if the amount of such tax had been distributed to that Partner.

**4.7   No Distributions in Kind.**  Except as otherwise specifically set forth herein, the Partners shall not have the right to demand or receive property other than cash in return of Capital Contributions or as to distributions.

**4.8   Discretion to Distribute Refinancing Proceeds.**  For purposes of Section 4.3, to the extent that the Operational General Partner determines to realize or realizes upon Partnership property through a refinancing or other restructuring transaction in lieu of a taxable disposition, then the General Partner in its good faith discretion shall decide, after consultation with the Executive Committee, what portion, if any, of the proceeds of a refinancing or restructuring shall be deemed to be proceeds of a Capital Transaction.

**4.9   Distribution of Start Up Capital Contributions.**  The Operational General Partner has made voluntary Capital Contributions of funds for the benefit and purposes of the Partnership in the amount of approximately Four Hundred Thousand United States Dollars ($400,000.00) including funds advanced for deposits and option payments for purchase of Partnership property, feasibility studies, attorneys' fees, land planning fees and other fees and expenses for development of the Partnership property.  The funds contributed by the Operational General Partner shall be distributed to the Operational General Partner at the time of the Initial Closing with a preferred return of ten percent (10%) per annum on the balance of the Capital Contributions voluntarily made by the Operational General Partner.

16

772957.3

4.10   Restricted Distributions.   Notwithstanding any provision to the contrary contained in this Agreement, the Partnership and the General Partners on behalf of the Partnership shall not make a distribution to any Partner on account of its interest in the Partnership if such distribution would violate the Act or other applicable law.

## ARTICLE V

### Limited Partners.

5.1   Identification of Limited Partners.   The Limited Partners of the Partnership are listed in Exhibit A, as from time to time amended and modified by the Operational General Partner to reflect admission of additional Limited Partners and admission of substitute Limited Partners upon transfer of a Limited Partner's Partnership Interest to the extent of a Permitted Transfer pursuant to this Agreement.

5.2   Personal Nature of Limited Partnership Interests.   The Limited Partnership Interests shall be personal property for all purposes. All property, real or personal, which the Partnership owns, shall be deemed owned by the Partnership as an entity and no Limited Partner shall have an ownership interest therein.

5.3   Liability Limitation.   Each Limited Partner's liability for the debts and obligations of the Partnership shall be limited as set forth in the Act and other applicable law.

5.4   Resignation or Withdrawal.   Except as provided in this Agreement, no Limited Partner may resign or withdraw from Partnership or withdraw that Limited Partner's Capital Contributions or Capital Account.

5.5   Management Rights of Limited Partners.   Except for the rights specifically provided in this Agreement, no Limited Partner shall have any right to participate in management of the Partnership or to bind the Partnership; provided, however that this Section 5.5 shall not apply to any Limited Partner who is also a General Partner acting in such Person's capacity as a General Partner.   Not withstanding the above the Limited Partners shall form an advisory committee to consult and advise the General Partners with respect to the partnership business as defined in Act Section 17-303(b)(8)a. through (8)n. except (8)b., (8)c. and 8(j), and any other advisory rights that may be required under 8 C.F.R. 204.6(j)(5)(iii) as determined by an applicable governmental authority.

5.6   Right of Limited Partners to Remove General Partner.   The Limited Partners owning Partnership Interests constituting in the aggregate at least two-thirds of the Partnership Interests of all Limited Partners may, without the concurrence of the General Partners remove a General Partner for Cause and after such removal may admit a substitute General Partner.

17

772957.3

**5.7** **Death or Legal Incapacity of Limited Partner.** The death, legal incapacity, dissolution, termination, merger, consolidation or Bankruptcy of a Limited Partner shall not cause dissolution of the Partnership, but the rights of such Limited Partner to share in the Profits and Losses of the Partnership, to receive distributions from the Partnership and to assign a Partnership Interest shall be transferred to such Limited Partner's executor, administrator, guardian, conservator, or other legal representative or successor, as the case may be, subject to the terms and conditions of this Agreement, and the Partnership shall continue as a Partnership. However, in any such event such legal representative or successor, or any assignee of such legal representative or successor shall be admitted to the Partnership as a Limited Partner only in accordance with and pursuant to all of the terms and conditions of Article VIII hereof.

**5.8** Meetings of Limited Partners.

(a)   Meetings of the Limited Partners to vote upon any matters on which the approval or consent of the Limited Partners is required or on which the Limited Partners are authorized to take action under this Agreement may be called at any time by the General Partners and shall be called by the General Partners within ten (10) days after receipt of a written request for such a meeting signed by one or more Limited Partners owning Partnership Interests constituting in the aggregate more than thirty percent (30%) of the Partnership Interests of all Limited Partners. Any such request shall state the purpose of the proposed meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement. Meetings shall be held at the principal office of the Partnership or at such place as may be designated by the General Partners or, if the meeting is called upon the written request of Limited Partners, such place within the United States as designated by such Limited Partners.

(b)   Notification of any meeting to be held pursuant to this Section 5.8 shall be given not less than ten (10) days nor more than sixty (60) days before the date of the meeting, to each Limited Partner at his record address, or at such other address which he may have furnished in writing to the Operational General Partner. Such notice shall be in writing; shall state the place, date and hour of the meeting; and shall indicate that the notice is being issued at or by the direction of the Partner or Partners calling the meeting. The notice shall state the purpose or purposes of the meeting and the matters proposed to be acted upon at such meeting, including a verbatim statement of the wording of any proposed amendment to this Agreement. If a meeting is adjourned to another time and place within the United States, and if an announcement of the adjournment of time or place is made at the meeting, it shall not be necessary to give notice of the adjourned meeting. No notice of the time, place or purpose of any meeting of Limited Partners need be given to any Limited Partner who attends in person or is represented by proxy, except for a Limited Partner attending a meeting for the express purpose of objecting at the beginning of the meeting to the transaction or any business on the ground that the meeting is not lawfully called or convened, or

18

772957.3

to any Limited Partner entitled to such notice who, in a writing executed and filed with the records of the meeting, either before or after the time thereof, waives such notice.

(c)    For the purpose of determining the Limited Partners entitled to notice of, or to vote at, any meeting or any adjournment thereof, or to vote by written consent without a meeting, the General Partners or the Limited Partners requesting such meeting or vote may fix, in advance, a date as the record date for any such determination of Limited Partners. Such date shall not be more than sixty (60) days nor less than ten (10) days before any such meeting or submission of a matter to the Limited Partners, the date on which notice of the meeting or submission of the matter to the Limited Partners for a vote by written consent is mailed shall be the record date for such determination of Limited Partners.

(d)    Each Limited Partner may authorize any person or persons to act for him by proxy with respect to any matter in which a Limited Partner is entitled to participate, whether by waiving notice of any meeting, or voting or participating at a meeting. Each proxy must be signed by the Limited Partner. No proxy shall be valid after the expiration of twelve (12) months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable by the Limited Partner executing it.

(e)    Any matter for which the approval or consent of the Limited Partners is required or for which the Limited Partners are authorized to take action under this Agreement or under applicable law may be approved or action may be taken by the Limited Partners without a meeting and shall be as valid and effective as action taken by the Limited Partners at a meeting assembled, if written consents to such action by the Limited Partners are signed by the Limited Partners owning Partnership Interests constituting in the aggregate the Partnership Interests required to approve or otherwise authorize such action, and such written consents are delivered to the General Partners.

(f)    Personal presence of the Limited Partners shall not be required at any meeting, provided an effective written consent to or rejection of the action proposed to be taken at such meeting is submitted to the Operational General Partner. Attendance by a Limited Partner and voting in person at any meeting shall revoke any written consents or rejections of such Limited Partner submitted with respect to action proposed to be taken at such meeting.

(g)    Failure to vote either in person, by proxy or by written consent at a duly called meeting upon receipt of notice as provided for in this Article V on matters for which approval of the Limited Partners are required by this Agreement shall be counted as an affirmative vote.

19

772957.3

## ARTICLE VI

### Management of the Partnership.

6.1   Exclusive Management by the General Partners.   Except for the Major Decisions to be made by the Executive Committee and the matters on which the Limited Partners are required to vote or consent, the business, property and affairs of the Partnership shall be managed exclusively by the General Partners and the General Partners shall have the full, complete and exclusive authority, power and discretion to manage and control the business, property and affairs of the Partnership, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of a Partnership's business, property and affairs.

6.2   Development General Partner.   The Development General Partner shall have the duties and obligations (i) to plan and obtain the requisite governmental approval to operate the business and affairs of the Partnership as decided by the Partnership's Executive Committee, and to thereafter (ii) manage and operate the business and affairs of the Partnership Subject to the approval of the Operational General Partner, and the Major Decisions to be approved by the Executive Committee, and the other provisions of this Agreement, the Development General Partner, acting alone is authorized to submit entitlement applications, retain consultants and contractors, execute and deliver documents, agreements and instruments in furtherance of obtaining the governmental development entitlements, financing and construction of the improvements for the Partnership property.

6.3   Powers of Development General Partner.   Without limiting the generality of Sections 6.1 and 6.2 but subject to the other provisions of this Agreement, the Development General Partner shall have all necessary powers to manage and carry out the purposes, business, and affairs of the Partnership including without limitation the power to:

(a)   To monitor, supervise and manage all aspects of the development and construction of the Partnership property and improvements thereon.

(b)   To review, select, analyze, structure, negotiate, complete and enter into, execute and consummate all agreements, instruments and other documents and do all other acts the Development General Partner deems advisable in connection with the development and construction of the Partnership property and improvements thereon; provided, however that any contract or agreement to be entered into by the Development General Partner that exceeds $100,000 in value or is binding on the Partnership for more than thirty (30) days (a "Major Contract") shall require the approval of the Executive Committee.

20

7729573

(c)   In connection with any financing approved by the Executive Committee, to borrow money and incur indebtedness for the purposes of the Partnership from any source on terms and conditions determined to be reasonable to the Partnership by the Executive Committee, and to cause to be executed and delivered therefor in the Partnership name promissory notes, bonds, debentures, deeds of trust, mortgages, pledges, hypothecations or other evidences of debt and security therefor; and such borrowings shall include obtaining a loan of funds secured by the Partnership's property.

6.4    Operational General Partner.  The Operational General Partner shall have the duties and obligations (i) to manage all financial and accounting aspects of the Partnership including maintaining all of the bank accounts of the Partnership, (ii) to select and oversee accountants for the Partnership and maintain the financial books and records of the Partnership, (iii) to select and oversee all attorneys to handle all legal affairs of the Partnership, and (iv) to select and oversee property managers, hotel and spa operators, management for the equestrian center, real estate brokers for sales or leasing of Partnership property and to approve all leases, franchises, operating agreements and management agreements for Partnership property.  Subject to the approval of Major Decisions by the Executive Committee, and the other provisions of this Agreement, the Operational General Partner, acting alone is authorized to retain consultants and contractors, execute and deliver documents, agreements and instruments in furtherance of discharging the duties and obligations of the Operational General Partner.

6.5    Powers of Operational General Partner.  Without limiting the generality of Sections 6.1 and 6.4 but subject to the other provisions of this Agreement, the Operational General Partner shall have all necessary powers to manage and carry out the purposes, business, and affairs of the Partnership including without limitation the power to:

(a)    To monitor, supervise and manage all aspects of the business of the Partnership.

(b)    To review, select, analyze, structure, negotiate, complete and enter into, execute and consummate all agreements, instruments and other documents and do all other acts the Operational General Partner deems advisable in connection with the business of the Partnership; provided, however that any Major Contract shall require the approval of the Executive Committee.

(c)    To open bank accounts in the name of the Partnership, and to draw checks on such bank accounts, control such bank accounts, grant security interests in such bank accounts, and issue other orders on such bank accounts.

(d)    Enter into an agreement to borrow money or incur indebtedness for the purposes of the Partnership and mortgage or grant security interests in any Partnership Property in connection therewith.

21

772957.3

(e)   Enter into an agreement to borrow money or incur indebtedness for the purposes of the Partnership on an unsecured basis and to agree to returns on such unsecured financing on a shared appreciation or share of profits basis.

(f)   To sell all or a portion of the Partnership property on terms and conditions approved by the Executive Committee.

(g)   To prepare annual budgets for the Partnership in which the costs and expenses of the Partnership shall be estimated which shall include, without limitation general and administrative expenses, entitlement costs, construction costs and compensation to the General Partners (the "Annual Budget").

(h)   To change the principal executive office of the Partnership from one location to another and to fix and locate from time to time one or more subsidiary offices of the Partnership.

(i)   To select and remove all of the officers, consultants, agents and employees of the Partnership, to prescribe such powers and duties for them as may not be inconsistent with law or this Agreement, to fix their compensation, and to require from them security for faithful service.

(j)   Sue on, defend or compromise any and all claims or liabilities in favor of or against the Partnership; submit any and all such claims or liabilities to arbitration; and confess a judgment against the Partnership in connection with any litigation in which the Partnership is involved.

(k)   Retain legal counsel, accountants, auditors and other professionals in connection with the Partnership business and pay such remuneration for such services as the Operational General Partners may determine.

6.6   Transactions between the Partnership and a General Partner. Although it may be a conflict of interest, upon approval of the Executive Committee, a General Partner or any Affiliate may engage in any transaction involving the Partnership or Partnership property (including, without limitation, the purchase, sale, lease or exchange of any property or the rendering of any service or the establishment of any salary, or other compensation or other terms of employment).

6.7   Expenses. The Partnership shall pay or reimburse the General Partners for expenses to prepare this Agreement (including, without limitation, legal and accounting fees and costs). The Partnership shall also pay or reimburse the General Partners for reasonable and necessary business expenses incurred by such General Partner in conjunction with performing the duties under this Agreement. All reimbursable expenses shall be appropriately documented in reasonable detail upon submission of the request for reimbursement, and in a

22

772957.3

format and manner consistent with the Partnership's expense reporting policy, as well as applicable federal and state tax record keeping requirements.

6.8    **Time and Effort.**   The General Partners shall not be required to devote all of such General Partner's business time and efforts to the Partnership. The General Partners shall only be required to devote such time and attention to the Partnership and its business as is reasonably necessary to manage its affairs in accordance with sound business practices.

6.9    **Dissolution, Disability or Bankruptcy of a General Partner.**   In the event of the dissolution or Bankruptcy of a General Partner, such General Partner shall be terminated and removed as a Partner of the Partnership.

6.10    **Compensation General Partners.**   The General Partners shall be entitled to payment by the Partnership of compensation in accordance with the Annual Budget prepared by the Operational General Partner and approved by the Executive Committee.

6.11    **Major Decisions.**   The following actions shall be "Major Decisions" which shall not be undertaken by the General Partners without the approval or consent of the Executive Committee:

(a)    Approval of Major Contracts.

(b)    Approval of the Annual Budget.

(c)    Enter into or conduct any transactions, contracts or agreements with Affiliates of a General Partner.

(d)    Acquisition of any real property by the Partnership other than the property commonly known as Hacienda de Caballo.

(e)    Sale of Partnership property.

(f)    Removal of any General Partner for Cause.

(g)    Replacement of any General Partner if the such General Partner has been removed.

(h)    Enter into any merger, consolidation or conversion of the Partnership, reclassify or modify any Partnership Interests, or issue any additional Partnership Interest or other equity interest; subject, however to any Permitted Transfer of any Partnership Interest.

(i)    Admission of any additional or new Partner to the Partnership other than in connection with a Permitted Transfer.

(j)    Repurchase or redemption of any Partnership Interest.

23

772957.3

(k)    Approval of a voluntary Dissolution of the Partnership.

6.12   <u>Executive Committee</u>.  Major Decisions shall be made at a regular or special meeting of the Executive Committee pursuant to Section 6.13 below. General Partners shall make recommendations to the Executive Committee for each Major Decision and such General Partner's recommendation shall be adopted unless overruled by the Executive Committee.   The "Executive Committee" shall consist of three individual members appointed by the General Partners.  The Development General Partner shall appoint one member of the Executive Committee.   The Operational General Partner shall appoint two members of the Executive Committee.  Any General Partner appointing a member of the Executive Committee pursuant to this Section 6.12 may at any time and from time to time, replace any member of the Executive Committee previously selected by it by giving written notice of such replacement to the Executive Committee.   The initial representatives appointed to the Executive Committee shall be:

| General Partner | Representative |
|---|---|
| Development General Partner | James Stout |
| Operational General Partner | Thomas Wilkinson Grace Lin |

6.13   <u>Regular and Special Meetings</u>.   The Executive Committee shall establish a regular meeting date at least once during each calendar month. Special meetings of the Executive Committee may be called by any General Partner by giving notice by personal delivery or facsimile, which notice shall be given at least two (2) business days prior to the date of any special meeting (except in an emergency, in which event the General Partner shall give the maximum amount of notice practical under the circumstances).   In addition, all meetings may be held completely via telephonic communication if members of the Executive Committee and other participants in the meeting are each able to communicate with one another at the same time by telephonic means.

6.14   <u>Voting and Consents</u>.   The majority vote or written consent of the members of the Executive Committee entitled to vote on Executive Committee matters, whether or not present, shall constitute Executive Committee action.

6.15   <u>Place of Meetings</u>.   The Executive Committee shall meet for its purposes, when a meeting is called pursuant to <u>Section 6.13</u>, at the principal office of the Partnership or as designated by Executive Committee.  The exact date, place and time of such meeting shall be determined by the Executive Committee, but shall in no event be more often than monthly unless the Executive Committee determines that unusual circumstances so require.

24

772957.3

6.16   Limited Liability.  No member of the Executive Committee shall be liable for the liabilities of the Partnership.  The failure of a limited partnership to observe any formalities or requirements relating to the exercise of its powers or management of its business or affairs under this Agreement or the Act shall not be grounds for imposing personal liability on the members of the Executive Committee for liabilities of this Partnership.

6.17   General Standards of Conduct.  No General Partner or other person has duties (including fiduciary duties) to the Partnership or to another Partner or to another Person that is otherwise benefited or bound by this Agreement beyond the contractual duties set forth in this Agreement.  No General Partner shall have any liability to the Limited Partners or the Partnership due to any loss or liability incurred in connection with the affairs of the Partnership except to the extent such loss is proximately cause by the fraud, deceit, reckless or intentional misconduct or a knowing violation of law which has a material adverse effect on the Partnership or a failure to discharge the contractual duties provided in this Agreement which has a material adverse effect on the Partnership .  The duties of the members of the Executive Committee and the General Partners shall be limited to the contractual duties provided in this Agreement and the implied covenant of good faith and fair dealing arising out of the provisions of this Agreement.

(a)   Each members of the Executive Committee and the General Partners have the following duties to the Partnership and its other Partners:

(i)   To account to the Partnership and to hold as trustee for it any property, profit, or benefit derived in the conduct or winding up of the Partnership's business or derived from a use of the Partnership's Property.

(ii)   To refrain from dealing with the Partnership in the conduct or winding up of the Partnership's business as or on behalf of a party having an interest adverse to the Partnership.

(iii)   To refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of law.

(b)   The members of the Executive Committee and the General Partners do not violate a duty or obligation under the Act or under this Agreement merely because the Person's conduct furthers the Person's own interest.

(c)   A General Partner may lend money to and transact other business with the Partnership.  As to each loan or transaction, the rights and obligations of the General Partner are the same as those of a person who is not a General Partner, subject to other applicable law.

6.18   Independent Activities.   The General Partners, members of the Executive Committee or their Affiliates may engage in or possess an interest in any other business or venture of every nature and description, independently or

25

772957.3

88

with others, including those which may be the same as or similar to the Partnership's business and in direct competition therewith. Neither the Partnership nor any Partner shall have any right, by virtue of this Agreement, in and to such independent ventures or the income or profits derived therefrom. The General Partners, members of the Executive Committee and their Affiliates have no duty to submit to the Partnership any business opportunities which may come to it or be presented to any corporation, joint venture, firm, individual or other entity in which it may be in any way interested, and the General Partners, members of the Executive Committee and their Affiliates independently shall have the right to take for their own account or to recommend to others any such investment opportunity.

6.19   Conflicts of Interest.   A General Partner, members of the Executive Committee, or their Affiliates shall be entitled to enter into transactions that may be considered to be competitive with, or a business opportunity that may be beneficial to, the Partnership, it being expressly understood that some of the Partners may enter into transactions that are similar to the transactions into which the Partnership may enter.   No transaction with the Partnership shall be voidable solely because a General Partner, members of the Executive Committee or their Affiliates have a direct or indirect interest in the transaction if either the transaction is fair to the Partnership or the Executive Committee knows the material facts of the transaction and authorizes, approves, or ratifies the transaction.

6.20   Actions Requiring Approval of the Partners.   Neither the Operational General Partner nor the Executive Committee shall have the authority under this Agreement to cause the Partnership to take any of the following actions or transactions without first obtaining the approval of the Partners holding Partnership Interests of seventy-five percent (75%) or more:

> (a)   Any action in contravention of the Certificate.
>
> (b)   Amendment of the Certificate.
>
> (c)   On any other matter submitted to the Partners by the Executive Committee.

6.21   Indemnification of Agents.   The Partnership shall defend, indemnify and hold any General Partner harmless and the Partnership may, in the discretion of the Executive Committee, defend, indemnify and hold any other person harmless who was or is a party, or is threatened to be made a party to, any threatened, pending or completed action, suit or other legal proceeding by reason of the fact that he, she or it is or was a General Partner or officer, employee, legal representative or other agent of the Partnership or that, being or having been such a General Partner, officer, employee, legal representative or agent of the Partnership, he or she was serving at the request of the Partnership as a manager, director, officer, employee or other agent of another limited liability company, corporation, partnership, joint venture, trust or other enterprise (all such

26

7729573

persons referred to as "Indemnified Parties") to the fullest extent permitted by applicable law in effect on the date hereof and to such greater extent as applicable law may provide after the date of this Agreement. The Operational General Partner shall be authorized, on behalf of the Partnership, to enter into indemnity agreements from time to time with any person entitled to be indemnified by the Partnership under this Agreement upon such terms and conditions as the Operational General Partner deems appropriate in its business judgment. The Operational General Partner may, in the Operational General Partner's sole discretion, cause the Partnership to pay for the defense costs of any Indemnified Parties prior to any decision, award or judgment.

6.22   Insurance.   The Partnership shall maintain insurance including, without limitation, general business liability insurance with coverage for non-owned automobile liability, property and casualty insurance, coverage required under any office or equipment lease, coverage required by lenders, workmen's compensation insurance and such other insurance coverage as may be determined appropriate by the Operational General Partner.

6.23   General Partner as Limited Partner.   Any General Partner may also be a Limited Partner to the extent that it purchases or becomes a transferee of all or any part of the interest of a Limited Partner, and is admitted to the Partnership as a Limited Partner in accordance with this Agreement, and to such extent shall be treated as a Limited Partner in all respects including the right to vote on all matters on which Limited Partners may vote. The consent of any Limited Partner to such transfer to any General Partner need not be obtained.

6.24   Foreign Ownership.   Each Limited Partner hereby agrees to provide the General Partners with such information as the General Partners may reasonably request from time to time with respect to foreign citizenship, residency, ownership or control of such Limited Partner so as to permit the General Partners to evaluate and comply with any regulatory and tax requirements applicable to the Partnership or proposed investments of the Partnership.

ARTICLE VII

Partnership Accounting.

7.1   Partnership Tax Treatment.   The Partners intend the Partnership to be treated as a partnership for all federal income tax purposes. No Partner shall assert, on any tax return or elsewhere, anything inconsistent with this intent, or do anything which could deny the Partnership the intended partnership tax treatment.

7.2   Method of Accounting.   The Partnership books shall be kept on a basis of accounting as determined by the Operational General Partner in the Operational General Partner's sole discretion.

27

772937.3

7.3    Fiscal Year.  The Partnership's fiscal year (the "Fiscal Year") is the calendar year unless changed by the Operational General Partner in accordance with applicable tax laws.

7.4    Financial and Business Records.

(a)    Records Maintenance.  The Operational General Partner shall maintain or cause to be maintained financial and business records for the Partnership.

(b)    Income Tax Data and Reports.  The Operational General Partner shall send or cause to be sent to the Partners, within ninety (90) days after the end of each Fiscal Year, such information as is necessary for the Partners to complete their federal and state income tax or information returns together with an annual report which includes financial statements of the Partnership consisting of at least a balance sheet and income statement which may, but are not required to, be audited by independent certified public accountants.

28

772957.3

## ARTICLE VIII

### Transfer of Partnership Interests.

8.1    Transfer By Limited Partners.  A Limited Partner may Transfer any portion of its Partnership Interest consisting of one or more whole Unit only if all of the following conditions are satisfied:

(a)    The transferring Limited Partner retains no Units or retains a Partnership Interest consisting of one or more whole Units;

(b)    The Assignee has agreed in writing to assume all of the obligations of the transferring Partner concerning the Partnership Interest transferred as provided in this Agreement and the Subscription Agreement entered into by the transferring Limited Partner, including the obligations imposed hereunder as a condition to any Transfer;

(c)    The Assignee makes all of the representations and warranties set forth in the Subscription Agreement entered into by the transferring Limited Partner and verifies to the satisfaction of the Operational General Partner that such Transfer to the Assignee will not violate any laws or regulations binding on the Assignee, the transferring Limited Partner or the transferred Partnership Interest;

(d)    The Operational General Partner has approved the proposed transferee (which approval may be withheld in the unfettered discretion of the Operational General Partner) and the proposed assignment and assumption agreement, which must include at least: (a) the transferring Partner's name, (b) the Assignee's name, address and taxpayer identification number, (c) the date on which the Partnership Interest has been transferred and (d) the transferring Partner's intent that the Assignee become a Partner in its place to the extent of the transferred Partnership Interest;

(e)    The Operational General Partner has concluded, which conclusion may be based upon an opinion of counsel satisfactory to the Operational General Partner, that such assignment or disposition would not (a) result in a violation of law; (b) result in a termination of the Partnership for federal or state income tax purposes; or (c) result in the Partnership being taxed as a corporation for federal income tax purposes. In addition, NO SALE OR TRANSFER OF ANY PARTNERSHIP INTEREST OF ANY LIMITED PARTNER SHALL BE MADE, NO ATTEMPTED SALE OR TRANSFER SHALL BE VALID, AND THE PARTNERSHIP SHALL NOT BE REQUIRED TO GIVE ANY EFFECT TO ANY SUCH TRANSACTION UNLESS (A) SUCH TRANSACTION SHALL HAVE BEEN DULY REGISTERED UNDER THE SECURITIES ACT OR 1033 AND QUALIFIED OR APPROVED UNDER APPROPRIATE STATE OR BLUE SKY LAWS, OR (B) THE ISSUER SHALL HAVE FIRST RECEIVED ASSURANCES SATISFACTORY TO THE OPERATIONAL GENERAL PARTNER THAT SUCH REGISTRATION, QUALIFICATION OR APPROVAL IS NOT REQUIRED WHICH ASSURANCES

29

772957.3

MAY INCLUDE AN OPINION OF COUNSEL SATISFACTORY TO THE OPERATIONAL GENERAL PARTNER.

8.2    Transfer Void.  Any attempted Transfer of a Partnership Interest of a Limited Partner in contravention of this Agreement is void.

8.3    Transfer By General Partner.  A General Partner may transfer all or any portion of such General Partner's Partnership Interest provided one or more of the following conditions are satisfied:

(a)    In the case of a Transfer by the Operational General Partner, Tom Wilkinson controls the management of the transferee Operational General Partner;

(b)    In the case of a Transfer by the Development General Partner, James Stout controls the management of the transferee Development General Partner; or

(c)    The Executive Committee determines in good faith that the transferee General Partner has the knowledge, skill and experience to perform the duties and obligations required to be performed with respect to the General Partnership Interest which is subject to such Transfer.

ARTICLE IX

Term and Dissolution of the Partnership

9.1    Events Causing Dissolution.  Any of the following events shall cause the dissolution of the Partnership:

(a)    Sale of Partnership Assets.  The sale or disposition of all or substantially all of the Partnership's assets.

(b)    Approval of Partners:  The vote or written consent of those non-defaulting Partners holding a majority of the Percentage Interests.

(c)    Determination by Operational General Partner.  The Operational General Partner determines that the Partnership shall be dissolved.

9.2    No Other Dissolution.  The Partners expressly agree no event other than those set forth in Section 9.1 above shall cause dissolution of the Partnership.

9.3    Responsibility for Winding Up.  Upon dissolution of the Partnership, the affairs of the Partnership shall be wound up by the Operational General Partner; provided, however, if dissolution occurs pursuant to judicial decree, the winding up shall be conducted in accordance with the Decree of Dissolution.  If

30

772957.3

any Partner winds up the Partnership's affairs, then such Partner shall be entitled to reasonable compensation.

9.4    Liquidation and Distribution.  The person or persons responsible for winding up the affairs of the Partnership shall take full account of the Partnership assets and liabilities, shall liquidate the assets of the Partnership as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds from the liquidation of assets and collection of the receivables of the Partnership, together with assets distributed in kind, in the following order:

(a)    Partnership Debts.  To the payment and discharge of all Partnership debts and liabilities and the expenses of liquidation.

(b)    Reserves.  To the creation of any reserves which such person deems necessary for any contingent or unforeseen liabilities or obligations of the Partnership.

(c)    Partner Obligations.  To the payment and discharge of all Partnership debts and liabilities owing to Partners, but if the amount available for payment is insufficient, then pro rata in accordance with the amounts of these debts and liabilities.

(d)    Partners.  When there is a distribution in liquidation of the Company or when any Partner's interest is liquidated, all items of income and loss first shall be allocated to the Partners' Capital Accounts under this Article III and other credits and deductions to the Partners' Capital Accounts shall be made before the final distribution is made.  The final distribution, when made, shall be made to the Partners in accordance with and in an amount equal to their positive Capital Account balances, thereby adjusting each Partners' Capital Account to zero.  The provisions of this Section 9.4(d) shall be construed in accordance with the requirements of paragraph (2) of the Regulations Section 1.704-1(b)(2)(ii)(b) and, if the Partners so elect, in accordance with any amended or successor regulations or authoritative interpretations issued thereunder.

9.5    Deficit Capital Accounts.  If any Partner shall have a deficit balance (after giving effect to all contributions, distributions and allocations for all taxable years, including the year in which the liquidation occurs), then such Partner shall have no obligation at any time to repay or restore to the Partnership all or any part of any distribution properly made to it from the Partnership in accordance with this Agreement or make any contribution to the Partnership with respect to such deficit and such deficit shall not be considered a debt owed to the Partnership or any other person or entity for any purpose whatsoever.

31

772957.3

# ARTICLE X

## Miscellaneous.

10.1   Notices.  Except as otherwise provided in this Agreement, all notices or other communications required or permitted hereunder shall be in writing and shall be delivered or sent, as the case may be, by any of the following methods: (a) personal delivery; (b) overnight commercial carrier or delivery service; (c) certified mail (with postage prepaid and return receipt requested); or (d) facsimile.  Any such notice or other communication shall be deemed received and effective upon the earlier of (i) if personally delivered, the date of delivery to the address of the party to receive such notice; (ii) if delivered by overnight commercial carrier or delivery service, one (1) day following the receipt of such notice or communication by such carrier or service from the sender, as shown on the sender's delivery invoice from such carrier or service, as the case may be; (iii) if mailed, forty-eight (48) hours after the date of posting as shown on the sender's registry or certification receipt; or (iv) if given by facsimile the day when sent if sent prior to 4:00 p.m. (local time of the recipient) on a Business Day and if sent at another time, on the next succeeding Business Day.  Any notice or other communication sent by facsimile must be confirmed in writing within forty-eight (48) hours by letter mailed or delivered in accordance with clause (b) or clause (c) of the first sentence of this Section 10.1.  Any reference herein to the date of receipt, delivery, or giving, as the case may be, of any notice or other communication shall refer to the date such communication becomes effective under the terms of this Section 10.1.  The address for purposes of the giving of notices hereunder (1) to the Partnership or the General Partners is the address for the Partnership set forth in Section 2.7 and (2) to a Partner is the address set forth in Exhibit A.

Notice of change of address shall be given by written notice in the manner detailed in this Section 10.1. Rejection or other refusal to accept, or the inability to deliver, because of a changed address of which no notice was given shall be deemed to constitute receipt of the notice or other communication sent.

10.2   Amendment.

(a)   Except as required by law or for an amendment to Exhibit A hereto or as otherwise provided in this Agreement, this Agreement may be amended by the written consent of the General Partner and a majority of the Percentage Interests of the Limited Partners; provided, however, that amendments which do not adversely affect the Limited Partners or the Partnership may be made to this Agreement and the Certificate, from time to time, by the General Partners, with the consent of the Executive Committee and without the consent of any of the Limited Partners, (i) to amend any provision of this Agreement and the Certificate which requires any action to be taken by or on behalf of the General Partners or the Partnership pursuant to requirements of Delaware law if the provisions of Delaware law are amended, modified or revoked so that the taking of such action is no longer

32

772957.3

95

required, (ii) to cure any ambiguity, or to correct any clerical mistake or to correct or supplement any immaterial provision herein or in the Certificate which may be inconsistent with any other provision herein or therein, or correct any printing, stenographic or clerical errors or omissions, which shall not be inconsistent with the provisions of this Agreement or the status of the Partnership as a partnership for United States federal income tax purposes, (iii) to change the name of the Partnership or (iv) to make any change which is for the benefit of, or not materially adverse to the interests of, the Limited Partners; provided, further, that no amendment shall (i) make any adverse change in the rights of any Partner under this Agreement, or in the allocations or distributions to such Partner, or increase the responsibility of any Partner for any expenditures, obligations or liabilities beyond that set forth in this Agreement, without the written consent of each Partner so affected, (ii) change the Percentage Interests of Limited Partners, (iii) amend this Section 10.2 without the consent of each affected Limited Partner. In addition to the foregoing, with the consent of the General Partner, which shall not be unreasonably withheld, any Limited Partner may irrevocably renounce the right to vote under this Agreement, in which case such Limited Partner shall not be counted as a Limited Partner for the purpose of any vote hereunder.

(b)     Any amendment to this Agreement that may be made solely with the approval of the General Partners and any amendment to Exhibit A hereto may be executed on behalf of each Limited Partner (other than any Limited Partner signatory to this Agreement on whose behalf the General Partner did not sign as attorney in fact) by the General Partner pursuant to the power of attorney given by the Limited Partners under the Subscription Agreement.

10.3   Construction of Agreement.  The Article and Section headings used in this Agreement are for reference purposes only, and are not intended to be used in construing this Agreement.  The Exhibits attached hereto are incorporated herein by reference and expressly made a part of this Agreement for all purposes.

10.4   Integration.  This Agreement and the other agreements specifically referred to herein contain the entire understanding between the Partners, and supersedes any prior or contemporaneous understanding or agreements between them, whether written or oral, respecting the within subject matter.

10.5   Time.  Time is of the essence of this Agreement.

10.6   Counterparts and Execution.  This Agreement may be executed in multiple counterparts, each of which shall be deemed an original Agreement, and all of which shall constitute one and the same Agreement.

10.7   Governing Law.  The provisions of this Agreement shall be construed and enforced in accordance with the law of the State of Delaware.

772957.3

10.8   Further Assurances.   The Partners agree to execute such further documents and take such other actions as may be permitted or required by law to implement the purposes, objectives, terms, and provisions of this Agreement.

10.9   Waiver.   No consent or waiver, express or implied, by any Partner or the Partnership to or of any breach or default by another in the performance by the other Partners of the other Partners' obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by any such Partners hereunder. Failure on the part of a Partner or the Partnership to complain of any act or failure to act of any Partner or to declare the other Partner in default, irrespective of how long such failure continues, shall not constitute a waiver by the Partnership or such Partner of its rights hereunder.

10.10   Severability.   If any provision of this Agreement or application to any party or circumstances shall be determined by any court of competent jurisdiction to be invalid and unenforceable to any extent, the remainder of this Agreement or the application of such provision to such person or circumstances, other than as to which it is so determined invalid or unenforceable, shall not be affected thereby, and each provision shall be valid and shall be enforced to the fullest extent permitted by law.

10.11   Equitable Remedies.   Any Partner hereto shall, in addition to all other rights provided herein or as may be provided by law, and subject to the limitations set forth herein, be entitled to all equitable remedies including those of specific performance and injunction, to enforce such Partner's rights hereunder.

10.12   Remedies Cumulative.   Subject to the provisions of this Agreement, each right, power, and remedy provided for herein or now or hereafter existing at law, in equity, by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy provided for herein or now or hereafter existing at law, in equity, by statute or otherwise, and the exercise or beginning of the exercise or the forbearance of exercise by the Partnership or any Partner of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise by the Partnership or such Partner of any or all of such other rights, powers or remedies.

10.13   Benefits, Obligations and Survival of Representations and Warranties.   The covenants and agreements herein contained shall inure to the benefit of, and be binding upon, the parties hereto and their respective successors and assigns. All representations, warranties and indemnifications of the Partners contained herein shall survive the termination of any such Partner or the termination of the Partnership and shall remain continuing obligations, representations and warranties of such Partners.

10.14   No Third-Party Beneficiary.   This Agreement is intended to create enforceable rights between the Partners only, and creates no rights in, or obligations to, any other Persons whatsoever. Without limiting the generality of

34

772957.3

the foregoing, as to any third party, a deficit Capital Account of a Partner shall not be deemed to be a liability of such Partner nor an asset or property of the Partnership. None of the provisions of this Agreement shall be for the benefit of or enforceable by any third-party creditors of the Partnership.

10.15 <u>Waiver of Partition</u>. Except as may be otherwise required by law in connection with the winding-up, liquidation and dissolution of the Partnership, each Partner hereby irrevocably waives any and all rights that it may have to maintain an action for partition of any of the Partnership's property.

10.16 <u>Power of Attorney</u>. Each Limited Partner (other than any Limited Partner signatory to this Agreement on whose behalf the General Partner did not sign as attorney in fact) hereby acknowledges and confirms that it has duly appointed each of the General Partner, the officers of each General Partner, the partners of each General Partner, and the officers of the partners of each General Partner, and any successors of any of them, as its true and lawful attorney in fact for the limited purposes and upon the terms and conditions specified in the power of attorney contained in the Subscription Agreements. Such appointment shall expire immediately if the General Partner is subject to bankruptcy proceedings or is adjudicated incompetent by a court of competent jurisdiction.

10.17 <u>Scope of Representation</u>. EACH OF THE PARTNERS HEREBY ACKNOWLEDGES AND AGREES THAT, IN CONNECTION WITH THE DRAFTING, PREPARATION AND NEGOTIATION OF THIS AGREEMENT, THE FORMATION OF THE PARTNERSHIP AND ANY MATTERS RELATED THERETO, JACKSON, DEMARCO, TIDUS, PETERSEN & PECKENPAUGH HAS ONLY REPRESENTED THE INTERESTS OF THE OPERATIONAL GENERAL PARTNER AND NOT THE INTERESTS OF ANY OF THE OTHER GENERAL OR LIMITED PARTNERS. THE ATTORNEYS, ACCOUNTANTS AND OTHER EXPERTS WHO PERFORM SERVICES FOR ANY OF THE PARTIES HERETO MAY ALSO PERFORM SERVICES FOR THE PARTNERSHIP. TO THE EXTENT THE FOREGOING REPRESENTATION CONSTITUTES A CONFLICT OF INTEREST, EACH OF THE PARTNERS HEREBY EXPRESSLY WAIVES ANY SUCH CONFLICT OF INTEREST. THE PARTNERS FURTHER ACKNOWLEDGE THAT THE ATTORNEYS, ACCOUNTANTS AND OTHER EXPERTS WHO PERFORM SERVICES FOR THE PARTNERSHIP OR ANY PARTNER OR ANY COMBINATION THEREOF SHALL NOT BE DEEMED BY VIRTUE OF SUCH REPRESENTATION TO HAVE ALSO REPRESENTED ANY OTHER PARTNER IN CONNECTION WITH ANY SUCH MATTERS.

(Signature Page to Follow)

772957.3

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

GENERAL PARTNER:

USA GLOBAL DEVELOPMENT COMPANY,

a California corporation

By: _____

       Name: Thomas Wilkinson

       Its: President

LIMITED PARTNERS:

On behalf of all Limited Partners listed on <u>Exhibit A</u> hereto (other than any Limited Partner whose signature appears below) being admitted to the Partnership as Limited Partners of the Partnership:

By:  USA GLOBAL DEVELOPMENT COMPANY,

a California corporation

By: _____

       Name: Thomas Wilkinson

       Its: President

1

772957.3

Hacienda De Caballo, LP

德拉维尔州有限责任合伙企业

修订重编版

有限责任合伙合约

本有限责任合伙合约修订重编版（以下简称为本"合约"）于 2009 年 3 月 1 日由德拉维尔州的一家有限责任合伙企业 — Hacienda De Caballo, LP（以下简称为 "合伙公司"）、加利福尼亚的一名执行股东 — 美国环球开发公司（以下简称为 "执行股东" 以及陆续在附件A 中载列姓名和住所的有限责任股东当事方（以下简称为"有限责任股东"）共同订立。

第 1 章

定义

本合约中下列术语具有下列含义：

法案：是指（可随时进行修订的）德拉维尔州统一有限责任合伙法（修正版）.．

经调整资本账赤字："经调整资本账赤字"是指任何一名股东的资本账户经过下列调整后在该会计年度年终结算时（可能）出现的赤字差额：（i）在根据本合约或者财政规章第 1.704-1(b)(2)(ii)(C) 款规定，该股东有义务或视为有义务填补任何金额的情况下，结合当年的最低合伙盈利额以及可用于偿还财政规章第 1.704-2(d)(2) 及 (3) 款项下之合伙无追索权债务的最低合伙盈利额的所有变动，加到该资本账户；以及

（ii）减掉该资本账户中的财政规章第 1.704-1(b)(2)(ii)(d)(4)、(5) 及 (6) 款所述项目。

上述 "经调整资本账户赤字"一词的定义是依财政规章第 1.7041(b)(2)(ii)(d) 款的规定，对其所作解释亦应与该款规定一致。

经调整的资本额：是指经过下列调整的任何一名股东的资本额：

（a）根据该股东向合伙公司缴纳的现金增资额或以公评市价同类实物增资扣除合伙公司因而承担的任何债务，或者以公评市价的任何不动产增资减掉抵押贷款额的净值；及

（b）根据按第 4.4(a) 款规定分配的现金及/或以实物分配的合理市值扣除股东承担的任何债务或抵押贷款后净值减少该股东的资本额（但不得低于零）。若任何股东依照本合约条款转让其全部或部分股份，则受让人应按该股东的经调整的资本额计算其转让股权。

1

772957.4

关系人：是指通过一个或多个媒介直接或间接控制另一个人或其配偶、祖先、直系子孙或家族一等关系人（或其配偶）或者受前述当事方控制或共同控制的任何人。"人"应视为控制其他任何人或受其他任何人控制或共同控制的个体，该等其他任何人控制该人的配偶、祖先、直系后代或家族一等亲属（或其配偶）或受前述人士所控制或共同控制。本合约中的"控制"一词（包括"控制"、"受控制"及"受共同控制"等词语）是指通过订立契约或其他方式直接或间接拥有（a）股份或其代理人拥有已发行股份百分之二十五（25%）或以上的表决权，或（b）以其他方式指引此人或组织制定管理政策的权力的任何行政主管、董事、执行股东、执行股东或经理人。

合约：是指本有限责任合伙合约（包括可随时修订或重新编制的所有附件）。

年度预算：定义见第 6.5(g) 款规定。

破产：如果任何人根据破产法、重整法、改组法或类似法律作出符合债权人利益的财产分配安排，或申请将其实质性的全部资产交托信托人、清算人、破产事务官或保管人，或向法院申请执行任何与其自身相关的法律程序；如果此类申请已提交或者针对此人此族的法律程序已启动并征得此人的同意，或有指令或法令已指定上述任何信托人、清算人、破产事务官或保管人或者对在此类法律程序中提出的申请予以批准（且该项指令或法令于 30 天内未获解除及推延）；如果任何人书面确认自身已无能力偿还到期债务，或任何人通过任何项公司股东决议促使上述申请或法律程序获得批准，或者任何人已破产或者无法偿还其到期债务，均构成破产行为。本合约对"破产"一词的定义及使用应视为取代法案中第 17-402(a)(4) 及 (5) 款规定的退股事件。

账面价值：是指作为缴纳联邦所得税依据的经调整的资产价值；但如果，（a）以实物增资者应以增资当日公平市价为基准，且（b）如果为了反映任何合伙资产的公评市价而根据财政规章第 1.704-1(b) 款规定对各股东的资本账户加以调整，则此类资产的账面价值应根据该财政规章的规定调整至与调整时各资产公评市价相当的数值。此后，所有资产的账面价值均应按照财政规章第 1.704-1(b)(2)(iv)(g)款规定进行计提折旧后调整或者进行除折旧或摊销之外的任何其他资产价值调整。

营业日：是指洛杉矶市的商业银行业机构未批准或规定休业的任何一天。

资本账户：定义见第 3.3 款规定。

资本额：对每一位有限责任股东而言，是指由有限责任股东认购的价值为伍拾万美元（US$500,000.00）的股份单位。对执行股东而言，是指由该执行股东向本合伙公司缴纳的并经指定为资本额的任何金额，也是资本帐户的资金额。

资本交易：是指该公司的全部或部分实质财产的出售、交换、融资、再融资、被征收、破坏或其他处分。

流动现金：是指本合伙公司所有资金来源收入的现金总额，扣除营业费用、短期借款应付费用以及合伙公司必需的合理流动资金。合伙公司所需的合理流动资金应包括合伙

2

772957.4

公司用于清偿其未来负债和其他短期债务的必需资金以及在业务执行股东认为适当的情况下所提取的适量准备金（包括用于支付维修、保养及替换费用的准备金及贷款银行所要求提列的准备金）。

　　**起因：**是指重大疏忽、蓄意渎职、欺诈或违反本合约规定的行为；倘若任何一名执行股东被指控违反本合约规定而构成起因，则应于收到合伙公司发出的书面通知后三十（30）天内开始对其违约行为进行补救，只要该执行股东在此三十（30）天期间内开始对其违约行为进行补救并随后积极完成其补救措施，将不视为起因继续存在。

　　**章程：**是指于 2008 年 2 月 22 日由执行股东签署并在德拉维尔州的州务卿官署备案的本合伙公司的有限责任合伙原始章程，以及随后对该章程进行的所有修订及重新整编。

　　**法规：**是指（可随时修订的）1986 年美国《所得税法规》。

　　**经济损失风险：**定义见财政规章第 1.752-2 款规定。

　　**解散事件：**定义见第 8.3(c)款规定。

　　**执行委员会：**定义见第 6.12 款规定。

　　**执行股东：**定义见引言段落。

　　**受偿人：**定义见第 6.2.1 款规定。

　　**创投交易：**是指有限责任股东对至少两（2）个股份单位的买卖所进行的创投交易.

　　**有限责任股东：**是指列入（可不时变更的）本合约附件 A 中的具备成为本合伙公司有限责任股东能力的当事方以及执行第三、四和九条的分配及分发规定的受托人。根据法案的规定，所有有限责任股东均应视为单一类别或群体。

　　**主要合同：**定义见第 6.3(b) 款规定。

　　**重大决策：**定义见第 6.11 款规定。

　　**备忘录：**是指于创投交易日之前修改或补充的与向本合伙公司有限责任股东发售股份单位相关的保密投资备忘录，本备忘录的副本已向本合约的每一位签署人发放。

　　**无追偿权扣除额：**应具有财政规章第 1.704-2(b)(1)款对其所规定的含义。合伙公司该会计年度的无追索权扣除额相当于该会计年度合伙最低盈利额的任何增加净值，较该项（根据财政规章第 1.704-2(c) 款规定）可分拨到合伙最低获利项目以提高其金额的无追偿权债务收益在该会计年度间的分拨总额所超出的任何金额。

　　**无追索权债务：**定义见第 1.704-2(b)(3) 款规定。

3

772957.4

<u>营业流动现金</u>：是指本合伙公司除资本交易所产生的流动现金以外的所有流动现金量。

<u>股东</u>：统指执行股东及有限责任股东。

<u>股东无追索权债务</u>：定义见财政规章中第 1.704-2(b)(4) 款规定。

<u>股东之无追索权最低获利</u>：定义见财政规章中第 1.704-2(i)(2) 款规定。

<u>股东之无追索权扣除额</u>：定义见财政规章中第 1.704-2(i)(2) 款规定。任何一会计年度间与股东无追索权债务相关的股东无追索权扣除额相当于该会计年度间股东无追索权债务所产生之最低获利的增加的任何净值，较任何项（根据财政规章第 1.704-2(i)(2)款规定）可分拨到由该股东无追索权债务所产生的最低获利项目以提高其金额的且在该会计年度间分配给该股东并为该股东无追索权债务在该债务获利范围内承担经济损失风险的总额所超出的任何金额。

<u>合伙公司</u>：是指德拉维尔州的一家有限责任合伙企业 — Hacienda De Caballo, LP。

<u>合伙公司权益</u>：是指任何一位股东在本合伙公司所拥有的全部权益它代表本合约对该股东赋予的权利、权力及特权。"合伙公司权益"一词包括该股东对本合约规定的所有事务所享有的表决权或同意权、对其资本账户、经调整的资本额以及股权比例所享有的权益。

<u>合伙最低盈利</u>：应具有财政规章中第 1.704-2(b)(2) 款对其所规定的含义。

<u>分配比例</u>：每一名有限责任股东在本合伙公司享有的盈利分配比例是指用百分之三十五（35%）乘以一个分数的值，该分数的分子为本合伙公司向各有限责任股东发行的股份单位数，分母为可出售给有限责任股东出售的最大股份单位数，最多为七（7）个单位。其余的盈利分配比例由业务执行股东和开发执行股东平分各半。

<u>合法转让</u>：是指有限责任股东严格按照<u>第 8.1 款</u>规定中的先决条件对其合伙股权权益进行转让或执行股东按照<u>第 8.3 款</u>规定对其合伙股权权益进行转让。

<u>人</u>：是指任何个人、合伙组织、法人、有限责任公司、合资公司、股份公司、非法人组织或协会、信托机构（包括以托管人名义对该信托机构进行委托的托管人）、政府、政府机构以及任何政府或其他组织的政治分支机构。

<u>利润及亏损</u>：是指本合伙公司根据法规第 703(a) 款规定在任何一纳税年度或其他期间并经过下列调整后的应纳税收入或亏损（包括根据法规第 703(a)(1) 款规定必须分别说明的所有收入、获利、亏损或扣除项目）：

(a)     本合伙公司获豁免缴纳联邦所得税以及出于其他原因未纳入利润或亏损计算中的各项收入应累计到可纳税收入或损失项目中；

4

772957.4

(b)　本合伙公司符合法规第 705(a)(2)(B) 款规定的或者根据财政规章第 1.704-1(b)(2)(iv)(i) 款规定视为构成第 705(a)(2)(B) 款所述费用的各项开支、以及出于其他原因未纳入利润或亏损计算的各项开支须从应纳税收入或损失项目中扣减；

(c)　各项合伙财产处分行为所产生的被认定应缴纳联邦所得税的利润或损失应参照该财产的账面价值进行计算，尽管该财产经调整后的课税基准与其账面价值不一样；

(d)　在财政规章第 1.704-1(b)(2)(iv)(g) 款所规定的纳税年度或其他期间计提的折旧应取代在计算应纳税收入或损失过程中纳入考虑的折旧、摊销及其他成本回收扣减额；以及

(e)　对于根据财政规章第 1.704-1(b)(2)(iv)(g) 款规定对本合伙公司资产面值进行调整而导致资本账户金额的增加或减少部分，在适当的情况下，应设立为一个利润或亏损项目。

**财政规章：**是指由美国国家税务局依据该法规规定颁布的财政规章。

**开办及管理费用：**是指股份单位定义中所涵括的费用，不应视为有限责任股东的资金部分，进行创投交易后即不可退还。

**认购合约：**是指本合伙公司与有限责任股东双方之间签署的各份认购合约。

**执行股东的股份比例总额：**相当于用百分之百（100%）减去持有目前已发行股份单位的所有有限责任股东的股份比例总额后的余额。

**转让：**是指对股份进行出售、让渡、让与、赠与或者抵押的行为。

**股份单位：**是指认购每一个股份单位所必须缴纳的伍拾万美元（US$500,000.00）资本额以及贰万伍仟美元（US$25,000.00）开办及管理费之和，即合计金额为伍拾贰万伍仟美元（US$525,000.00）的投资。

## 第 2 章

## 总则

2.1　**本合伙公司的成立。**执行股东与有限责任股东双方根据法案及本合约的规定据此成立本合伙公司。

2.2　**章程。**执行股东已根据法案规定提交合伙公司章程。该章程应载明执行股东认为应当载明的各项附加资料。股东应按照所有相关规定，及时签署成立并营业本合伙公司所必需的所有证明及其他文件，并完成所有必要的存档、登记、公布及其他相关工作。执行股东可将该章程呈报本合伙公司各不动产所在郡的郡档案署或者执行股东认为合适的地方备案。

5

772957.4

2.3　　营业证明及其他文件。为协助业务执行股东遵循（a）本合伙公司依据德拉维尔州法律以有限责任合伙企业形式成立、存续并营业；（b）在执行股东认为适当的情况下，本合伙公司以有限责任合伙企业形式、或者有限责任股东承担有限责任的合伙形式，在所有计划营业的辖区内营业；以及（c）本合伙公司依法编制其他所有文件所必需依据的一切相关规定，完成所有合理的存档、登记、公布及其他相关工作，应业务执行股东的要求，开发执行股东与有限责任股东应及时签署所有必要的且符合本合约条款的证明及其他文件、以及随后必需签署的所有该等证明及其他文件的变更或延续文件。

2.4　　本合伙公司的名称。本合伙公司的名称为"Hacienda De Caballo, LP"，是德拉维尔州的一家有限责任合伙公司。业务执行股东可不时自行更换本合伙公司的名称，并应自本合伙公司名称更换日期起 30 天内通知有限责任股东。业务执行股东不时自行选用其认为适合本合伙公司业务进行的商号或别名。业务执行股东应按适用法律规定的要求，公布商号别名声明并呈报相关部门备案。

2.5　　目的。本合伙公司成立的目的在于收购众所周知的"Hacienda De Cabllo"商业及居住地产；拥有、开发、营业、改良、管理并处分合伙公司的不动产或动产，将其用于融资和再融资之目的；共负盈亏并进行为达成上述目的的各种必要辅助性活动，并从事众多依法成立之有限责任合伙企业为促成上述目的而进行的所有合法行为或活动。

2.6　　权力。为促成本合伙公司的目的，本合伙公司应根据本合约的限制条款规定拥有一切适于或便于达成上述目的的必要权力，包括但不限于下列权力：

　　　　（a）　　订立、履行及执行为达成本合伙公司目的的所必需的，或与之相关的，或随之产生的所有类型合同（明确包括为遵循对合伙财产造成影响的适用政府法律法规而希望或必须与适当政府机构签署的一切合同）。

　　　　（b）　　为达成本合伙公司的目的，借款、开立借据并以合伙财产作为抵押、信托契据、质押或其他留置权的担保。

　　　　（c）　　实施一切为促成并完成本合约项下之业务、目标及目的所必需的、适当、正当、合理、随之产生的、或便于促成并完成前述目标的行为及事件。

2.7　　主营业所。本合伙公司必须在以下地址：3080 Bristol Street, #630, Costa Mesa, CA 92626，或者在业务执行股东认为适当的美国境内任何地方设立其办公室及主营业所，并进行营业活动。

2.8　　注册地址及注册机构。本合伙公司的注册地址为：德拉维尔州多佛市 A 区迪威臣街 40E 号，邮编：19901（40 E. Division Street, Suite A, Dover, Delaware 19901）。在德拉维尔州为本合伙公司送达法律文件的注册机构名称为 Paracorp Incorporated。

2.9　　期限。本合伙公司的营业期限自其章程在德拉维尔州州务卿署备案之日开始，直至本合伙公司根据第 9.1 款规定提前解散、结业及清算时为止。

6

772957.4

2.10    会计年度。本合伙公司的财政年度应按日历年度计算。本合伙公司应按照同样的会计年度计算美国联邦政府及州政府所得税以及执行财务及合伙会计工作。

第 3 章

资金、贷款、资本账户及分配

3.1    资金。

(a)    尽管本合约另有其他规定，本合伙公司及代表本合伙公司的业务执行股东毋须通过任何股东所采取的进一步行动、表决或同意，即可签署、交付并履行认购最多为七（7）个股份单位的认购合约，并与任何有限责任股东或有意投资的有限责任股东签署任何其他合约。

(b)    进行创投交易时，有限责任股东应根据认购合约规定向本合伙公司支付认购金额，授权并指示业务执行股东将其名称、住址、资本额列入附件 A 中，该附件 A 将由营业有限责任股东在创投交易时粘附到本合约中。倘若未能进行创投交易，营业有限责任股东应再次获得授权和指示将各股份单位的认购金额退还给有限责任股东。

(c)    在创投交易之后，业务执行股东有权依合约修改或更换附件 A 添加新的有限责任股东的名称、住址以及支付的资本额，直至本合伙公司已售出最大数目的股份单位为止。若本合伙公司购买任何股份单位，则（i）业务执行股东可以有权及指示以变更或更换附件 A，删除向本合伙公司出售该股份单位的有限责任股东，以及（ii）该股份单位可转售给另一名有限责任股东，业务执行股东有权依合约修改或更换附件 A，添加该有限责任股东的名称、住址及资本额。

(d)    有限责任股东无义务缴纳追加资本额。执行股东无义务向合伙公司缴付创投款或缴纳追加资本额；然而，若已征得营业有限责任股东的许可，执行股东可向本合伙公司缴付创投款或缴纳追加资本额。

(e)    进行创投交易后，向本合伙公司支付的作为开办及管理费用的股份单位部分不得退还给有限责任股东，亦不得添加到该有限责任股东的资本账户中。

3.2    本合伙公司取得贷款。业务执行股东有权可争取一名或多名股东自愿为合伙公司提供满足其资金需求的贷款。任何股东均无权向本合伙公司提供贷款。营业股东无义务向任何股东通知任何可向本合伙公司提供贷款的机会。业务执行股东有权可按照其认为对本合伙公司公平合理的条款，向任何与业务执行股东相关的股东争取贷款。若业务执行股东对任何股东作出向本合伙公司提供贷款的安排，则该项贷款的金额不得累计到该贷款股东的资本账户中，亦不得提高该贷款股东对本合伙公司享有的利润分配份额，亦不得要求该贷款股东按较大比例承担本合伙公司所可能遭受的亏损。任何此类贷款或账款金额属于本合伙公司欠付该贷款股东的追索权债务，本合伙公司应按该贷款股东与业务执行股东

7

772957.4

双方约定的条件予以偿还。除非该贷款股东与业务执行股东双方另有约定，任何此类贷款应按华尔街日报不时刊登的最优惠利率产生利息。

3.3　　**资本账户。** 本合伙公司应为每一名股东分别准备一个资本账（即"资本账户"）。

(a)　　应增列到每个股东资本账户中的项目如下：（a）该股东的资本额；（b）该股东的利润分配所得；（c）经特定分配而得的具有收入或盈利性质的任何项目；以及（d）合伙公司为该股东承担的负债或者以该股东由分配获得的任何合伙财产作为担保的合伙负债。

(b)　　应从每个股东资本账户中扣减的项目如下：（a）根据本合约所有规定分配给该股东的任何合伙财产的现金及资产净值总额（扣除根据法规第 752 款规定财产接受股东所必须承担并以该分配所得财产作为偿还担保的负债）；（b）该股东所分摊的亏损额；（c）根据本合约条款规定特地分摊的具有费用或亏损性质的任何项目；以及（d）本合伙公司对该股东承担的任何负债或者以该股东向本合伙公司缴纳的任何财产作为偿还担保的负债。

(c)　　前述规定以及本合约中与资本账户维护相关的其他规定旨在符合财政规章第 1.704-1(b) 款规定，对其所作解释及应用应与该款规定相一致。若业务执行股东合理地认为：为了审慎起见，应当改变资本账户、或该等账户任何借方金额或贷方金额的计算方法以遵循财政规章规定，则业务执行股东可进行此类改变。

(d)　　若合伙公司的资产总值按照资产总值定义中的规定获得调整，则所有股东的资本账户应同时获得调整，以反映出总体调整净值，如同本合伙公司的确认利润或亏损等于该调整净值一般。

(e)　　若本合约公司的任何权益按照本合约条款规定转让，则受让人应按经转让权益所涉及的范围承让转让人的经调整资本额。

3.4　　**给于股东的分配。**

(a)　　除资本交易外的营业利润应按照股东的股份比例分配给股东。

(b)　　除资本交易外的营业亏损应按照股东的股份比例分摊给股东。

(c)　　资本交易所产生的利润应按下列规定进行分配：

(i)　　首先，在本合伙公司的营业期限内，若先前分摊给股东的累计亏损超出该期限内分配给股东的累积利润，则利润应当以抵消其亏损的方式，按照与本合约第 3.4(b)、3.4(d)(ii) 以及 3.4(d)(iii) 款所规定的向股东分摊亏损的优先顺序相反的优先顺序分配给该等股东（即上一次分摊的亏损应由下一次分享的利润所抵消），直至所有累计亏损额均以利润额抵消为止。

8

772957.4

(ii)　　随后，再按照该等股东的股份比例进行分配。

(d)　　资本交易所产生的亏损应按下列规定进行分配：

(i)　　首先，在本合伙公司的营业期限内，若先前分配给股东的累计利润超出该期限内分摊给股东的累积亏损，则亏损应当以抵消利润的方式，按照与本合约第 3.4(a)、3.4(c)(ii) 款所规定的向股东分配利润的优先顺序相反的优先顺序分摊给股东（即上一次分享的利润应由下一次分摊的亏损所抵消），直至所有累计利润额均以亏损额抵消为止。

(ii)　　接着，向资本账户余额为正数的股东按照其余额比例分摊，直至该等股东的资本账额减少到零为止。

(iii)　　随后，再按照该等股东的股份比例进行分摊。

3.5　　特殊分配。尽管本合约第 3.5 款有相反规定：

(a)　　以下特殊分配应按照下列顺序进行：

(i)　　最低盈利抵偿。若公司最低盈利额在任何一会计年度出现净减额，进行本合约第 3.5 款项下的任何其他分配之前，公司应将该会计年度（若有必要，应包括随后几年）的收入及利润，按每名股东对公司最低盈利额的净减额（依照财政规章第 1.704-2(g)(2) 款规定进行确定）所分摊比例及金额，特别分配给每名股东。本 3.5(a)(i)款的制定及解释旨在符合财政规章第 1.704-2(f)款中的"最低盈利抵偿"规定。

(ii)　　公司无追索权债务最低盈利抵偿。尽管本合约第 3.5 款有相反规定，若股东无追索权债务最低盈利在本公司的任何一会计年度间出现净减额，公司应将该会计年度（若有必要，应包括随后几年）的收入及利润特别分配给每名享有股东无追索权债务最低盈利份额的股东（依照财政规章第 1.704-2(i)(5)款规定进行确定），分配的收入及利润金额应相当于每名股东对股东无追索权债务最低得利净减额（依照财政规章第 1.704-2(i)(4)款规定进行确定）所应有的份额。上句规定之项目应按规定须分配给每一名股东的金额比例进行分配。公司对拟分配项目应按照财政规章第 1.704-2(i)(4) 款规定加以确定。本 3.5(a)(ii) 款的制定及解释旨在符合财政规章中的"最低盈利抵偿"规定。

(iii)　　合乎规定的收入抵偿。尽管本合约第 3.4 款另有规定，公司任何一位股东若未预期的收到依照财政规章第 1.704-1(b)(2)(ii)(d)款的(4)、(5)或(6)项规定所述的资本帐额的调整、分摊或分配，则须尽快以足以消除由该调整、分摊或分配所产生的任何调整后资本账赤字的金额及方式，特别向该股东分配公司的收入及利润。本 3.5(a)(iii) 款对"合乎规定的收入抵偿"内容的制定及解释旨在与财政规章第 1.704-1(b)(2)(ii)(d)(3) 款规定相一致。

9

772957.4

108

      (b)     无追索权扣除项。股东应特别按各自的股份比例分摊任何会计年度间或其他时期所产生的无追索权扣除项。

      (c)     股东无追索权扣除项。任何须承担（或视为承担）无追索权减项的股东所产生的相关的经济损失风险应根据财政规章第 1.704-2(i)(2) 款规定应特别分摊任何会计年度或其他时期所产生的股东无追索权扣减项。

3.6     特定额外分摊项。

      (a)     关于以实物形式分配给股东的资产：（a）该资产的所有未实现增值或未实现减值应视为在分配之前合伙公司已经实现的利润或损失；以及（b）该利润或损失应根据本合约第 3.4(c) 或 3.4(d) 款规定分摊到资本账户。按此形式分配给股东的任何财产应视为由业务执行股东所确定的财产价值减去与该财产相关的（由获得财产分配的股东承担或以该分配所得财产作为偿还担保的）任何负债额后的余额。本 3.6 款规定与本合约的任何其他规定均无意将此类分配项目视为或促使他人视之为有偿资产出售。就本合约第 3.6 款而言，"未实现增值"或者"未实现减值"是指由业务执行股东确定的该资产价值与合伙公司的该资产价值之间的差额。

      (b)     所得税法规第 704(c) 款之分配规定。由股东缴纳现金以外给本公司的财产、或者按照本合约"资本账户"定义中的第 (d) 条规定以重新评估的财产、或者（为了便于在分配财产時结合考虑该财产的纳税标准与其公评市值之间的变动情况）根据法规第 704(c) 款规定准许分配給该股东用于缴纳所得税的财产，任何与上列财产相关的收入、盈利、亏损及扣减项目，应以计算所得税为唯一目的，按法规第 704(c) 款规定所要求或准许的形式并采用财政规章第 1.704-3(b) 款规定的"传统方法"对其进行分配，除非资金股东之间另外约定采用财政规章适用条款所准许的其他方法进行分配。

3.7     法律法规遵守条款。股东打算依照法规第 704(b) 及 704(c) 款规定的准许范围内按照本合约第三条规定确定各股东在本合伙公司纳税项目中的分配额。因此，尽管本合约有任何相反规定，若本合伙公司得知：由于符合法规第 704(b) 及 704(c) 款规定的任何些新条例或条例修正案的施行，或者任何些法规的权威性解释的颁布，公司在联邦所得税缴纳问题上可能无法遵循本合约第三条分配规定，则股东与业务执行股东应修改本合约的分配，以确保该等分配项目规定至少在联邦所得税缴纳问题上得以遵循。

3.8     税务股东的税务选择与决定。业务执行股东应具有税务股东的身份。业务执行股东应不时促使本合伙公司作出所有其认为符合本合伙公司以及股东最高利益的税务选择。税务股东应具有法规第 6231 款所规定的含义，应在税务机关对本合伙公司事务进行的所有审查（包括司法及行政程序）中代表本合伙公司办理相关事务，费用由本合伙公司承担，并且应使用本合伙公司的资金支付专业服务及其相关费用。若税务股东出于任何种原因不再具有上述能力或者失去作为一名股东或业务执行股东的身份（视情况而定），则业务执行股东可另外指定一名（尽可能具有股东身份的）税务股东。

3.9     税务股东的职权。税务股东有权，但並无义务行使下列的职责：

10

      (a)    与美国国内税务署或财政部长签署所有涉及税务审核或司法审查方面的协议书，该税务股东可在此类合约中明确表明：该合约对其他股东具有约束力，除非任何股东（在法规及该合约所规定的期限内）向财政部长呈交一份说明该税务股东无权代表该股东签署任何安排合约的声明书。

      (b)    若该税务股东收到国税局通知，要求合伙公司内部对股东纳税时必须考虑的任何项目作最终行政调整（以下简称为"最终调整"），该税务股东可就该最终调整寻求司法审查，包括向税务法院、本合伙公司主营业所所在地的美国地方法院、或者美国索赔法院出申请重新调整，并就任何法院的判决提出上诉。

      (c)    介入其他股东对最终调整司法审查采取的任何行动。

      (d)    随时向财政部长提出行政调整请求，若该请求的任何一部份未获得财政部长的同意，可就该部分请求提出司法审查申请。

      (e)    與国税局簽署延长股东纳税时必须考虑的任何项目（或受此类项目影响的项目）的税务核定期限。

      (f)    在适用法律或行政法规的准许范围内，代表股东或合伙公司采取其他与行政或司法税务程序相关的行动（包括聘请税务顾问），税务股东可在其认为适当且有必要的情况下，将其作为税务股东所拥有的权利及义务转授给税务顾问。

    3.10    <u>股份转让时的分配</u>。转让股东与替代股东之间应采用业务执行股东选用的且法规第 706 款规定准许的方法，分配利润与亏损及其相应的税项。

## 第 4 章

### 分配项目

    4.1    <u>抽回资金</u>。除非本合约另有明确规定，任何股东均无权从本合伙公司抽回资金或接收任何资金分配或退还。本合约所规定的本合伙公司资产仅限于（根据本合伙公司的账簿记录）分配给在业务执行股东所指定日期持有本合伙公司股票的人（且该股东在该日期有权获得此类分配）。

    4.2    <u>有限责任股东的分配</u>。执行股东同意暂停并累计其获得营业流动现金分配及下列<u>第 4.3 及 4.4 款</u>项下之资本交易收益的权利，直至有限责任股东分配到以调整资本额每年百分之五（5%）的非复利计算累计回报为止。有限责任股东分配到累计每年百分之五（5%）的非复利回报后，所有执行股东即可获得全部盈余分配，<u>直至其暂停及累计的分配额支付完毕为止</u>。

    4.3    <u>营业流动现金</u>。每一名股东应按照其股份比例获得营业流动现金分配。

    4.4    <u>资本交易收益</u>。在本合伙公司未解散的任何一年间，资本交易产生的收益应按下列规定分配给股东：

11

772957.4

                (a)     首先，按股东的经调整资本额比例进行分配，直至减少到零为

止；以及

                (b)     此后，按股东的股份比例向所有股东分配余下的资本交易收益。

**4.5** <u>解散与清算</u>。在本合伙公司解散当年，清算分配应按照本合约<u>第 9.4 款</u>规定进行。

**4.6** <u>预提税</u>。若本合伙公司有义务预提并扣缴股东的税款，所有必须预提的税款可从应付该股东的分配中扣减，并可向适当的税务机关缴付。任何一名股东向税务机关预提并扣缴的任何金额，应从该股东的资本账户中扣划，如同该税款金额已分配给该股东一般。

**4.7** <u>禁止实物分配</u>。除非本合约另有特殊规定，股东无权索取或接收任何作为资金回报的非现金财产或分配。

**4.8** <u>再融资收益的分配决定权</u>。就<u>第 4.4 款</u>规定而言，若业务执行股东决定通过再融资或其他资产重组交易（替代应税处分）变卖合伙财产，则善意行使其酌处权的执行股东与执行委员会商议后，应确定再融资或重组交易的收益额可视为资本交易。

**4.9** <u>启动资金分配</u>。业务执行股东已自愿为本合伙公司缴纳金额约肆拾万美元（$400,000.00）的资本额，包括购买合伙财产的预存款和认购费、开发该合伙财产所需的可行性研究费用、律师费、土地规划费以及其他费用及开销。业务执行股东所缴纳的资本额应于创投交易时分配给该业务执行股东，另外每年应按该业务执行股东自愿缴纳资金余额的百分之十（10%）向其分配优先回报。

**4.10** <u>分配限制</u>。尽管本合约有任何与此相反的规定，本合伙公司及代表本合伙公司的执行股东不得以股东拥有本合伙公司权益为由，向股东分配任何违反法案或其他适用法律的财产。

# 第 5 章

## 有限责任股东

**5.1** <u>有限责任股东的身份识别</u>。本合伙公司的有限责任股东名称列在<u>附件 A</u>中，业务执行股东不时对该附件进行修改及更改，以反映新增有限责任股东的加入以及有限责任股东在本合约准许的转让范围内转让其股份后产生的替代有限责任股东的加入。

**5.2** <u>有限责任股份的私人性质</u>。无论在任何情况下，有限责任股份应属于私人财产。本合伙公司拥有的所有不动产或动产应视为以一个整体归本合伙公司所有，有限责任股东均不享有所有者权益。

**5.3** <u>责任限制</u>。每一名有限责任股东应根据法案及其他适用法律对本合伙公司的债务及义务承担有限责任。

12

772957.4

5.4　　辞职或退股。除非本合约另有规定，有限责任股东不得辞职或退伙或者抽回有限责任股东的资金或资本账额。

5.5　　有限责任股东的管理权。除非本合约另有特别规定，有限责任股东无权管理或约束本合伙公司；然而，本 5.5 款规定不适用于同时具有执行股东身份的有限责任股东。尽管有上述规定，有限责任股东应成立一个咨询委员会，就法案第 17-303(b)(8)a. 至 (8)n. 款所规定的合伙业务、以及根据美国联邦法规第 8 篇第 204.6(j)(5)(iii) 款规定由相关政府机关确定的任何其他可能必要的咨询权，与执行股东进行商议。若《统一有限责任合伙法》与《法案》对本 5.5 款所述之有限责任股东的规定相抵触，有限责任股东应拥有《统一有限责任合伙法》通常赋予有限责任股东的权利、权力及职责。

5.6　　有限责任股东开除执行股东的权利。拥有（合计至少占所有有限责任股东股份三分之二的）股份的有限责任股东，可在未征得所有执行股东一致同意的情况下，因故免除任何名执行股东的职务，并随后接纳一名替代执行股东。

5.7　　有限责任股东死亡或丧失法定行为能力。任何一名有限责任股东的死亡、法定行为能力的丧失、解散、停业、兼并、合并或者破产均不得构成本合伙公司解散的原因，但该有限责任股东所享有的本合伙公司利润分享权及亏损分担权、本合伙公司财产分配获得权、以及股份转让权应根据本合约条款的规定转让给该有限责任股东的遗嘱执行人、管理人、监护人、接管人或者其他法定代表人或继承人（视情况而定），本合伙公司仍以合伙企业的形式存续。然而，所有此类法定代表人或继承人、或者此类法定代表人或继承人的受让人必须根据本合约第八条的所有规定取得本合伙公司的有限责任股东身份。

5.8　　有限责任股东会议。

　　　　(a)　　对于必须征得所有有限责任股东批准或同意的事务或者有限责任股东有权可依照本合约规定对之采取行动的事务，执行股东可随时召开有限责任股东会议进行投票表决，并应自收到拥有占所有有限责任股东股份百分之三十（30%）以上的一名或多名有限责任股东签署发出的书面要求日起十（10）天内召开有限责任股东会议。所有此类要求应说明要求举行会议的目的以及在该会议上准备表决的事项，包括对本合约的所有修正建议进行逐字说明。此类会议应在本合伙公司总部或者执行股东指定的地点召开，若是通过有限责任股东书面要求召开，会议地址则应为该有限责任股东所指定的美国境内任何地点。

　　　　(b)　　所有根据本 5.8 款规定召开的会议通知应于开会日期前不少于十（10）天但不超出六十（60）天内按每一名有限责任股东的注册地址或者业务执行股东可能书面提供的其他地址寄发至每一名有限责任股东。该通知应以书面形式发出，载明会议召开地点、日期以及时间，并应表明：此通知应按照召集会议之股东的指示寄发。该通知应说明拟举行会议的目的以及在该会议上的拟表决事项，包括对本合约的所有修正建议进行逐字说明。倘若会议延期并转移到美国其他地方举行，且下次会议时间或地点已在会上宣布，则不必发出休会通知。公司不必向亲自或委托他人与会的有限责任股东通知任何有限责任股东会议的时间、地点或目的（除非有任何一位有限责任股东出席的明确目的是在会议时以该会议非法召开或召集为由，反对任何项交易

13

772957.4

**112**

或业务），亦不必向应该通知但在会议之前或之后以书面形式在会议记录中表明放弃获得此类通知权利的有限责任股东寄发上述通知。

(c) 为了判定有限责任股东是否有权获得任何次会议或休会的召开通知、或在会议或休会期间进行投票表决、或毋需通过会议以同意书形式进行投票表决，提请该会议或该项投票表决的执行股东或有限责任股东可提前选定一个登记日期对有限责任股东进行判定。该登记日期不得选在该会议时间或向有限责任股东提交拟表决事项之前的十（10）天至六十（60）天期间，而应选在向有限责任股东邮寄会议通知或提交拟以书面同意形式进行表决的事项的当日。

(d) 每一名有限责任股东均可授权或委托他人处理有限责任股东有权参与的所有事务（比如：放弃获得任何会议通知的权利、或者出席任何次会议或在会议上进行投票表决等等）。每一份委托书均须由该有限责任股东签署。委托书自生效日期起十二（12）个月后无效，除非该委托书另有规定。有限责任股东可撤销其订立的委托书。

(e) 对于任何需得有限责任股东批准或同意的事项、或者任何有限责任股东有权可依照本合约或经采纳适用法规定对之采取行动的事项、或者任何未通过有限责任股东大会而由有限责任股东投票表决的决议，若有股东取得其他有限责任股东签署了针对该项决议的同意书，数量足以达到合约规定的多数赞成或否决股份，且此类同意书已送交执行股东，则该项决议即如同通过大会表决一般具有法律效力。

(f) 有限责任股东若对预备在任何一次大会上提请的决议向业务执行股东提交同意书或否决书，可不必亲自出席该次会议。有限责任股东倘若亲自出席任何一次会议并进行投票表决，其原来递交业务执行股东对议案的同意书或否决书即告无效。

(g) 任何一名有限责任股东收到会议通知后，若无法按照本第五条规定在依法召开的任何次大会上亲自、委托他人或通过提交同意书的方式对由本合约规定必需征得该有限责任股东同意的事项进行投票表决，则应视为已投赞成票。

5.9 **新增有限责任股东的加入。**倘若可认购七（7）单位原始特许股份的首批有限责任股东的股份比例及其他权利未受损并因获得执行委员会的认可，执行股东应获准按照其完全自行制定的条款，接纳新增有限责任股东，股份比例由一名或多名持有股份比例的执行股东进行发售，执行股东有权向政府申请将本合伙公司指定为移民区域中心，以促进新增有限责任股东的加入。

第 6 章

本合伙公司的管理

6.1 **执行股东的专权管理。**除执行委员会所作重大决策和有限责任股东必需予以表决或赞同的事项外，本合伙公司的业务、财产及事务应由执行股东专权管理，执行股东

14

772957.4

应拥有完全的专属性权限、权利及酬情决定权以管理并控制本合伙公司的业务、财产及事务，作出与此相关的决策，并采取与此类管理工作相关的所有惯常或临时行动或活动。

6.2 **开发执行股东**。开发执行股东有职责及义务去：（i）依据执执行委员会的决定申請到公司营业所需的政府許可，並(ii)管理及经营公司的业务 。经业务执行股东批准，并在执行委员会所作重大决策和本合约其他规定准许的情况下，开发执行股东有权自行提交授权申请、聘用专业顾问及承包商、签署并交付（可促使政府对此类开发工程予以授权、且可促进对本合伙公司物业改良工程融资及施工的）公文、合约及法律文书。

6.3 **开发执行股东的权力**。在不影响本合约第 6.1 及 6.2 款规定的一般性但必须在本合约其他规定准许的情况下，开发执行股东应拥有管理并执行本合伙公司的宗旨、业务及事务的所有必要权利，包括但不限于：

      (a)     对本合伙公司物业的开发及施工及其改良方面的所有工作进行指导、监督及管理。

      (b)     审评、选用、分析、拟订、商定、完成并签署、执行并完善所有合约、法律文书及其他公文，采取开发执行股东认为合理的并与本合伙公司物业的开发及施工相关的行动；然而，对于价格超出 100,000 美元或对本合伙公司的约束期限超过三十（30）天的所有合同或合约（简称为"主要合同"），开发执行股东应经执行委员会批准方可签订。

      (c)     关于经执行委员会批准的融资计划，根据执行委员认为对本合伙公司合理的条款从各种渠道为本合伙公司借款及借贷，并为此以本合伙公司的名义签署并交付期票、债券、借据、信托契据、抵押合约、质押合约、担保契约或者其他债务及担保证明；此类借款应应包括以本合伙公司财产作为抵押的贷款。

6.4 **业务执行股东**。业务执行股东应承担以下职责及义务：（i）管理本合伙公司财务及会计方面的所有工作，包括保管本合伙公司的所有银行账户；（ii）为本合伙公司选用会计师并对其工作进行监督，保管本合伙公司的财务账簿记录；（iii）选用法律顾问以管理本合伙公司的所有法律事务，并对其工作进行监督；（iv）选用并管理所有地产经理、酒店及水疗中心经营者、马术中心管理人员、以及负责出售或出租本合伙公司物业的地产经纪人，并批准通过本合伙公司物业的所有租约、经营特许、营业合约及管理合约。经业务执行股东批准，且在本合约其他规定准许的情况下，业务执行股东有权自行聘用专业顾问及承包商、签署并交付（有助于业务执行股东履行职责及义务的）公文、合约及法律文书。

6.5 **业务执行股东的权力**。在不影响本合约第 6.1 及 6.4 款规定的一般性但必须在本合约其他规定准许的情况下，业务执行股东应拥有管理并执行本合伙公司的宗旨、业务及事务的所有必要权利，包括但不限于：

      (a)     对本合伙公司业务方面的所有工作进行指导、监督及管理。

772957.4

(b)    审评、选用、分析、拟订、商定、完成并签署、执行并完善所有合约、法律文书及其他公文，并采取业务执行股东认为合理的并与本合伙公司业务相关的行动；然而，所有重大决策必须通过执行委员会的批准方可执行。

(c)    以本合伙公司的名义开立银行账户，并在该等银行账户上开立支票，管理该等银行账户，提供该等银行账户的物权担保，并发出有关该等银行账户的其他指示。

(d)    为本合伙公司签订借款或负债合约，抵押或转让与此类合约相关的本合伙财产的担保物权。

(e)    为本合伙公司签订无担保借款或负债合约，并同意以资本增值部分和利润分享作为此类无担保融资的回报。

(f)    根据经执行委员会批准的条款出售本合伙公司的全部或部分财产。

(g)    编制本合伙公司的年度预算（以下简称为"年度预算"），其中本合伙公司的预计成本费用应包括但不限于总务及行政开支、权利资格成本、建造成本、执行股东取得薪酬。

(h)    将本合伙公司的行政总部迁到其他地方，并选址安置本合伙公司的一个或多个附属机构。

(i)    选用或开除所有本合伙公司的高级职员、专业顾问、代理人及雇员，对该等人员赋予与法律或本合约规定相一致的权力和职责，确定其薪酬额度，并要求其提供忠诚供职保证。

(j)    对有利于或有损于本合伙公司的所有索赔或责任向法院提起诉讼、予以抗辩或进行和解，对此类索赔或责任争议提请仲裁，或接受所有牵涉本合伙公司且对本合伙公司不利的诉讼判决。

(k)    聘用法律顾问、会计师、审计师和与本合伙公司业务相关的其他专业人士，并依业务执行股东所定薪酬制度，支付该等受聘人员的劳务报酬。

6.6    **本合伙公司与执行股东之间的交易。** 尽管会有利益冲突存在，经执行委员会批准，执行股东或其关系人可从事所有与本合伙公司或合伙财产相关的交易（包括但不限于购买、出售、出租或交换任何财产、或提供任何服务、或设立任何薪金或其他薪酬项目或制定其他雇佣条款）

6.7    **费用。** 本合伙公司应向执行股东支付或偿还本合约的拟订费用（包括但不限于法律及会计费用开支）本合伙公司应支付或偿还执行股东在履行本合约项下之职责时产生的合理而必要的业务费用。对于所有可偿还费用，应于偿还请求提交时予以适当及详

16

772957.4

**115**

细的备案，备案格式及方式应符合本合伙公司的费用报告政策以及适用联邦及州政府的纳税记录保存要求。

6.8　**时间及精力。** 执行股东毋须将其所有营业时间及经商精力投入到本合伙公司。执行股东仅需依照合理的商业惯例，向本合伙公司投入足以管理本公司事务的时间和精力。

6.9　**执行股东解散、丧失行为能力或破产。** 倘若任何一位执行股东解散或破产，则其在本合伙公司的股东身份应予以终止并撤销。

6.10　**执行股东薪酬。** 执行股东有权根据由业务执行股东编制并经执行委员会批准通过的年度预算，获得本合伙公司所支付的薪酬。

6.11　**重大决策。** 以下行为属于"重大决策"，未经执行委员会批准或同意，执行股东不得实施：

　　　　(a)　　批准签订主要合同

　　　　(b)　　批准通过年度预算

　　　　(c)　　与执行股东的关系人进行任何交易或签订任何合同或合约。

　　　　(d)　　收购本合伙公司通称为"Hacienda De Caballo"的物业以外的其他任何物业。

　　　　(e)　　出售本合伙公司财产。

　　　　(f)　　因故开除任何执行股东。

　　　　(g)　　任何执行股东被开除后，替换该名执行股东。

　　　　(h)　　对本合伙公司进行任何兼并、合并或转换经营机制，重新分类或改变任何股份，或者发行任何新增股份或其他股本权益，但必须获得股份转让许可。

　　　　(i)　　准许非获股权转让许可的新增股东入伙本合伙公司。

　　　　(j)　　准许新增有限责任股东入伙或根据本合约第 5.9 款规定提请政府指定区域中心。

　　　　(k)　　回购或赎回任何股份。

　　　　(l)　　准许本合伙公司自愿解散。

　　　　(m)　　批准通过在执行股东权力及权限范围外或者依本合约规定须征得有限责任股东同意的任何其他事项。

17

5. AUG. 2009 12:12    ILUN HOTEL BEIJING          NO. 539   P. 3

附件 A

<u>认购之投资股份</u>

投资股份数量:          <u>壹股</u>

认购金额:              出资额为每单位伍拾万美元 (US$500,000.00)
                      加开办及管理费贰万伍仟美元, 总计购买价为
                      每单位伍拾贰万伍仟美元 (US$525,000.00),

                      US$ <u>525,000</u>

- 10 -

117

5. AUG. 2009 12:13   KUNLUN HOTEL BEIJING                    NO. 539   P. 9

附件 B

共同加入

第二次重新修订版的苦运合约
卡巴俗有限合伙公司，
特拉华州登记的有限合伙公司

以下签名人共同加入执行卡巴俗有限合伙公司（特拉华州有限合伙企业，简称为"合伙公司"）
之合伙合约（简称为"合约"）。签名人明白，作为该合约的签约方应遵守协议中适用于"有限贵
任股东"的全部条款、约定和条件。

日期： 2009. 8. 5.            地址：中国 黑龙江省. 哈尔
No.127 Anhua St. Daoli District. 滨市 道里区 安化亍 127号
Haerbin City, Heilongjiang Province
China

电话： 13904619988.

传真：_____

陈义亍  Yiguang Chen
有限责任股东的正楷书写姓名

陈义亍
有限责任股东或其授权代表签名

职衔（如果适用）：_____

机构名称（如果适用）：_____

- 11 -

5. AUG. 2009 12:13     KUNLUN HOTEL BEIJING                    NO. 539    P. 5

附件 C

配偶同意书

以下签名人，有限责任股东的配偶，承认以下签名人已阅读并理解 Hacienda DE Caballo, LP（一家特拉华州有限合伙企业，简称为"合伙公司"）的合伙协议（简称为"合约"，此配偶同意书将随附于其后），并知悉"合约"内容。

以下签名人同意，签名人之配偶拥有的以合伙公司投资股份形式存在的任何共有财产或其他婚姻财产单位应受"合约"的条款、约定和条件的约束。

以下签名人同意，签名人之配偶，作为合伙公司的有限责任股东，有购买、出售或转让以下签名人之配偶拥有的投资股份以及转让以投资股份形式存在的共有财产或其他婚姻财产中以下签名人之权益的全部权利、权力和权限。签名人还同意"合约"中规定的任何转让限制或任何强制性或可选的买卖权利。并且，签名人同意，在签名人身亡的情况下，签名人在其生前（通过遗嘱或以托管形式）不得将投资股份之任何单位转让或托管予除其配偶之外的任何人。

以下签名人承认其在签署此配偶同意书之前已按其认为必要之程度征询独立顾问的意见。

日期： 2009. 8. 5

签名 高丽杰

配偶的正楷书写姓名 高丽杰    Lijie Gao

- 12 -

## SUPPLEMENTAL CONTRACT

This document is a supplemental contract made by the General Partners of Hacienda de Caballo, L.P., a California limited partnership (the "Partnership") for the benefit of each Limited Partner investor in the Partnership who intends to apply for an EB-5 Visa (the "Investor"), as follows:

The General Partners agree to return to the Investor the amount of the investment in the Partnership (which is US$500,000) within thirty (30) days upon written notification that the Investor's I-526 or I-829 petition to the US Citizenship and Immigration Service was denied solely by reason of failure of the General Partners to comply with items 1, 2 or 3 below:

1.      The General Partners shall use reasonable efforts to assist Investor's immigration lawyer with the filing of Investor's I-526 and I-829 petitions to the US Citizenship and Immigration Service.

2.      The General Partners shall verify the direct employment requirements for the EB-5 Visa until the removal of Investor's conditional status for permanent residency by supplying reasonable documentation and information to Investor and Investor's immigration lawyer.

3.      The General Partners shall not sell the property supplying requisite job creation before the earlier of (i) removal of Investor's conditional status for permanent residency or (ii) March 31, 2014.

This document may be translated into other languages; however, the English language version shall control and any interpretation of this supplemental contract shall be governed by the law of the State of California of the United States of America.

USA GLOBAL DEVELOPMENT COMPANY
a California corporation

By:

President

# SUPPLEMENTAL CONTRACT

## 附带条约

卡巴悠有限合伙公司，(一个加州有限合伙公司，简称合伙公司)，为保障打算申请投资移民签证的有限责任股东的利益，由无限责任执行股东立定本同意书，作为股东认购合约的附带条约，内容如下：

无限责任执行股东同意在投资人向移民局申请 I-526 或 I-829 时，因执行股东未能尽到以下三项责任而被拒时，退还投资人的投资资金$500,000.00.

1.　　执行股东应尽力协助投资人的移民律师向移民局申办 I-526 或 I-829

2.　　执行股东应提供合理的证件或资料给投资人及投资人的移民律师，证实达到投资移民签证所需的直接雇用条件，直到投资人完成解除条件取得永久居留权为止。

3.　　执行股东在 (i) 投资人完成解除条件取得永久居留权，或 (ii) 2014 年 3 月 31 日以前不得出售提供就业证明的物业产权。

本同意书可翻译成其他语言，但以英文原版为准，本声明书之任何阐述应以美国及加州法律为准。

美国环球开发公司
-　加州註冊公司

By: _____
Thomas Wilkinson 汤玛斯.威金森
President  总裁

B04817.1

6.12　执行委员会。重大决策须按照下文第 6.13 款规定在常设及特别执行委员会上作出。执行股东应对每一项重大决策向执行委员会提出建议，且该执行股东的建议若未被执行委员会否决，则应予以采纳。"执行委员会"应由执行股东所指定的三名成员组成。开发执行股东应指定一名执行委员会成员。业务执行股东应指定两名执行委员会成员。指定执行委员会成员的任何执行股东，依照本合约第 6.12 款规定，可随时或不时向执行委员会发出书面通知，更换其先前指定的任何执行委员会成员。执行委员会指定的首批公司代表为：

| 执行股东： | 代表 |
|---|---|
| 开发执行股东 | James Stout |
| 业务执行股东 | Thomas Wilkinson |
|  | Grace Lin |

6.13　例会及特殊会议。执行委员会应在每个月设定至少一个例会日期。　执行股东可亲自或通过传真寄发通知，召开执行委员会特殊会议，通知应与特殊会议日期前至少两（2）个工作日内发出（除非在有紧急情况发生时，执行股东应根据实际情况，给予最大限度的通知）。另外，若执行委员会成员及其他与会者能够彼此通过电话进行沟通，则所有会议均可完全通过电话召开。

6.14　投票及同意书。有权对执行委员会事务进行投票表决的执行委员会成员（无论是否在场）的绝大多数投票或书面同意书均应构成执行委员会的决议。

6.15　会议地点。执行委员会根据第 6.13 款规定召集的会议应在本合伙公司的总部或由执行委员会指定的地点召开。此类会议的确切日期、地点及时间应由执行委员会决定，但每月绝不能召开一次以上，除非执行委员会认为出现特殊情况，有必要如此。

6.16　有限责任。任何一名执行委员会成员均不对本合伙公司的债务承担任何责任。若有限责任合伙公司未能依照本合约或《法案》的任何规定或要求行使其权力或管理其业务或事务，不得以此为由将合伙公司的责任强加给执行委员会成员个人来承担。

6.17　行为通则。任何执行股东或其他人在本合约所规定的合同义务范围以外，对本合伙公司或其他股东或其他受益或受限于本合约的人士，均不负有任何义务（包括守信义务）。任何执行股东均不对任何有限责任股东或合伙公司承担任何由合伙公司事务产生的任何损失或责任，除非此类损失可能因欺诈、瞒骗、疏忽大意、故意过失或故意违法等对合伙公司产生重大不利影响的行为所导致，或者因未能履行合约所规定的合同义务而对合伙公司产生重大不利影响所引起。执行委员会成员和执行股东的义务应限定在本合约和依据本合约所产生的默示的善意与公平交易合约中所规定的合同义务范围内。

(a)　　执行委员会的每一名成员及执行股东对本合伙公司及其他股东均负有以下义务：

18

772957.4

122

　　　　　　　　(i)　　向本合伙公司述职，作为受托人保管本合伙公司的业务经营或清算过程中或本合伙公司财产使用过程中产生的所有财产、利润或利益。

　　　　　　　　(ii)　　避免作为或代表拥有对本合伙公司不利之权益的当事方，在本合伙公司的业务经营或清算过程中与本合伙公司进行交易。

　　　　　　　　(iii)　　避免实施严重的过失或不计后果行为、故意过失、或故意违法行为

　　　　　　(b)　　执行委员会成员及执行股东不可因实现个人利益的行为而违反《法案》或本合约中的责任或义务规定。

　　　　　　(c)　　执行股东可贷款给合伙公司并与本合伙公司进行其他交易。在每一项贷款或交易中，执行股东的权利及义务与不具有执行股东身份的人士一样，但此规定受其他适用法律所规限。

　　6.18　　独立活动。执行股东、执行委员会成员或其关系人可独立或与他人从事其他任何性质及类型的业务或商业（或持有其中的权益），包括与本合伙公司业务相同或类似且直接形成竞争的业务或商业。合伙公司或任何股东均无权以合约为由拥有该独立商业中的任何权利或由此产生的收入或利润。执行股东、执行委员会成员及其关系人均无义务向合伙公司提供可能出现的或者任何企业、法人、商号、个人或其他组织取得得的以任何方式可从中获利的商业机会；执行股东、执行委员会成员及其关系人应有权为自身利益争取投资机会或推荐给他人。

　　6.19　　利益冲突。执行股东、执行委员会成员、或其关系人均有权进行其认为可能与本合伙公司形成竞争的任何交易或使本合伙公司受益的任何商业活动，本合伙公司明确了解：任何些股东可从事与本合伙公司可能从事的交易类似的交易事务。与本合伙公司进行的交易事务不得仅因为执行股东、执行委员会成员或其关系人直接或间接拥有其中的利益而取消，只要该交易对本合伙公司而言公平公正，且执行委员会已得知该交易的重大实情并予以授权、批准、认可。

　　6.20　　需经股东批准的行动。未事先征得持有百分之七十五（75%）或以上股份的股东同意，依照本合约规定，业务执行股东与执行委员会均无权促使本合伙公司实施下列行动或交易：

　　　　　　(a)　　与合伙公司章程相抵触的任何行动；

　　　　　　(b)　　变更合伙公司章程内容；

　　　　　　(c)　　股东提请执行委员会办理的任何其他事项。

　　6.21　　代理人的保障。本合伙公司应为任何一名执行股东抗辩、对其进行赔偿、并使其免受损害；并可根据执行委员会自行作出的决定，对由于曾经、目前或已经拥有本合伙公司执行股东、高级职员、雇员、法人代表或其他代理人身份或者曾应本合伙公司的诸

19

772957.4

求担任其他有限责任合伙公司、法人、合伙组织、合资企业、信托机构或其他企业的经理、董事、高级职员或其他代理人的原因而曾经或目前或可能即将成为拟起诉、已起诉或已结案之诉讼当事方的任何其他当事人（所有此类人统称为"受偿人"），在本合约签署日期当天有效适用法律的准许范围内（并在本合约签署日期之后的适用法律可能规定的更大准许范围内），竭力为其抗辩、对其进行赔偿、并使其免受损害。业务执行股东应有权代表本合伙公司，根据其经营有判断认为适当的价格及条件，随时与依本合约规定有权获得合伙公司补偿的任何当事人签署补偿合约。业务执行股东可自行促使本合伙公司于法院作出任何相关裁定、裁决或判决之前，向受偿人支付抗辩费用。

6.22    保险。本合伙公司应投保的保险包括但不限于一般性商业责任保险，包括非自有车辆责任险、财产及意外伤害险、办公室或设备租约规定的保险、贷款人要求投保的保险、劳工保险以及业务执行股东认为合适的其他保险。

6.23    具有有限责任股东身份的执行股东。任何执行股东若购买或受让任何有限责任股东的全部或任何部分权益，则可同时拥有有限责任股东的身份，并可依照本合约规定加入合伙公司成为一名有限责任股东，职责上各方面应视为一名有限责任股东，包括享有对有限责任股东可进行投票的所有事务进行投票表决的权利。任何执行股东的此类身份转变毋须征得任何有限责任股东同意。

6.24    外资拥有权。每一名有限责任股东在此同意随时提供执行股东所需的有关有限责任股东的外国国籍、住所、股份所有权或支配权的资料，以便执行股东可评估并遵循适用于本合伙公司的行政或税务规定，或评估适用合伙公司的投资建议。

第 7 章

合伙会计

7.1    合伙税务处理。股东有意完全按照联邦所得税规定以合伙公司身份报税。股东不得在报税表或其他地方宣称任何与此意向相反的内容、或作任何否定合伙税务处理意向的活动。

7.2    会计方法。本合伙公司应按照业务执行股东自行制定的会计标准保管其账簿。

7.3    会计年度。本合伙公司的财政年度（以下简称为"会计年度"）以日历年度为准，除非业务执行股东根据适用的税务法律改变会计年度的算法。

7.4    财务及业务记录。

(a)    记录维护。业务执行股东应维护本合伙公司的财务及业务记录或促使其得以维护。

(b)    所得税资料及记录。业务执行股东应在每一会计年度结束后的九十（90）天内寄发给股东申报个人联邦及州政府所得税申报所必需的有关资料或连同

20

772957.4

124

包括至少由资产负债表及损益表构成的合伙公司的财务报告（可以但不须已经由独立注册会计师审核）的合伙公司的年度报告的资料，或者促使此类信息得以寄发。

第 8 章

股份转让

8.1    有限责任股东转让。只有符合下列所有条件时，有限责任股东才能转让其拥有的一个或多个完整权益单位构成的股份的任何部分。

(a)    转让权益的有限责任股东可不保留任何股份，或保留由一个或多个完整权益单位构成的股份。

(b)    受让人书面同意承担依照本合约及有限责任转让股东所签订之认购合约上规定有关合伙公司权益的所有义务，包括本合约以下规定的转让条件的义务。

(c)    受让人作出转让有限责任股东签署的认购合约中规定的所有申明及保证，并以让业务执行股东满意的方式向其证明：该转让不会违反对该受让人、转让有限责任股东或转让股份具有约束力的任何法律或法规。

(d)    业务执行股东已批准通过该受让人提议（业务执行股东有绝对酌情权拒绝通过该提议）以及转让合约提案，其中至少包括：（a）转让股东的名称、（b）受让人的名称、地址及纳税人代码、（c）股份转让日期、（d）转让股东有意让受让人在转让的权益范围内代替其成为股东；

(e)    业务执行股东基于达到满意的法律顾问的意见断定该转让或处分不会（a）造成违法；（b）导致本合伙公司因联邦或州政府所得税处理方面的原因而停业；或者（c）导致本合伙公司以法人身份缴纳联邦所得税。此外，不得出售或转让任何有限责任股东的股份，任何企图出售或转让此类权益的行为均不具法律效力，本合伙公司毋须对任何该等交易行为赋予效力，除非（a）该交易行为已依照证券管理条例 1033 条的规定正式登记并依据各州法律或阳光法取得许可或批准，或者（b）发行人事先以令业务执行股东感到满意的证明（包括提供业务执行股东感到满意的法律顾问意见），证实毋须对该交易进行登记、资格鉴定或通过核准。

8.2    无效转让。任何试图进行的与本合约规定相抵触的有限责任股东股份转让均无效。

8.3    执行股东转让。在符合下列一项或多项条件的情况下，执行股东可转让其全部或部分股份。

(a)    在业务执行股东进行权益转让的情况下，Tom Wilkinson 控制对受让权益的业务执行股东的管理。

21

772957.4

(b)　　在开发执行股东进行权益转让的情况下，William Phillips 或 James Stout 或两者一同控制对受让权益的开发执行股东的管理；或者

(c)　　执行委员会善意确认：受让股份的执行股东拥有履行对该转让所要求的、与执行股东权益相关的责任及义务所需的知识、技术及经验。

第 9 章

**本合伙公司的解散**

9.1　　**导致解散的事件。**发生下列任何一项事件时，本合伙公司应当解散：

(a)　　**合伙资产出售。**本合伙公司的全部或实质性全部资产的出售或处分。

(b)　　**股东的批准。**持有大多数股份比例的无过失股东通过投票或同意书形式予以批准。

(c)　　**业务执行股东的决定。**业务执行股东可决定解散本合伙公司。

9.2　　**禁止因其他事件解散本合伙公司。**股东明确同意，本合约第 9.1 款规定以外的事件不得构成本合伙公司解散的原因。

9.3　　**清算责任。**本合伙公司解散时，业务执行股东应清算本合伙公司的事务，然而，若是根据司法判决进行的解散，清算工作必须依照该解散判决进行。清算本合伙公司事务的任何股东应有权获得合理补偿。

9.4　　**清盘与分配。**负责清算本合伙公司事务的任何人应充分估计本合伙公司的资产及负债，在争取公评的清算价格的同时及时清算本合伙公司的资产，并按下列顺序对本合伙公司的资产清算收益及应收账款（连同以实物分配的资产）进行分配：

(a)　　**合伙债务。**支付所有合伙公司债务及清算费用。

(b)　　**准备金。**设立清算人认为必要的准备金，以支付/履行可能或不可预见的债务/责任。

(c)　　**股东义务。**支付/履行股东承担的所有合伙债务/责任，若可用资金的不足，则应按该债务/责任的金额/数量比例进行支付/分摊。

(d)　　**股东。**本公司进行清算分配或任何一名股东的权益被清算时，所有收入及亏损项目应根据本合约第三条规定分摊到该股东的资本账户上，其他贷记及扣减项目应于最终分配之前从该股东资本账上扣减。股东之间的最终分配应根据其资本账户中的正数余额进行分配，直至将每一名股东的资本账户余额调整到零为止。本

-22-

772957.4

**126**

9.4(d) 款规定应根据财政规章第 1.704-1(b)(2)(ii)(b) 款中的第（2）项规定进行解释，并根据该项规定所作的任何修订或后续条款或公布的权威性解释加以理解。

9.5   资本账赤字。在所有应税年度（包括清算当年）中的所有资金、分配及分摊生效后，若任何股东的资本账中出现赤字，则该股东在任何时候均无义务向本合伙公司偿还或归还依据本合约合理分配的所有或任何部分债务，亦无义务向本合伙公司缴纳任何与该赤字相关的资本额，且该赤字不得视为对本合伙公司或任何其他人士或组织的欠债。

第 10 章

杂项规定

10.1   通知。除非本合约另有规定，本合约所要求或准许的所有通知或其他通讯均应以书面形式按下列任何一种方法交付并寄发（视情况而定）：（a）亲手交付；（b）隔日商务信差或递送服务商递交；（c）（预付邮费并要求回执的）挂号信；或者（d）传真。任何此类通知或其他信件在下列任何一时间应视为已收悉并生效（以最早的一个时间为准）：（i）若是亲手交付，则于此类通知或其他信件递送到接收人地址的日期；（ii）若通过隔日商务信差或递送服务商寄发，则于该信使或递交服务商从寄发人接收到此类通知或其他信件时（该信差或邮递服务商（视情况而定）向寄发人开立的邮递发票上注明其接收的时间）起后一（1）天，；（iii）若是通过邮寄寄发，则于寄发人的挂号信或回执中注明的邮寄日期之后的四十八（48）小时；或者（iv）若是通过传真寄发，则于工作日下午四点前寄发的当天（以接收人当地时间为准），或于其他时间寄发的下一个工作日。对所有依据本合约第 10.1 款第一句中的第（b）和（c）项规定通过传真寄发的通知或信件，应于信件发出后的四十八（48）小时以书面形式通过邮寄或送交方式予以确认。本款规定所述之任何通知或其他信件的接收、递送、或寄发日期是指此类信件依据本 10.1 款规定生效的日期。用于寄发本合约项下之通知的地址为：（1）若向本合伙公司或执行股东寄发，则地址为本合约第 2.7 款规定的本合伙公司地址，及（2）若向股东寄发，则为附件 A 中规定的地址。

地址变更通知应按本 10.1 款规定的方式以书面形式发出。任何通知若因地址的变更但是无任何地址变更通知的情况下被拒收或未能交付，则该通知或其他已寄发的信件应视为已被接收。

10.2   变更。

(a)   除非法律要求或为修改附件 A 或本合约另有规定外，执行股东和持有多数股份比例的有限责任股东以书面形式表示同意后，本合约可予以修改；然而，只要不对有限责任股东和本合伙公司产生不利影响，执行股东可经执行委员会批准并不必征得任何有限责任股东同意，即可不时对本合约和章程进行下列修改：（i）根据德拉维尔州法律规定，对要求执行股东和本合伙公司亲自或委托代表采取任何行动的本合约和章程的任何规定进行修改；若德拉维尔州法律对此相关的规定已修改、更改或撤销，则不必再采取此类行动；（ii）在本合约或不符合本合约其他规定的章程中，修改任何模糊不清的规定、纠正任何笔误或补充任何重要规定、或者修

23

改任何印刷、速记或笔头失误或者填补遗漏之处，此类修改必须与本合约规定或本合伙公司缴纳美国联邦所得税的合伙企业的身份一致；（iii）改变本合伙公司的名称；（iv）根据本合约第 5.9 款规定，制定接纳新增有限责任股东的入伙条款以及实现此类入伙的相关规定；或者（v）作出任何有利于有限责任股东或者不会严重有损于有限责任股东的修改；然而，任何修改均不得（1）对本合约内容的任何股东权利或对该股东分摊或分配产生不利影响，或者以本合约规定范围外的费用、义务或负债增加任何股东的责任，除非已征得每一名受此类影响的股东同意；（2）改变有限责任股东的股份比例；（3）未经每一名受影响的有限责任股东同意修改本 10.2 款规定。除前述规定之外，经执行股东同意（不得无理反对），任何有限责任股东可选择不可撤销地放弃其在本合约包括的投票权，由此，就任何投票问题而言，该有限责任股东将不得算为有限责任股东。

　　　　　　　　（b）　　本合约的任何变更仅限在执行股东予以批准的情况下进行，且本合约附件 A 中的任何变更可由执行股东根据有限责任股东依据认购合约所签署的授权委托书的规定代表每一名有限责任股东（执行股东实际上未曾以代理人身份代表其签署本合约的有限责任股东除外）进行。

　　　10.3　　合约之构成。本合约的条款标题仅供参考，不应用以解释本合约。本合约在此处提及的附件是用来对照合约并明确构成本合约的一部分。

　　　10.4　　完整性条款。本合约及其特别提及的其他合约涵括合约各方之间的全部合同，并可取代股东之间先前或同时达成的与本合约标的相关的任何（书面或口头）合同或约定。

　　　10.5　　时间。时间是本合约中的一个要素。

　　　10.6　　副本及签署。本合约可有多份经签署生效的副本，每一份均应视为合约原件，所有副本应构成同一份合约。

　　　10.7　　适用法律。本合约规定应根据德拉维尔州法律进行解释并执行。

　　　10.8　　其他保证。股东同意为实现本合约宗旨、目标及条款规定而签署其他文件及采取法律准许或要求的其他行动。

　　　10.9　　权利放弃。任何股东或本合伙公司不论以明示或暗示的方式同意或放弃追究其他股东的违约责任决不意味着其同意、放弃或免除对方的任何其他违约责任。股东或本合伙公司未对任何其他股东的作为或不作为或违约行为进行控诉（无论持续时间的长短）均不意味着其放弃此类权利。

　　　10.10　　可分割性条款。若具有管辖权的任何法院对本合约任何规定或适用任何当事方或情形的规定失效或不具可行性，本合约的其他规定或适用于该当事方或情形的其他规定仍然有效并应在法律准许范围内充分得以执行。

24

772957.4

10.11　公平法救济。本合约所述的任何股东，除了享有本合约或法律规定以及受本合约所规限的所有其他权利外，还享有所有公平法救济，包括实现该股东在本合约项下之权利的特定履行令及禁止令。

10.12　累加救济条款。根据本合约规定，本合约规定的或目前/今后根据现行法律、公平法、政府法规或其他规定所享有的每一项权利、权力及补救均可累积共存，并应与本合约规定的或目前/今后根据现行法律、公平法、政府法规或其他规定所享有的其他所有权利、权力及补救累加，且该等权利、权力及补救的行使或开始行使或延期行使不得排除本合伙公司或该股东同时或以后行使任何一项或所有该等其他权利、权力及补救措施。

10.13　申明及保证的权利、义务及继续有效性。本合约所包含的契约及合约对各合约方的利益及其约束力应继续适用其各自的继承人及受让人。本合约中股东的申明、保证及保障条款在该股东身份结束或本合伙公司停业后仍持续有效。

10.14　第三方受益人禁止条款。本合约仅限于为股东设立可执行的权利，绝不对任何其他人士产生权利或义务。在不影响前述一般性规定的情况下，对任何第三方而言，股东的资本账号赤字不应视为该股东的债务，亦不应视为本合伙公司的资产或财产。本合约不得有任何为本合伙公司第三方债权人的利益设立条款或可执行的规定。

10.15　放弃分产权。除非法律对本合伙公司的清算、清盘及解散事务另有规定，每一名股东据此不可撤销地放弃所有可分割本合伙公司任何财产的权利。

10.16　授权委托书。每一名有限责任股东（执行股东尚未以代理人身份代表其签署本合约的有限责任股东除外）在此确认：其已依法委派每一名执行股东、各执行股东的主管人员、各执行股东的股东、各执行股东的股东的主管人员、以及上述人员的任何继任人，在有限责任范围内根据认购合约中的授权委托书所规定的条款作为其合法代理人。执行股东一旦进入破产程序或经具有管辖权的法院裁决为不具行为能力时，该委托即告终止。

10.17　代表范围。每一名股东据此确认并同意：关于本合约的起草、拟订及商议、本合伙公司的成立以及任何与此相关的事务，Jackson、Demarco、Tidus、Petersen 和 Peckenpaugh 仅代表业务执行股东的权益，并不代表其他执行股东或有限责任股东的权益。为本合约任何当事方服务的法律顾问、会计及其他专业人士也可以为本合伙公司服务。若前述申明构成任何利益冲突，各股东在此表示放弃该相冲突的利益。股东进一步确认：为本合伙公司、任何股东或此两者服务的法律顾问、会计及其他专业人士均不应视为其代表行为同时代表与此类事务相关的任何其他股东。

25

772957.4

本合约由合约各方于本合约开头所载日期签订，特此为证。

执行股东：

美国环球开发公司（USA GLOBAL DEVELOPMENT COMPANY）
一家加利福尼亚州公司

签署人：

姓名：Thomas Wilkinson
总裁

有限责任股东：

代表入伙本合伙公司成为有限责任股东并列入附件A中的所有有限责任股东（在下方签名的有限责任股东除外）：

签署人：美国环球开发公司（USA GLOBAL DEVELOPMENT COMPANY）
一家加利福尼亚州公司

签署人：

姓名：Thomas Wilkinson
总裁

26

772957.4

### 《认购合约》

英国居民：本促销材料内容未经依2000年金融服务与市场法授权人员认可。依赖此促销材料进行任何投资活动可能具有重大风险，可能导致投资人全部投资财产或其他资产的损失。

Hacienda de Caballo, LP
3080 Bristol Street
Costa Mesa, CA 92626
电话：949-296-3078
传真：949-296-3079

贵客户：

1.　　在本《认购合约》（以下简称为本"合约"）规定的条款及条件下，签名人（以下简称为"认股人"）在此不可撤销的申请认购美国特拉华州华侨有限公司 Hacienda De Caballo, LP（以下简称为"合伙公司"）（详细说明见附件 A）发行的合伙股份（简称为"股份"），并同意为在附件 A 中规定的每个股份向合伙公司支付伍拾万美元 (US$500,000.00)（以下简称为"出资额"）及开办费及管理费贰万伍仟美元(US$25,000.00)（以下简称为"开办及管理费"），共计伍拾贰万伍仟美元 (US$525,000.00)（以下简称为"购买价"）。

2.　　在签署《认购合约》的同时，认股人应 (i) 向合伙公司支付购买价，且 (ii) 按照附件 B 所附表格签署合伙公司的叁股协议（简称为"叁股书"）交付合伙公司，并应认股人要求，提供合伙公司协议全文。合伙公司的执行股东接受投资者的认购后，此叁股书立即生效，认股人成为合伙公司的有限责任股东。若认股人为已婚人士，认股人应在签署《叁股书》时提供其配偶签署之同意书（见附件C表格）。

3.　　执行股东接受投资者之叁股书及第一期款（见合伙公司协议中之规定），则在任何情况下均不退还认股人开办费。投资金额将长期投入到合伙公司的业务及项目中（在此过程中"有损失风险"），在未来合伙公司财产出售时返还。

4.　　认股人清楚了解并同意，执行股东和合伙公司经过慎重考虑可能因认股人不符合合伙公司及执行股东要求之资格或任何原因拒绝认股人认股申请，包括 (i) 认股人不符合 1933 年证券法第 501(a) 条规定的"合格投资者"，或 (ii) 认购行为不符合美国、任何州或其他政府管辖区的法规规定。如果投资人之认购申请遭到拒绝，在符合所有有关洗钱及类似非法活动的法规下，将依本《认购合约》认股人所列之地址退还其支付的购买价。合伙公司执行股东应在《叁股书》副本上签字后寄回给投资人，通知认股人其叁股书已被接受。

5.　　认股人明白根据美国、国际及其他反洗钱法律、法规、限令、条约或其他限制规定，执行股东或合伙公司在处理认购申请或退款（拒绝投资人之认购申请时）可能要求认股人提供进一步个人证件资料，若认股人不能及时提供所需之证明，可能导致延迟接受认股或退款。签名人同意提供执行股东或合伙公司符合有关反洗钱及相关非法行为之法律规定必要或适当的其他证明。

6.　　认股人明白并同意，合伙公司将尽力在合理范围为认股人提供之资料保密，但在合伙公司有合理理由认为披露是必要、适当或必须的情况下，合伙公司可能因以下原因披露认股人提

供之资料；(a) 为协助律师、会计师或其他有保密责任之顾问人员提供建议、顾问等服务；(b) 依联邦或州证券法律办理股票注册豁免权；(c) 为保护或增进合伙公司或执行股东在任何诉讼、调查、法律行动、法律程序中为当事人、利益方、被告或嫌疑人之权益；或 (d) 合伙公司或任何执行股东为遵守或符合法律、法规、命令、法律程序或任何政府行动诚实以报。

7.      在明白合伙公司需凭认股人、并依照联邦及州证券法律取得股票注册豁免权的情况下，认股人在此向合伙公司申明并保证，以下申明属实无误：

      (a)      认股人具有签署并履行《叁股书》所述条约之权力。

      (b)      认股人为签名页注明之州或辖区居民。

      (c)      认股人是为自己认股而非作为其他人的代理人，且不具有转售、批发、分割、细分或变卖股份的目的，认股人当前亦无销售或转卖股份之意图。

      (d)      认股人符合 1933 年《证券法》"第 501(a) 条"规定的合格投资者。

根据 1933 年《证券法》"限制条款 D"之"第 501(a) 条"规定，认股人要符合合格投资者条件须勾选以下至少一项，表明资格。

_____ 认股人为自然人，其个人资产净值或与配偶共有资产净值，在其投资时，超过 $1,000,000 美金。

✗ 认股人为自然人，其个人收入在最近两 (2) 年均超过 $200,000 美金，或其与配偶近两年的共有收入均超过 $300,000 美金，在任一种情形下，以合理估计，今年可达到同等之收入水平。

_____ 认股人为《证券法》"第 3(a)(2) 款规定的银行、或符合《证券法》第 3(a)(5)(A)款规定的储贷公司或其他机构。

_____ 认股人为符合 1934 年证券交易法修订案第 15 章规定注册注册证券经纪人。

_____ 认股人为符合《证券法》第 2(13)款规定设立的保险公司。

_____ 认股人为 1940 年投资公司法根据上述法律第 2(a)(48)款规定设立注册之投资公司或商业开发公司。

_____ 认股人为美国的一个州政府、州政府的一个或多个下属机构、或州政府或其下属机构的任何代理机构或部门为其员工建立和维护的福利计划，总资产超过 $5,000,000 美金。

_____ 认股人是一个依照 1974 年美国雇员退休收入《证券法》修订案(ERISA)之规定成立的私人企业员工福利计划，并(i) 根据 ERISA 第 3(21)款规定投资决策由以银行、储蓄贷款协会、保险公司或注册投资顾问为信托管理人来决定，(ii)该计划总

- 2 -

资产超过$5,000,000 美金，或(iii)如果为自营计划，投资决策只能由合格投资人作出。



——　认股人为根据1958年美国小型企业投资法修订版第301(c)或(d)款规定成立并经核准的小型企业投资公司。

——　认股人为根1940年投资顾问法第202(a)(22)款规定成立的私人企业开发公司。

——　认股人是(i)1940年投资公司法第501(c)(3)规定的组织，(ii)一个股份有限公司(iii)一个马萨诸塞州或其他州的商业信托机构，或(iv)合伙公司，以上任何一家机构均不是为申购本投资股份而成立，且总资产超过$5,000,000美金。

——　认股人是一家信托机构，总资产超过$5,000,000美金，且不是专为申购本投资项目而成立，其投资事宜由《证券法》第506(b)(2)(ii)款规定之有相当经验人士负责。

——　认股人为一个企业组织，其全部股东人均为合格投资者。

(e)　　　认股人(i)已收到日期为 _____，2009，由合伙公司执行股东的美国环球开发公司（简称为"USAGDC"）拟定的私人投资备忘录（简称为"投资备忘录"），；(ii)已收到并阅读过有关投资项目、投资移民法律及向合伙公司认股所需的所有其他资料；(iii)有向合伙公司、或 USAGDC、或其代表提出任何有关合伙公司及股权问题的机会；且(iv)有机会要求额外资料验证投资项目资料的准确性，认股人并未凭任何其他资料、文章或口头表述决定认股。

(f)　　　认股人明白并同意合伙公司提供的预计未来收益和费用及合伙公司可能获得之财务回报只是基於预期估计。签名人理解合伙公司仍处于初期开发阶段，尚未有获得此等收益之业绩记录。合伙公司的预估是其基于诚实善意的假设，在能取得足够融资、政府相关部门批准、并按业计划开始经营运转的情况下能够获得的结果。该预估并非由独立会计师提供，亦未依会计师协会规定的预估方法计算。假设和预估情况是不能确定的，合伙公司的实际利润可能与预估结果会有差异，甚至可能有相反结果。

(g)　　　认股人已咨询财务、会计、法律及税务方面专家的意见，足夠知情作投资决定。认股人或其投资、法律或税务顾问对投资及商业事宜有相当经验，认股人了解并可承担包括损失全部资金的投资风险。认股人的财务状况可以无需考虑对投资股份的流动性，且不需要变卖投资股份的任何部分来偿付其他现有或未来的担保责任或债务。认股人投资于不能变卖的股份不应占认股人净资产太大的比例，以致投资股份的结果会对认股人资产产生过大影响。

(h)　　　认股人明白合伙公司财务及运营历史有限，对合伙公司进行的投资为投机性投资，具有损失全部投资的风险。认股人表示并保证有足够的经济来源应付现在及个人未来突发事件需要，并了解投资的股份具有高度投机性，可能存在极大风险。认股人有能力承担对投资股份的经济风险，及承担损失全部投资的风险，认股人投资股份的目的和金额符合其投资目标、能力和财力。

- 3 -

(i)　　　　认股人明白目前无投资股份的公开市场，亦不保证将来会有此类买卖市场。认股人已知悉此投资股份未根据 1933 年《证券法》修订案（简称为《证券法》）或任何其他证券法律注册，除非按照证券法注册，或获得豁免注册，必须无限期持有投资股份，认股人明白合伙公司无义务注册投资股份或申请豁免注册。

(j)　　　　认股人不得变卖投资股份之所有或任何部分，除非：(i) 认股人已通知合伙公司将变卖投资股份；(ii) 认股人向合伙公司提交律师的意见，表明变卖投资股份无需依《证券法》办理股票登记；及 (iii) 认股人律师的意见应与合伙公司的律师的意见一致。

(k)　　　　认股人明白并同意合伙公司的有限合伙协议书及其他证明投资股份的证书须符合所有政府机构或代理机构的任何规定，包括但不限于以下规定：

该证券尚未根据 1933 年美国《证券法》（简称为：《证券法》）、或各州制定的证券管理条例、或阳光法注册或取得发行资格，除非已按照联邦及各州制定的相关法律或阳光法加以注册及/或取得发行资格，或取得注册或发行资格审核豁免才能公开发行及出售，。因此，该证券不得出售或转让，任何企图出售或转让该证券的行为均不具法律效力，发行人亦毋须对此类交易行为赋予法律效力，除非（a）该交易行为已依照《证券法》正式登记并根据各州法律或阳光法的规定获得许可或批准，或者（b）发行人的律师认为，该证券无须经过注册、资格鉴定或核准，且该交易行为在其他方面均符合所有适用法律的规定。该证券购买者将须承担无限期的投资风险。

(l)　　　　认股人明白，《证券法》第 144 条目前不适用于此投资股份且可能永远不适用，因为合伙公司现在不会且可能未来也不会根据 1934 年《证券交易法修订案》（简称为《交易法》）提交报告，目前没有且可能未来也不会公开提供交易法第 15c2-11 条所规定的资料。此外，认股人明白，即使第 144 条适用，依法可以出售的投资股份数量也是有限的，且必须持有一定时间以上、有公开的特定资料后，在完全符合第 144 条规定的情况下进行。认股人明白，在投资股份不符合第 144 规定的情况下，须符合《证券法》其他豁免条件之规定。

(m)　　　　认股人明白 (i)根据《证券法》第 237 条可出售的投资股份仅限少数金额，且须根据第 144 条规定持有一定在受益时间后进行， (ii) 第 144 条不适用于合伙公司有关的成员或机构。

(n)　　　　合伙公司的股东、执行股东、管理人员、董事、代理人或雇员或其他任何人员从未向认股人明示或暗示地表示、担保或保证可自由转让投资股份、或投资的结果将分配特定比例的利润或金额或补偿、或合伙公司及其股东、执行股东、管理人员、董事、代理人或雇员或其他任何人以任何方式将过去的表现或经验作为预示投资股份或合伙公司业务经营的结果、或合伙公司将在特定日期对认股人分配任何现金或其他方式的补偿，或认股人将因投资合伙公司而享受任何税收减免。

(o)　　　　已建议认股人就投资合伙公司股份的相关法律事宜咨询其律师或法律顾问，就其投资股份相关财务问题（包括对其个人财务状况的全部影响）咨询其财务顾问，并就投资股份的税务问题咨询其税务顾问，而认股人也已在其认为必要的程度上做过所有相关咨询。

- 4 -

134

(p)　认股人未看到、听到或接到任何与投资股份发行和销售有关的广告或其他一般诱导性资料。

(q)　认股人不属于美国与敌对国家贸易法修订案（50 USC App 第一段及及以下后）第二段中所谓的"敌对国家"或"敌对国家支持者"。认股人未违反 (i) 与敌对国家贸易法修订案、(ii) 美国财政部与外国资产控制有关的任何限令修订案（第 V 章，第 6 节 31CFR）或任何法规或有效之法令、或 (iii) 2001 年 10 月 26 日签署生效的美国爱国者法案（Pub. L. 107-56 第 3 章）认股人 (i) 不是反恐怖主义法令第 1 节中所谓的受禁人士或 (ii)就其所知，也未与任何该类受禁人士从事过任何交易或与之有任何关联。

8.　认股人在此不可撤销地指定美国全球开发公司，(加利福尼亚注册公司)为开发营运执行股东，(简称为"执行股东")，作为认股人的实际合法代理人（该代理人可亲自或通过其管理人员、董事或获授权员工全权行事），以其名义签署和认可 (i) 投资备忘录所附的合伙协议书及与认股人签署之参股书，使认股人成为合伙公司之有限责任股东；以及 (ii) 合伙公司的成立及维持营业必需的文件、和合伙公司法律顾问认为符合任何州及联邦法律所必要、适当或需要的文件。此代理权经授予后与权益相关且不可撤销，实际代理人可以签章与单独认股人行使该代理权以及代表合伙公司的全部有限责任股东签署任何文件。

9.　寻求合法进入美国或在美国定居的认股人须同意以下条款：

(a)　美国联邦政府的立法或行政部门可能在不提前通知的情况下修改法律、法规或法律的解释，这些修改可能对认股人或合伙公司不利。

(b)　无法预计签证处理时间。认股人在其签证颁发前不应搬到美国居住。

(c)　申请取得永久居留权的认股人必须有意将美国作为其主要居住地。除非在离开美国前采取适当措施，继续生活在外国的永久居民有被撤销永久居民身份的风险。认股人应就此咨询移民律师。

(d)　8 CFR 216.6 相关章节要求申请永久居民身份的移民需"能创造或在合理期限内创造 10 个全职工作机会雇用合格员工"。每个移民认股人要从有条件永久居民身份转为正式永久居民，必须创造十 (10) 个直接工作机会。对未来直接雇佣的数量是依业务计划估计。市场或其他因素的影响有可能导致难以或不能达到预计制造的就业机会。如果认股人申请解除条件为永久居民身份时预计制造的就业机会延迟或无法达成，则永久绿卡申请可能被延迟批准或拒绝。

(e)　认股人应雇用独立移民律师咨询移民程序及相关法律事宜。认股人应自行支付法定费用。

(f)　执行股东应尽合理努力向认股人提供合理的文件和资料，协助认股人的移民律师递交认股人的 I-526 及 I-829 申请表，并提供所需的直接雇佣纪录证明，直到认股人的永久居民身份的条件解除。执行股东将不会因协助认股人申请永久居民身份收取任何额外费用。

(g)　认股人对合伙公司进行的投资不依赖于或以合伙公司成功提供工作机会为条件，亦不以任何订购者成功获得合法的有条件或无条件美国永久居民身份为条件；合伙公司的合约是同

- 5 -

135

意认股人在申请解除条件变成永久绿卡时维持每个认股人雇用十个合法全职员工的纪录。如果认股人的 I-526 或 I-829 申请因任何原因被拒绝，认股人支付的购买价将不会退还，出资额将留作合伙公司投资并承担"损失风险"的长期投资，仅在未来不限定的时间，于合伙公司资产出售时返还，但是如果认股人的 I-526 或 I-829 申请是因为合伙公司未能向认股人或其移民律师提供合理文件和资料而遭到拒绝，认股人可能因此会遭收不可估量的损失。认股人及合伙公司同意，如果合伙公司 (1) 因违约 (i) 未能在申请解除条件变成永久绿卡时或之前，提供每个认股人雇用十个合法全职员工的纪录，或 (ii) 未能提供认股人或其移民律师合理文件和资料，或 (2) 未能履行上述两项，则合伙公司将赔偿本金五十万美元给认股人。认股人除了五十万美元现金赔偿以外，同意放弃因申请 I-526 或 I-829 被拒对执行股东、合伙公司、主管、董事、经纪人或、代理人、员工或承包商诉讼的权利。

       (h)    执行股东同意，认股人藉以申请移民签证的合伙公司财产在下列时间之前不会出售：(i) 所有认股人的永久居民身份的条件解除，或 (ii)2014 年 3 月 31 日（以较早者为准）。

10.    其他。

       (a)    不得放弃、更改、撤销或终止此《认购合约》或其任何条款，除非得到该放弃、更改、撤销或终止行为涉及的相关方的签名书面同意书。

       (b)    合伙公司或认股人未经另一方事先书面同意，均不得转让此《认购合约》及因其产生的任何权利、补救、义务或责任。

       (c)    此《认购合约》受加利福尼亚州法律管辖并根据加利福尼亚州法律诠释。

       (d)    此《认购合约》可以多个副本形式分别签署和移交，每个副本应视为与原件有同等效力，综合所有副本应视为同一协议。

       (e)    有关合约的所有通知和其他通信应采用书面形式，在当面移交或传真（至以上所载的合伙公司传真号码或签名页所载的认股人传真号码）、或通过美国邮政服务（以预付邮资、要求回执、挂号方式）寄出邮件（至以上所载的合伙公司地址，或签名页所载的认股人地址）九十六 (96) 小时后，应视为已正式移交。

       (f)    此《认购合约》条款应约束协议各方并起算当事人、其继承人、合法代理人、继任者或指定人应得的权益。

       (g)    此合约中包含的所有申明、保证和约定在以下情况下仍保持有效：(i) 认股人死亡或伤残；(ii) 有关交易、证件或文书上非重要性的或对认股人有利之变更，和 (iii) 购买任何投资股份。

       (h)    认股人同意在发生任何会导致《认购合约》中包含认股人之任何申明、保证或约定有不真实或错误的情况时通知合伙公司。

       (i)    时间是本合约的关键要素。在合约内容需要的情况下，任何代词均包括相应的阳性、阴性及中性形式，单数亦包括复数形式，反之亦然。

- 6 -

(j)　认股人申明并保证认股人 (I) 能阅读并理解英语及本《认购合约》和本投资备忘录所有部分中的财务及法律概念，且 (II) 已请可信任的顾问将本《认购合约》和本投资备忘录所有内容译为认股人的母语，并请可信任并能理解英语和本《认购合约》及本投资备忘录中所包含的财务及法律概念的顾问向其解释本《认购合约》和本投资备忘录所有部分中所包含的财务及法律概念。

（后附签名页）

'5. AUG. 2009 12:12   KUNLUN HOTEL BEIJING                   NO. 539   P. 2

为昭信守，合伙公司和认股人于20_09_年_8_月_5_日签署本《认购合约》。

税务 ID 号码：_____          地址：_____

                                              _____

                                        电话：_____

                                        传真：_____

在投资时尚无社会保险号 (SSAN) 或个人税收识别号 (ITIN) 的认股人于投资后必须及时申请并
提供上述编号。如果其所有股东均无 SSAN 或 ITIN，合伙公司可能会被美国国内税务署扣
款。若在合伙公司要求下，认股人未能提供上述编号，需对此类扣款负责。如果投资者需要相
关协助，我们将推荐有资格的相关专业人员。

认股人（个人）（注：此栏建议希望根据 EB-5 计
划获得美国绿卡的认股人签署）：

陈义广                                    陈义广  Yiguang Chen
_____                         _____
签名                                      正楷书写姓名

若为共同所有：

_____                         请选择一项（所有人都必须签名）：
共同所有人签名                                ☐ 共同保有（未亡人自动继承）
                                          ☐ 普通共有
_____                         ☐ 共有财产
共同所有人的正楷书写姓名

认股人（机构）：

_____                         请选择机构类型：
机构正楷书写名称                               ☐ 信托机构
                                          ☐ 产业
代表：_____                      ☐ 有限责任股东
        签名                               ☐ 有限责任股东
                                          ☐ 公司
姓名：_____                      ☐ 其他：_____

职衔：_____

- 8 -

138

To:   Hacienda de Caballo LP,  致：卡巴悠合伙有限公司
      3080 Bristol Street         3080 Bristol Street
      Costa Mesa, CA 92626        Costa Mesa, CA 92626

Re:   Hacienda de Caballo LP   有关：卡巴悠合伙有限公司

I/We _____陈文宁_____, hereby agree to pay a deposit of
US$5,000.00 to secure/for an investment slot for EB-5 in the Hacienda de Caballo LP.
本人，____谨此同意先付 US$5,000.00 訂金，保留以卡巴悠合伙有限公司申请投资移民的一個名额。

US$5,000.00 deposit will be paid immediately to Hacienda de Caballo LP. The balance
of US$520,000.00 will be paid to Hacienda de Caballo LP within 30 days of this agreement
to complete the investment per Subscription Agreement. I/We understand that interest on
the deposit, if any, shall accrue to the benefit of Hacienda de Caballo LP. $5,000.00
Deposit is non-transferable. $5,000 美元訂金会馬上付给卡巴悠合伙有限公司，余額
US$520,000.00 將於簽約 30 天内依據認购指示及合同要求先成投资证明。此訂金如有任何利息，將
屬卡巴悠合伙有限公司。$5,000 美元訂金將不得转销。

Failure to invest the balance of US$520,000.00 within 30 days of this agreement will
result in $5,000.00 of the deposit being forfeited, unless the extension is arranged in
advance. 除非另有約定延展延長期限，投資人未能在签约後 30 天内投入足款 US$520,000 時，視同棄
权。

_____陈文宁_____ x          2009. 8. 5.   x
Signature 签名                        Date 日期

Name 姓名: ____陈文宁_____   Yiguang Chen

E-mail address: _____

Phone 电话: _1390461.9988_____

Address 地址: 中国黑龙江省哈尔    No.127 Anhua St. Daoli District,
滨市道里区安化街127号             Haerbin City, Heilongjiang Province,
                                 China

汇款時请依照下列资料填写正确
**PLEASE FOLLOW WIRE INSTRUCTIONS EXACTLY AS BELOW**

Bank 银行:                  Bank of America
地址:                       31531 Santa Margarita Parkway
                           Rancho Santa Margarita, CA 92688
电话:                       Phone (949) 951-4136
Account Number 帐号:        23530-69883
ABA Number 美国境内汇款代号:  122000661
SWIFT Address 国际汇款代号:   BOFAUS3N
Account name  账户名:        Hacienda de Caballo LP
Investor's Name 投资人姓名:

139

# EXHIBIT "C"

## SUBSCRIPTION AGREEMENT

Hacienda de Caballo, LP
3080 Bristol Street, Ste 630
Costa Mesa, CA 92626
Phone: 949-296-3078
Fax:   949-296-3079

Gentlemen,

1.    On the terms and conditions set forth in this Subscription Agreement (this "Agreement"), the undersigned ("Subscriber") hereby irrevocably offers to subscribe for the number of units ("Units") in Hacienda de Caballo, LP, a Delaware limited partnership (the "Partnership"), as set forth in Exhibit A, and agrees to pay to the Partnership a capital contribution to the Partnership of five hundred thousand United States dollars (US$500,000.00) (the "Capital Contribution") and a set up and administrative fee of twenty five thousand United States dollars (US$25,000.00) (the "Set Up and Administrative Fee") for a total of five hundred twenty five thousand United States dollars (US$525,000.00) for each Unit subscribed in the total amount set forth in Exhibit A ("Purchase Price").

2.    Concurrently with the execution of this Subscription Agreement, Subscriber shall (i) pay to the Partnership the Purchase Price and (ii) execute and deliver to the Partnership the Joinder to the Limited Partnership Agreement (the "Partnership Agreement") of the Partnership in the form attached as Exhibit B, which Partnership Agreement shall be delivered to the Subscriber upon request.  Such Joinder shall be effective to bind Subscriber as a Limited Partner of the Partnership if the subscription by Subscriber is accepted by the General Partners of the Partnership.  If Subscriber is a married individual, then Subscriber shall also provide to the Partnership the executed Consent of Spouse in the form attached as Exhibit C concurrently with execution of this Subscription Agreement.

3.    If the subscription by Subscriber is accepted by the General Partners of the Partnership and the Initial Closing (as defined in the Partnership Agreement) occurs, then the Set Up and Administrative Fee shall not be refunded to Subscriber in any event.  The Capital Contribution amount will be invested "at risk" of loss in the business and project of the Partnership on a long term basis and shall be returned, if at all, when the property of the Partnership is sold at an indefinite time in the future.

4.    Subscriber acknowledges and agrees that the General Partners and the Partnership may reject the offer of Subscriber to subscribe for the Units for any reason in the sole and absolute discretion of the General Partners including failure of Subscriber to satisfy the Partnership and the General Partners (i) that Subscriber is not an "accredited investor" within the meaning of Rule 501(a) under the Securities Act of 1933 or (ii) that the subscription is not in compliance with all other laws or regulations of the United States of America, any state or any other governmental jurisdiction.  If the offer to subscribe for the Units is rejected, then, subject to compliance with all laws regarding money laundering and similar illicit activities, the Purchase Price shall be returned to Subscriber at the address of Subscriber set forth in this Subscription Agreement.  The Partnership shall notify Subscriber of acceptance of the offer to

- 2 -

140

subscribe for the Units by returning to Subscriber a copy of this Subscription Agreement signed by a General Partner of the Partnership.

5.    Subscriber acknowledges that under U.S., international and other anti-money laundering laws, rules, regulations, treaties or other restrictions, the General Partners or the Partnership may require further identification of Subscriber before they will process a subscription or return of fund in the event of rejection of offer of Subscriber to subscribe for the Units and Subscriber's subscription for the Units may be delayed if the undersigned does not provide such required information on a timely basis. The undersigned agrees to provide to the General Partners any additional information regarding the undersigned that the General Partners or the Partnership deem necessary or appropriate to verify compliance with all applicable laws concerning money laundering and similar illicit activities.

6.    Subscriber acknowledges and agrees that, although the Partnership will use reasonable efforts to keep information provided by Subscriber to the Partnership confidential, the Partnership may disclose the information provided by Subscriber if the Partnership reasonably believes that disclosure is necessary, appropriate or required (a) to assist in advice, counsel or services to the Partnership or the General Partners by any attorney, accountant or other advisor bound to protect confidential information, (b) to establish the availability under any federal or state securities laws of an exemption from registration of the offering of the Units, (c) to defend or promote the interests of the Partnership or the General Partners in connection with any litigation, investigation, action, suit or proceeding to which the Partnership or any General Partner is a party, person of interest, defendant or suspect, or (d) to comply with any law, regulation, order, lawful process or any governmental action that the Partnership or any General Partner is, may be, or in good faith believed to be, bound.

7.    Subscriber hereby represents and warrants to the Partnership, knowing that Partnership is relying upon such representations in connection with its reliance upon exemptions from registration or qualification under applicable federal and state securities laws, that the following statements are true and correct:

        (a)    Subscriber has all requisite authority to enter into this Subscription Agreement and to perform all the obligations required to be performed by Subscriber hereunder.

        (b)    Subscriber is a resident of the state or jurisdiction set forth on the signature page hereto.

        (c)    Subscriber is acquiring the Units for Subscriber's own account and not as a nominee or agent for the benefit of any other person and not with a view to the resale, distribution, subdivision, fractionalization or disposition of the Units, and Subscriber has no present intention of selling or otherwise distributing the Units.

        (d)    Subscriber is an accredited investor as defined in Rule 501(a) under the Securities Act of 1933.

TO ESTABLISH THAT THE SUBSCRIBER IS AN ACCREDITED INVESTOR AS DEFINED IN RULE 501(a) OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, THE SUBSCRIBER MUST MARK AT LEAST ONE LINE BELOW, THEREBY MAKING THE REPRESENTATION SET FORTH BESIDE THE MARKED LINE.

- 3 -

_____ Subscriber is a natural person whose individual net worth, or joint net worth with a spouse, at the time of his or her investment, exceeds $1,000,000.

_____ Subscriber is a natural person who has had individual income in excess of $200,000 in each of the two (2) most recent years, or joint income with a spouse in excess of $300,000 in each of those years, and in either case has a reasonable expectation of reaching the same income level in the current year.

_____ Subscriber is a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association or other institution as defined in Section 3(a)(5)(A) of the Securities Act.

_____ Subscriber is a broker-dealer registered pursuant to Section 15 of the Securities Exchange Act of 1934, as amended.

_____ Subscriber is an insurance company as defined in Section 2(13) of the Securities Act.

_____ Subscriber is an investment company registered under the Investment Company Act of 1940 or a business development company as defined in Section 2(a)(48) of said act.

_____ Subscriber is a plan established and maintained by a state within the United States, one or more political subdivisions of such a state, or any agency or instrumentality of such a state or its political subdivisions, for the benefit of its employees, with total assets in excess of $5,000,000.

_____ Subscriber is an employee benefit plan within the meaning of the U.S. Employee Retirement Income Security Act of 1974, as amended (ERISA), and (i) the investment decision is being made by a plan fiduciary, as defined in Section 3(21) of ERISA, which fiduciary is either a bank, savings and loan association, insurance company or registered investment adviser, (ii) the plan has total assets in excess of $5,000,000, or (iii) if a self-directed plan, the investment decisions are made solely by persons who are accredited investors.

_____ Subscriber is a Small Business Investment Company licensed by the U.S. Small Business Administration under Section 301(c) or (d) of the U.S. Small Business Investment Act of 1958, as amended.

_____ Subscriber is a private business development company as defined in Section 202(a)(22) of the Investment Advisers Act of 1940.

_____ Subscriber is (i) an organization that is described in Section 501(c)(3) of the Code, (ii) a corporation, (iii) a Massachusetts or similar business trust, or (iv) a partnership, any of which was not formed for the specific purpose of acquiring the Units, and with total assets in excess of $5,000,000.

- 4 -

_____   Subscriber is a trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Units, and whose investment is directed by a sophisticated person as described in Rule 506(b)(2)(ii) promulgated under the Securities Act.

_____   Subscriber is an entity, all of the equity owners of which are accredited investors.

(e)   Subscriber (i) has received the Business Plan, dated March 2009," prepared by the USA Global Development Company ("USA Global"), as the Development General Partner of the Partnership; (ii) has received and thoroughly reviewed all other information requested by Subscriber relating to the Partnership and this investment in the Partnership and deemed necessary by the Subscriber to acquire the Units; (iii) has been given the opportunity to ask questions of and receive answers from the Partnership or their representatives, concerning the Partnership and the Units; and (iv) has been given the opportunity to obtain such additional information as deemed necessary to verify the accuracy of the information provided, and Subscriber has not relied upon any other information, literature or oral communications in deciding to acquire the Units.

(f)   Subscriber acknowledges and agrees that the Partnership prepared *pro formas* and estimates of possible revenues and expenses and the possible consequent financial returns the Partnership could experience if such revenues and expenses were achieved.  The undersigned understands that the Partnership is still in an early stage of development and has no history of achieving such revenues.  The Partnership estimates are based on a good faith belief of what the Partnership can accomplish if it is able to obtain adequate financing, required approvals of governmental authorities and is able to commence and maintain operations in accordance with its current business plan. The *pro formas* were not prepared by any independent accountant and were not prepared with a view toward compliance with the Association of Independent Certified Accountants' guidelines for projections. The assumptions and estimates are uncertain and the actual results of the Partnership will vary from the projected results and could vary in a materially adverse manner.

(g)   Subscriber has sought such financial, accounting, legal and tax advice as necessary to make an informed investment decision.   Subscriber or Subscriber's investment, legal or tax advisors are experienced in investment and business matters and Subscriber is aware of and can afford the risks of making such an investment, including the risk of losing the entire investment.  The financial condition of Subscriber is such that there is no need for liquidity with respect to this investment in the Units and no need to dispose of any portion of the Units to satisfy any existing or contemplated undertaking or indebtedness.  The overall commitment by Subscriber to investments that are not readily marketable is not disproportionate to Subscriber's net worth and will not become excessive as a result of this investment in the Units.

(h)   Subscriber understands that the Partnership has a limited financial and operating history and that an investment in the Partnership represents a speculative investment which involves a high degree of risk of loss of the undersigned's entire investment.  Subscriber represents and warrants that Subscriber has adequate means of

- 5 -

143

providing for current needs and personal contingencies, and is aware that an investment in the Units is highly speculative and subject to substantial risks. Subscriber is able to bear the economic risk of an investment in the Units and can afford to sustain a total loss on such investment, and the nature and amount of Subscriber's investment in the Units is consistent with his investment objectives, abilities and resources.

(i)     Subscriber understands that there is no public market for the Units and there is no assurance that there will be such a market in the future. Subscriber has been advised that the Units have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or under any state securities laws, and that the Units must be held indefinitely unless they are subsequently registered under the Securities Act, or an exemption from such registration is available, and understands that the Partnership is under no obligation to register the Units or to comply with any exemption from such registration requirement.

(j)     Subscriber shall not make any disposition of all or any part of the Units unless and until (i) the Subscriber shall have notified the Partnership of the proposed dispositions; (ii) the Subscriber shall have furnished the Partnership with an opinion of counsel to the effect that such disposition will not require registration of such Units under the Securities Act; and (iii) such opinion of counsel shall have the concurrence of the Partnership's counsel.

(k)     Subscriber understands and agrees that the Limited Partnership Agreement of the Partnership and any certificate evidencing the Units may bear any legend required by any governmental body or agency including, but not limited to, the following legend:

THIS SECURITY HAS NOT BEEN REGISTERED OR QUALIFIED UNDER THE SECURITIES ACT OF 1933 (ACT) OR THE SECURITIES OR BLUE SKY LAWS OF ANY STATE AND MAY NOT BE OFFERED AND SOLD UNLESS REGISTERED AND/OR UNTIL QUALIFIED PURSUANT TO THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES OR BLUE SKY LAWS OR AN EXEMPTION FROM SUCH REGISTRATION OR QUALIFICATION IS APPLICABLE. THEREFORE, NO SALE OR TRANSFER OF THIS SECURITY SHALL BE MADE, NO ATTEMPTED SALE OR TRANSFER SHALL BE VALID, AND THE ISSUER SHALL NOT BE REQUIRED TO GIVE ANY EFFECT TO ANY SUCH TRANSACTION UNLESS (A) SUCH TRANSACTION SHALL HAVE BEEN DULY REGISTERED UNDER THE ACT AND QUALIFIED OR APPROVED UNDER APPROPRIATE STATE OR BLUE SKY LAWS, OR (B) THE ISSUER SHALL HAVE FIRST RECEIVED AN OPINION OF COUNSEL SATISFACTORY TO ISSUER THAT SUCH REGISTRATION, QUALIFICATION OR APPROVAL IS NOT REQUIRED AND THAT SUCH TRANSACTION OTHERWISE COMPLIES WITH ALL APPLICABLE LAW. PURCHASERS OF SUCH SECURITIES WILL BE REQUIRED TO BEAR THE RISK OF THEIR INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.

(l)     Subscriber understands that Rule 144 under the Securities Act does not presently apply and may never apply to the Units because the Partnership does not now, and may never, file reports required by the Securities Exchange Act of 1934, as amended (the

- 6 -

144

"Exchange Act"), and has not made, and may never make, publicly available the information required by Rule 15c2-11 of the Exchange Act. Furthermore, if Rule 144 becomes available, Subscriber understands that sale of the Units made in reliance thereon can be made only in certain limited amounts, after certain holding periods and only when there is available specific current public information, all in accordance with the terms and conditions of Rule 144. Subscriber understands that, in the case of the Units to which Rule 144 is not applicable, compliance with some other exemption under the Securities Act will be required.

(m)     Subscriber understands that (i) any sales of securities made in reliance on Rule 237 under the Securities Act can only be made in very limited amounts after a beneficial holding period in accordance with the terms and conditions of Rule 144, and (ii) that Rule 144 is not available to affiliates of the Partnership.

(n)     No Partner, General Partner, officer, director, agent or employee of the Partnership or any other person has at any time expressly or implicitly represented, guaranteed, or warranted to him that he may freely transfer the Units, that a percentage of profit or amount or type of consideration will be realized as a result of an investment in the Units, that past performance or experience on the part of the Partnership and its Partners, General Partners, officers, directors, agents and employees or any other person in any way indicates the predictable results of the ownership of the Units or of the overall Partnership business, that any cash distributions from Partnership operations or otherwise will be made to Subscriber by any specific date or will be made at all, or that any specific tax benefits will accrue as a result of an investment in the Partnership.

(o)     Subscriber has been advised to consult with his own attorney or legal advisor regarding all legal matters concerning an investment in the Partnership, with his own financial advisor regarding all financial aspects of an investment in the Partnership including all impacts on Subscriber's personal financial circumstances and with his own tax advisor concerning the tax consequences of investing in the Partnership, and has done so, to the extent he considers necessary.

(p)     Subscriber has not seen, heard or otherwise received any advertisement or other general solicitation regarding the offer and sale of the Units.

(q)     Subscriber is not an "enemy" or an "ally of the enemy" within in the meaning of Section 2 of the Trading with the Enemy Act of the United States of America (50 USC App. Section 1 and following), as amended.  Subscriber is not in violation of (i) the Trading with the Enemy Act, as amended, (ii) any of the foreign asset control regulations of the United States Department of Treasury (31 CFR, Subsection 6, Chapter V , as amended) or any enabling legislation or executive order relating thereto, or (iii) the USA Patriot Act, Title 3 of Pub. L. 107-56, signed into law October 26, 2001.  Subscriber is (i) not a blocked person as described in Section 1 of the Anti-Terrorism Order or (ii) to the best of its knowledge, engaged in any dealings or transactions, or is otherwise associated with, any such blocked person.

8.     Subscriber hereby irrevocably makes, constitutes and appoints USA GLOBAL acting alone by and through their officers, directors and authorized employees, with full power of substitution, as Subscriber's true and lawful attorney-in-fact in its name to execute and acknowledge (i) the Partnership Agreement and the Joinder to the Limited Partnership

- 7 -

145

Agreement delivered with this Subscription Agreement to such Partnership Agreement and thereby cause the undersigned to become a Limited Partner in the Partnership; and (ii) any document required to effect the formation or continuation of the Partnership or which counsel to the Partnership deems necessary, appropriate or desirable to comply with any state or federal law. The power of attorney hereby granted is irrevocable and coupled with an interest and may be exercised by the attorney-in-fact for subscriber as well as other Limited Partners of the Partnership by executing any instrument by use of the single signature of such attorney-in-fact acting for all the Limited Partners.

9.      Subscribers who are seeking permission to lawfully enter and reside in the United States of America agree as follows:

(a)     The legislative branch or executive branch of the United States federal government may change the law, regulations, or interpretations of the law without notice and in a manner that may be detrimental to a Subscriber or the Partnership.

(b)     It is impossible to predict visa-processing times. Subscribers should not physically move to the United States until their visa has been issued.

(c)     Subscribers who obtain permanent residence status must intend to make the United States their primary residence. Permanent residents who continue to live abroad risk revocation of their permanent residence status unless proper actions are taken in advance of departing the United States. Subscribers should consult their independent counsel regarding this issue.

(d)     8 CFR 216.6, in pertinent part, requires an immigrant petitioning for permanent residency status to "create or can be expected to create with a reasonable period of time ten full-time jobs to qualifying employees." Removal of conditional status depends upon creating a combination of ten (10) direct jobs for each immigrant Subscriber. Estimates of future direct employment are based upon projections. Market or other factors may make it difficult or impossible to achieve projected employment creation. If predicted employment creation is delayed or not achieved at the time of filing of a petition by a Subscriber to remove conditional status, then an immigrant Subscriber's petition for removal of conditional status may be delayed or possibly denied.

(e)     Subscriber shall hire an independent counsel for immigration processing and other related legal matters. Subscriber shall be responsible for payment of legal fees and costs.

(f)     The General Partners shall use reasonable efforts to assist Subscriber's independent counsel with the filing of Subscriber's I-526 and I-829 petitions, and verifying required direct employment until the removal of the Subscriber's conditional status for permanent residency by supplying reasonable documentation and information to Subscriber or Subscriber's independent counsel. The General Partners will not charge additional fees to assist with Subscriber's permanent residence application.

(g)     The investment in the Partnership by Subscriber is not dependent or conditioned upon success by any Subscriber in achieving lawful conditional or unconditional permanent residency in the United States; provided, however that the Partnership covenants and agrees to provide at least ten (10) full time jobs at its facilities on the Property at the time

- 8 -

necessary for Subscriber's timely application for removal of conditional residence status, for support of Subscriber's I-526 or I-829 petition. If Subscriber's I-526 or I-829 petition is denied for any reason, then the Purchase Price paid by Subscriber shall not be returned, refunded or paid back but the Capital Contribution shall remain "at risk" of loss as a long term investment in the Partnership to be returned, if at all, when the property of the Partnership is sold at an indefinite time in the future; provided, however, that the Partnership covenants and agrees that the Partnership shall supply reasonable documentation and information to Subscriber or Subscriber's legal counsel for Subscriber's I-526 or I-829 petition. If the Partnership does not fulfill its contractual duty regarding provision of jobs on or before the time necessary for Subscriber's timely application for removal of conditional residence status, or if Subscriber's I-526 or I-829 petition is denied solely by reason of failure of the Partnership to supply reasonable documentation and information to Subscriber or Subscriber's legal counsel for Subscriber's I-526 or I-829 petition, then the parties agree that Subscriber will suffer damages in an amount that cannot be readily ascertained. Subscriber and the Partnership agree that if the Partnership (1) breaches either of (i) its covenant and agreement to provide jobs on or before the time necessary for Subscriber's timely application for removal of conditional residence status or (ii) its covenant and agreement to supply reasonable documentation and information to Subscriber or Subscriber's independent counsel for Subscriber's I-526 or I-829 petition or (2) breaches both of such covenants, then the Partnership shall pay to Subscriber liquidated damages equal to and limited to US$500,000.00. Except for payment of the liquidated damages by the Partnership provided herein, Subscriber hereby waives any claims against the General Partners, the Partnership or their officers, directors, agents, employees or contractors related to denial of Subscriber's I-526 or I-829 petition for any reason.

(h)    The General Partners agrees that the property of the Partnership that Subscriber relies upon for Eb5 visa approval shall not be sold until the earlier of (i) removal of Subscriber's conditional status for permanent residency or (ii) July 31, 2014.

10.    Miscellaneous.

(a)    Neither this Subscription Agreement nor any provisions hereof shall be waived, changed, discharged or terminated except by an instrument in writing, signed by the party against whom any waiver, change, discharge or termination is sought.

(b)    Neither this Subscription Agreement nor any right, remedy, obligation or liability arising hereunder or by reason hereof shall be assignable by either the Partnership or Subscriber without the prior written consent of the other party.

(c)    This Subscription Agreement shall be governed by and construed in accordance with the laws of the State of California.

(d)    This Subscription Agreement may be executed and delivered in any number of counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which together shall be deemed to be one and the same agreement.

(e)    All notices and other communications provided for herein shall be in writing and shall be deemed duly given at the time of delivery if such notice is personally delivered or delivered by facsimile, or ninety six (96) hours after mailing if such notice is deposited with the United States Postal Service, postage prepaid, for mailing via certified or

- 9 -

147

registered mail, return receipt requested, to the Partnership at the address or facsimile number set forth above, or to the Subscriber at the address or facsimile number set forth on the signature page hereto.

(f)    The provisions of this Subscription Agreement shall be binding upon and accrue to the benefit of the parties hereto and their respective heirs, legal representatives, successors and assigns.

(g)    All representations, warranties and covenants contained in this Agreement shall survive (i) the death or disability of Subscriber, (ii) changes in the transactions, documents and instruments described herein that are not material or that are to the benefit of Subscriber, and (iii) the purchase of any Units.

(h)    Subscriber hereby covenants and agrees to notify the Partnership upon the occurrence of any event that would cause any representation, warranty or covenant of Subscriber contained in this Subscription Agreement to be false or incorrect.

(i)    Time is of the essence of this Agreement.  Whenever required by the context, any pronoun shall include the corresponding masculine, feminine, and neuter forms, and the singular shall include the plural, and vice versa.

(j)    SUBSCRIBER REPRESENTS AND WARRANTS THAT SUBSCRIBER EITHER (I) READS AND UNDERSTANDS THE ENGLISH LANGUAGE AND UNDERSTANDS THE FINANCIAL AND LEGAL CONCEPTS ADDRESSED IN THIS SUBSCRIPTION AGREEMENT OR (II) HAS HAD THIS SUBSCRIPTION AGREEMENT TRANSLATED INTO SUBSCRIBER'S NATIVE LANGUAGE BY A TRUSTED ADVISOR AND HAS HAD THE FINANCIAL AND LEGAL CONCEPTS ADDRESSED IN THIS SUBSCRIPTION AGREEMENT EXPLAINED TO SUBSCRIBER IN SUBSCRIBER'S NATIVE LANGUAGE BY A TRUSTED ADVISOR WHO UNDERSTANDS THE ENGLISH LANGUAGE AND UNDERSTANDS THE FINANCIAL AND LEGAL CONCEPTS ADDRESSED IN THIS SUBSCRIPTION AGREEMENT.

(Signature Page to Follow)

- 10 -

148

IN WITNESS WHEREOF, the Partnership and Subscriber have each executed this Subscription Agreement to be effective the _____ day of _____, 20___.

Tax ID Number: _____

Address: _____

_____

Phone: _____

Fax: _____

**Subscribers who do not have a social security account number (SSAN) or an individual tax identification number (ITIN) at the time of the investment must apply for and provide one in a timely manner after the investment. The Partnership can be fined by the Internal Revenue Service if all of its Partners do not have SSAN or ITIN. Subscribers who fail to provide such number upon the request of the Partnership will be liable for any fines incurred. We will refer qualified professionals to investors who need assistance in this regard.**

**SUBSCRIBER INDIVIDUAL (Note:  Individual Subscriber is recommended for Subscribers intending to obtain a Green Card under the EB-5 program.):**

_____

Signature

Print Name

If Joint Ownership:

_____

Signature of Co-Owner

Check one (all parties must sign):
☐ Joint Tenants with Right of Survivorship
☐ Tenants in Common
☐ Community Property

_____

Print Name of Co-Owner

**SUBSCRIBER ENTITY:**

_____

Print Name of Entity

Check type of entity:
Trust
Estate
Limited Partnership
Limited Partnership
Corporation
Other: _____

By: _____

Signature

Name: _____

Title: _____

- 11 -

149

(SIGNATURE OF ACCEPTANCE BY GENERAL PARTNER)

HACIENDA DE CABALLO, LP

GENERAL PARTNER

USA GLOBAL DEVELOPMENT COMPANY,
a California corporation

by: _____
    Name: Thomas Wilkinson
    Its: President

- 12 -

Exhibit A

**UNITS SUBSCRIBED**

Number of Units: _____

Amount of Subscription: A Capital Contribution of Five Hundred Thousand Dollars (US$500,000.00) per Unit plus the Set Up and Administration Fee of Twenty Five Thousand Dollars (US$25,000.00) per Unit for a total Purchase Price of Five Hundred Twenty Five Thousand Dollars (US$525,000.00) per Unit.

US$_____

- 13 -

Exhibit B

**JOINDER**
**TO**
**SECOND AMENDED AND FULLY RESTATED OPERATING AGREEMENT**
**FOR HACIENDA DE CABALLO, LP,**
**A DELAWARE LIMITED PARTNERSHIP**

The undersigned hereby joins in the execution of the Partnership Agreement (the "Agreement") for Hacienda de Caballo, LP, a Delaware limited partnership (the "Partnership"). The undersigned understands that the undersigned shall be a party to the Agreement subject to all of the terms, covenants and conditions applicable to a "Limited Partner."

Dated:_____

Address:_____

_____

_____

Phone:_____

Fax:_____

_____
Printed Name of Limited Partner

_____
Signature of Limited Partner or Authorized
Representative

Title (if applicable):_____

_____
Name of Entity (if applicable)

- 14 -

Exhibit C

## CONSENT OF SPOUSE

The undersigned, the spouse of a Limited Partner, acknowledges that the undersigned has read and understands the Partnership Agreement (the "Agreement") of Hacienda de Caballo, LP, a Delaware limited partnership (the "Partnership"), to which this Consent of Spouse is to be attached, and knows its contents.

The undersigned agrees that any community property or other marital property Units in any Units in the Partnership owned by the spouse of the undersigned shall be subject to the terms, covenants and conditions of the Agreement.

The undersigned agrees that the undersigned's spouse, as the Limited Partner of the Partnership, shall have the full right, power and authority to purchase, sell or transfer the Units owned by the spouse of the undersigned and to transfer, assign and convey all of the community property or other marital property rights of the undersigned in the Units. The undersigned further consents to any restrictions on transfer as provided in the Agreement and to any mandatory or optional buy-sell rights as provided in the Agreement. Further, the undersigned agrees that in the event of death of the undersigned, the undersigned shall not transfer or dispose of any Units in the Units by will or by trust to any person other than the spouse of the undersigned during the lifetime of the spouse of the undersigned.

The undersigned acknowledges that the undersigned has sought, to the extent believed necessary, the advice of independent counsel in executing this Consent of Spouse.

Dated:_____

_____
Signature

_____
Printed Name of Spouse

- 15 -

153

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I. (a) PLAINTIFFS  ( Check box if you are representing yourself ☐ ) | DEFENDANTS  ( Check box if you are representing yourself ☐ ) |
|---|---|
| YIGUANG CHEN, an individual | USA GLOBAL DEVELOPMENT COMPANY; AMERICAN LIFE, INC.; THOMAS G. WILKINSON; JAMES STOUT; GRACE LIN |

| (b) County of Residence of First Listed Plaintiff   China | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |

| (c) Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. | Attorneys *(Firm Name, Address and Telephone Number)* If you are representing yourself, provide the same information. |
|---|---|
| MUSICK, PEELER & GARRETT LLP<br>One Wilshire Boulveard, Suite 2000<br>Los Angeles, California 90017-3383<br>(213) 629-7823 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☐ 3. Federal Question (U.S. Government Not a Party)

☒ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☒ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No    ☒ **MONEY DEMANDED IN COMPLAINT:** $ 3,150,000

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. Section 1332(a) Diversity Action. Fraudulent scheme to convert money collected from immigrant Plaintiff and his family for investment in U.S. commercial enterprise to secure visas under EB-5 Visa Program pursuant to 8 U.S.C. Section 1153(b)(5).

**VII. NATURE OF SUIT** (Place an X in one box only).

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/Etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt Org.
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Info. Act
☐ 896 Arbitration
☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.)
☐ 153 Recovery of Overpayment of Vet. Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment

**REAL PROPERTY CONT.**
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**
**PERSONAL PROPERTY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpractice
☐ 365 Personal Injury-Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**TORTS**
**PERSONAL PROPERTY**
☒ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accomodations
☐ 445 American with Disabilities-Employment
☐ 446 American with Disabilities-Other
☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus/Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405 (g))
☐ 864 SSID Title XVI
☐ 865 RSI (405 (g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

| FOR OFFICE USE ONLY: | Case Number: | CV14-08764 |
|---|---|---|

CCD-CV71

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII.   VENUE**: Your answers to the questions below will determine the division of the Court to which this case will most likely be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| Question A:  Was this case removed from state court? | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| [ ] Yes   [X] No | [ ] Los Angeles | Western |
| If "no," go to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | Eastern |

| Question B:  Is the United States, or one of its agencies or employees, a party to this action? | If the United States, or one of its agencies or employees, is a party, is it: | | INITIAL DIVISION IN CACD IS: |
|---|---|---|---|
| | **A PLAINTIFF?** Then check the box below for the county in which the majority of DEFENDANTS reside. | **A DEFENDANT?** Then check the box below for the county in which the majority of PLAINTIFFS reside. | |
| [ ] Yes   [X] No | [ ] Los Angeles | [ ] Los Angeles | Western |
| If "no," go to Question C. If "yes," check the box to the right that applies, enter the corresponding division in response to Question D, below, and skip to Section IX. | [ ] Ventura, Santa Barbara, or San Luis Obispo | [ ] Ventura, Santa Barbara, or San Luis Obispo | Western |
| | [ ] Orange | [ ] Orange | Southern |
| | [ ] Riverside or San Bernardino | [ ] Riverside or San Bernardino | Eastern |
| | [ ] Other | [ ] Other | Western |

| Question C: Location of plaintiffs, defendants, and claims? (Make only one selection per row) | A. Los Angeles County | B. Ventura, Santa Barbara, San Luis Obispo Counties | C. Orange County | D. Riverside or San Bernardino Counties | E. Outside the Central District of California | F. Other |
|---|---|---|---|---|---|---|
| Indicate the location in which a majority of plaintiffs reside: | [ ] | [ ] | [ ] | [ ] | [ ] | [X] |
| Indicate the location in which a majority of defendants reside: | [ ] | [ ] | [X] | [ ] | [ ] | [ ] |
| Indicate the location in which a majority of claims arose: | [ ] | [ ] | [ ] | [X] | [ ] | [ ] |

**C.1.  Is either of the following true?  If so, check the one that applies:**

[ ] 2 or more answers in Column C

[ ] only 1 answer in Column C and no answers in Column D

Your case will initially be assigned to the
SOUTHERN DIVISION.
Enter "Southern" in response to Question D, below.

If none applies, answer question C2 to the right. ➡

**C.2.  Is either of the following true?  If so, check the one that applies:**

[ ] 2 or more answers in Column D

[ ] only 1 answer in Column D and no answers in Column C

Your case will initially be assigned to the
EASTERN DIVISION.
Enter "Eastern" in response to Question D,  below.

If none applies, go to the box below. ⬇

Your case will initially be assigned to the
WESTERN DIVISION.
Enter "Western" in response to Question D below.

| Question D: Initial Division? | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, or C above: ➡ | WESTERN DIVISION |

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a).  IDENTICAL CASES:** Has this action been previously filed **in this court** and dismissed, remanded or closed?  [ x ] NO   [ ] YES

If yes, list case number(s): _____

**IX(b).  RELATED CASES:** Have any cases been previously filed **in this court** that are related to the present case?  [ x ] NO   [ ] YES

If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**

(Check all boxes that apply)   [ ]  A. Arise from the same or closely related transactions, happenings, or events; or

[ ]  B. Call for determination of the same or substantially related or similar questions of law and fact; or

[ ]  C. For other reasons would entail substantial duplication of labor if heard by different judges; or

[ ]  D. Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**X. SIGNATURE OF ATTORNEY**
**(OR SELF-REPRESENTED LITIGANT):** _____   DATE: November 12, 2014

Marc R. Greenberg

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

**Key to Statistical codes relating to Social Security Cases:**

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |